# In the United States District Court for the Southern District of Georgia Waycross Division

BRANTLEY COUNTY DEVELOPMENT
PARTNERS, LLC,

     Plaintiff,

     v.

BRANTLEY COUNTY, GEORGIA by and
through its Chairman and
Members of the Brantley County
Board of Commissioners; CHRIS
"SKIPPER" HARRIS, RANDY
DAVIDSON, BRIAN HENDRIX, JESSE
MOBLEY, and RAY GRIFFIN, all in
their individual and official
capacities as Commissioners,

     Defendants.

CV 5:19-109

## ORDER

Before the Court is Plaintiff's Motion for Preliminary
Injunction. Dkt. No. 58. For the reasons below, Plaintiff's
Motion is **GRANTED**.

### Factual Background

Plaintiff Brantley County Development Partners, LLC
("Plaintiff"), is a limited liability company registered to do
business under the laws of the State of Georgia. Dkt. No. 1 ¶ 1.
On December 22, 2014, Plaintiff purchased 2,839 acres of land in
Brantley County (the "Property") to pursue the construction and

operation of a solid waste handling facility. Id. ¶ 9. Under the provisions of Georgia's Comprehensive Solid Waste Management Act (the "CSWMA"), O.C.G.A. §§ 12-8-20 et seq., any person seeking to operate a solid waste handling facility must obtain a solid waste handling permit by application to the Georgia Environmental Protection Division (the "EPD"). In order to proceed through the EPD's permitting process, the applicant must submit certain letters from the local governing authority certifying that the proposed site complies with local land use ordinances and is consistent with the local solid waste management plan. O.C.G.A. § 12-8-24(g).

Before closing on the Property, Plaintiff sought and obtained written verification (the "2014 Verification Letters") from County Manager Carl Rowland ("Rowland") certifying that Plaintiff's proposed solid waste handling facility (the "Proposed Facility") was consistent with Brantley County's solid waste management plan ("SWMP") and local land use plan. Dkt. No. 1-2 at 3. At that time, Brantley County did not have any zoning ordinances in effect at all. Id. at 2.

On February 5, 2015, at a regularly scheduled meeting, the Brantley County Commission, through its Board of Commissioners ("Defendants"),[1] took official action to authorize Plaintiff's

---

[1] Plaintiff is suing the individual commissioners of Brantley County both in their individual and official capacities. Dkt. No. 1 at 1. This includes

Proposed Facility. Dkt. No. 1-4 at 4. The minutes and regular agenda show Plaintiff requested Defendants ratify and confirm the Proposed Facility and related activities were "consistent with [the] local land use plan and [the] Solid Waste Management Plan." Id. Consequently, Defendants authorized the Chairman of the Board of Commissioners, Charlie Summerlin, to execute two letters:

> [T]he first letter acknowledging that the solid waste handling facilities proposed by [Plaintiff] . . . is consistent with the approved Solid Waste Management Plan adopted by Brantley County and the cities of Hoboken and Nahunta on June 26, 2006, and our most recent 2011 Five Year Short Term Work Program 2010-2019; and, the second letter acknowledging that the facilities proposed by [Plaintiff] is consistent with Brantley County's Local Land Use Plan.

Id. The minutes acknowledge that these letters were necessary for Plaintiff to obtain permits from the EPD in order to conduct solid waste material activities. Id.

On February 6, 2015, Chairman Summerlin allegedly signed and issued the letters to Claudia Moeller, an EPD program manager, verifying Plaintiff's Proposed Facility was consistent with the County's SWMP and local land and zoning regulations (the "2015 Verification Letters"). Dkt. No. 1-5 at 3. These letters reiterated that "Brantley County at the present time does not have a zoning ordinance." Id. at 2.

---

Commissioners Chris "Skipper" Harris, Randy Davidson, Brian Hendrix, Jesse Mobley, and Ray Griffin. Id.

On September 8, 2016, Defendants voted to adopt a new land-use ordinance for Brantley County (the "2016 Zoning Ordinance"). Dkt. No. 1-7. Plaintiff contends, however, that it received assurances from Defendants that this zoning would not apply to its Proposed Facility. Dkt. No. 1 ¶ 18. As such, on December 29, 2016, Plaintiff filed a permit application for the Proposed Facility with the Georgia EPD. Dkt. No. 1-11. The EPD accepted the application along with a filing fee for processing. Dkt. No. 58-1 ¶ 9. Plaintiff insists it complied with all applicable state laws and EPD rules and regulations with respect to the submission of its EPD application. Id. ¶ 10.

Beginning in 2017, a noticeable shift occurred in Defendants' stance toward the siting and construction of a solid waste handling facility on Plaintiff's Property. On January 3, 2017, Defendants imposed a 180-day moratorium on any landfills in Brantley County. Dkt. No. 1-12. That same day, Defendants also moved to send a written objection to the EPD regarding Plaintiff's Proposed Facility. Dkt. No. 1-14 at 2. The January 3, 2017 Board minutes show that Defendants moved to instruct all county officials to "immediately cease and desist any communications or efforts with [Plaintiff] or any other individual or entity where the intent is to establish or facilitate a landfill or solid waste handling facility." Id. at 3.

4

On January 6, 2017, County Attorney Deen Strickland, on behalf of Defendants, sent a letter to the Georgia EPD stating that Defendants were unanimously opposed to Plaintiff's Proposed Facility and advising the EPD that Defendants had passed a moratorium on the proposed location. Dkt. No. 1-16 at 2.

On June 15, 2017, Defendants adopted a new county-wide zoning ordinance (the "2017 Zoning Ordinance"). Dkt. No. 58 at 7; Dkt. No. 58-2 ¶ 15. Under this new zoning ordinance, landfills are prohibited on property zoned as "light industrial," which Plaintiff's Property was so designated.[2] Dkt. No. 86-4 at 2. That same day, Defendants also adopted an amended Solid Waste Management Plan (the "2017 SWMP"). Dkt. No. 58-4 at 156. The 2017 plan, as amended, prevents Plaintiff from importing any waste from outside the County, stating:

> any future waste disposal facilities, whether landfill or thermal energy, or other, should be constructed on a size-need basis dependent upon waste generated within the County and its municipalities. Brantley County ... *must limit use of such sites to disposal of wastes generated from only within the County.*

Id. at 211 (emphasis added).

However, soon thereafter, the County Attorney ostensibly realized that, due to a clerical error, the Board's resolution

---

[2] In fact, landfills are not permitted anywhere in Brantley County due the lack of any "Heavy Industrial" zoning districts present in the County. Dkt. No. 86-4 at 2. Moreover, even under the "Heavy Industrial" zoning, landfills would be permitted only with the issuance of a special exception granted by Defendants. Dkt. No. 66 at 28-29.

adopting the 2017 SWMP mistakenly had a *draft* copy of the plan attached to it. Dkt. No. 64-6 at 4. The *correct* version of the 2017 SWMP omits reference to any prohibition on importation of out-of-county waste. Compare Dkt. No. 58-4 at 211 with Dkt. No. 64-6 at 11. On August 6, 2020, Defendants remedied this mistake by passing an amended SWMP (the "2020 SWMP"), which does not state that a solid waste management facility is limited only to the waste of the County. Dkt. No. 64-6 at 4.

Nonetheless, on June 19, 2019, Plaintiff sent a demand letter to Defendants requesting they certify in writing that Plaintiff's Proposed Facility is subject to neither the 2017 Zoning Ordinance nor the 2017 SWMP. Dkt. No. 58-3 at 102. Defendants did not provide the requested confirmation. Dkt. No. 1-26 at 3.

On May 28, 2020, the Georgia EPD issued a Site Suitability Notice confirming that Plaintiff's Proposed Facility can safely meet applicable state laws and EPD regulations. Dkt. No. 48-2. However, before a permit may be issued, Plaintiff must submit a Design and Operational Plan ("D&O Plan"), a public hearing transcript, and a reaffirmation of zoning consistency[3] to the EPD Id. No decision will be made by the EPD until each required submittal is received. Dkt. No. 88-5 at 125.

---

[3] Pursuant to the Rules of the Georgia Department of Natural Resources, written verification of local zoning compliance must be "reaffirmed by the governmental authority prior to permit issuance." Ga. Comp. R. & Regs. 391-3-4-.05(1)(a).

Defendants continue to refuse to provide the necessary reaffirmation of zoning consistency that Plaintiff has requested. Dkt. No. 66 at 59-60. Instead, on July 9, 2020, Defendants adopted a resolution withdrawing the 2015 Verification Letters originally issued by the Brantley County commissioners, asserting that the letters were illegally issued, and thus, void. Dkt. No. 52-5 at 2, 3. Defendants acknowledged that the 2015 Verification Letters were required for Plaintiff to obtain a permit for a solid waste handling facility. Id. at 3.

### Procedural Background

On July 17, 2017, Plaintiff filed a timely complaint against Defendants in the Superior Court of Brantley County (the "State Court Action"). Dkt. No. 52-1. On November 12, 2019, Plaintiff amended its complaint in the State Court Action to assert federal claims for violation of the Takings Clause, procedural and substantive due process violations, and violation of the First Amendment.[4] Dkt. No. 48-1. On November 13, 2019, Plaintiff voluntarily dismissed its complaint in the State Court Action without prejudice. Dkt. No. 52-3.

On November 26, 2019, Plaintiff filed the present action against the County and its members of the Board of Commissioners, both in their official and individual capacities. Dkt. No. 1.

---

[4] These claims are now pled as Counts I, II, and III in the present action. Dkt. No. 1.

Thereafter, on July 8, 2020, Plaintiff amended its complaint to include a claim for violation of the Dormant Commerce Clause of the United States Constitution. Dkt. No. 45 ¶¶ 148-50, 161-63 (the "Amended Complaint"). In its Amended Complaint, Plaintiff challenges the constitutional validity of Brantley County's regulations and prays for injunctive relief barring the enforcement of the regulations. Id. ¶ 170. Plaintiff likewise requests an order requiring Defendants to provide any and all necessary certification(s) to the EPD so Plaintiff's permitting process can proceed. Id. at 9-11. On July 22, 2020, Defendants filed a motion to dismiss the Amended Complaint. Dkt. No. 48.

On September 11, 2020, Plaintiff filed the present Motion for Preliminary Injunction against Defendants. Dkt. No. 58. In that Motion, Plaintiff asks the Court to enter an order prohibiting Defendants from enforcing against Plaintiff the regulations that violate its vested property rights and/or the Dormant Commerce Clause. Dkt. No. 58 at 14. Plaintiff also asks the Court to enjoin Defendants' "continuing hindrance, delay and obstruction in regards to Plaintiff's Application for permit with the Georgia EPD." Id.

On September 24, 2020, the Court held a hearing on Plaintiff's Motion for Preliminary Injunction. Dkt. No. 65. Following that hearing, Defendants filed a motion to expedite discovery, which the Court later granted. Dkt. Nos. 67, 69. Following the close of

expedited discovery, both Plaintiff and Defendants filed additional briefs on the pending Motion for Preliminary Injunction. <u>See</u> Dkt. Nos. 83, 87.

Thereafter, on February 19, 2020, the Court held an evidentiary hearing on the instant Motion for Preliminary Injunction. Dkt. No. 97. Plaintiff's Motion is ripe for review.

## Discussion

As a preliminary matter, Defendants challenge Plaintiff's standing to bring the suit. Defendants also argue that they retain immunity as to the claims raised against them. The Court will address these preliminary issues before turning to an analysis of the preliminary injunction itself.

### I.   Preliminary Issues

### A. Plaintiff's Standing

The Court must first answer the threshold question of whether Plaintiff has standing. Litigants must have standing to properly invoke the jurisdiction of federal courts. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). "In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims, and the court is powerless to continue." <u>Hollywood Mobile Estates Ltd. v. Seminole Tribe</u>, 641 F.3d 1259, 1265 (11th Cir. 2011). To have standing, a plaintiff must show that it: (1) suffered an injury-in-fact; (2) that is fairly traceable to the challenged conduct of the defendant; and

(3) that is likely to be redressed by a favorable judicial decision. <u>Lujan</u>, 504 U.S. at 560.

Here, Defendants contest the injury-in-fact requirement. Dkt. No. 55 at 4. The requirement that a plaintiff suffer an injury-in-fact helps "ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014) (citation omitted). A plaintiff must show that the injury is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" <u>Id.</u> (citation omitted). An allegation of future injury may suffice if the threatened injury is "certainly impending" or there is a "substantial risk" that the harm will occur. <u>Tsao v. Captiva MVP Rest. Partners, LLC</u>, 986 F.3d 1332, 1339 (11th Cir. 2021) (quoting <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398 (2013)).

Plaintiff states in its Amended Complaint that Defendants are utilizing unconstitutional zoning ordinances and regulations to hinder, delay, and block Plaintiff's vested property right. Dkt. No. 1 ¶ 74. Therefore, the alleged injury-in-fact is Defendants' hindrance of Plaintiff's ability to receive a permit from the EPD.

On December 29, 2016, Plaintiff filed the requisite permit application for the solid waste handling facilities with the Georgia EPD. <u>Id.</u> Plaintiff has demanded that Defendants provide requisite certifications in writing to complete processing and approval of the application pending before the EPD. Dkt. No. 1

¶ 58. Plaintiff asserts that Defendants refuse to provide the zoning certification sought by Plaintiff in its June 19, 2019 request. Id. ¶ 59. Moreover, Defendants bolstered this position at the September 24, 2020 hearing—stating affirmatively that the Defendants are unwilling to provide a reaffirmation of zoning consistency without the Court ordering them to do so. Dkt. No. 66 at 59:19-25, 60:1-2.

The EPD's site suitability notice made clear that "reaffirmation of zoning consistency must be submitted to EPD prior to a final decision regarding the issuance of a permit." Dkt. No. 48-2. Only *after* receiving this required reaffirmation from Defendants will Plaintiff's Solid Waste Handling Permit either be issued or denied. Consequently, Plaintiff's EPD permit application will remain pending indefinitely so long as Defendants continue to "hinder, delay[,] and obstruct" Plaintiff's right to develop its property. Dkt. No. 1 ¶¶ 59, 84.

Defendants argue that no injury to Plaintiff exists because neither Defendants nor the EPD has actually *denied* Plaintiff's permit application. Dkt. No. 48 at 9, 13. As such, Defendants contend that the "claimed injury from the County's actions has not occurred." Id. at 9; cf. Tinsley Media, LLC v. Pickens Cnty., Ga., 203 F. App'x 268, 272 (11th Cir. 2006) ("[The plaintiff] has shown 'injury in fact' because it was denied a permit to erect the billboards.").

11

However, Plaintiff need not wait until denial of its EPD permit to bring this suit. "The delayed processing of [an] application[] . . . constitutes an injury in fact." Roma Outdoor Creations, Inc. v. City of Cumming, Ga., 599 F. Supp. 2d 1332, 1339 (N.D. Ga. 2009); see also MSPA Claims 1, LLC v. Tenet Fla., Inc., 918 F.3d 1312, 1318 (11th Cir. 2019) ("The question is whether delay alone is a 'concrete' injury. It is."). This is especially true when, as is the case here, permit denial may never occur *because of* Defendants' alleged improper obstruction. As noted in the site suitability notice, the EPD's issuance of a permitting decision is contingent upon its receipt of a reaffirmation of zoning from the local governing authority. Not having an application processed timely is a distinct injury from the ultimate denial of the application itself. Roma, 599 F. Supp. 2d at 1339.

Moreover, in making a standing determination, the Court fails to see a meaningful distinction between the indefinite delay of a permit decision and denial of a permit. Without judicial resolution, Defendants' precluding the EPD's final decision obstructs Plaintiff from receiving a permit just as effectively as denial would. Justice delayed is often justice denied—this is certainly true where the looming delay is set to continue in perpetuity.

12

Plaintiff has presented sufficient evidence for the Court to conclude that, for the purposes of standing, Defendants' alleged conduct indefinitely delays Plaintiff's ability to proceed with the EPD permitting process. The alleged hindrance, delay, and obstruction of Plaintiff's application is sufficient to constitute an injury-in-fact. Accordingly, Plaintiff has shown that it has standing to pursue this action.

### B. Defendants' Immunity

Defendants also contend they are entitled to various forms of immunity as to the claims before the Court, thus precluding Plaintiff's requested injunctive relief. Dkt. No. 87 at 9.

### 1. Qualified Immunity

Plaintiff brings a Dormant Commerce Clause claim against Defendants in their individual capacities. Defendants contend they are entitled to qualified immunity on that claim. Dkt. No. 48 at 30. However, the qualified immunity defense has no application to charges asserted against government actors in their individual capacity to gain prospective relief. Rogers v. Miller, 57 F.3d 986, 988 n.4 (11th Cir. 1995). "Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." Ratliff v. DeKalb Cnty., 62 F.3d 338, 340 n.4 (11th Cir. 1995).

Before the Court is Plaintiff's Motion for Preliminary Injunction—a request for prospective relief. As such, to the extent non-monetary relief is sought, qualified immunity does not bar Plaintiff's Dormant Commerce Clause claim against Defendants in their individual capacities.

## 2. State Law Immunity

Plaintiff also brings state law claims against Defendants in their official and individual capacities. Defendants contend the "County and the individual commissioners are entitled to sovereign immunity" on the state law claims, and that the individual commissioners are further entitled to official and legislative immunity. Dkt. No. 63 at 5-6.

### a. Sovereign Immunity

Defendants argue that both the County and the individual commissioners are entitled to sovereign immunity. Id. Under Georgia law, sovereign immunity extends to the State and all of its departments and agencies, including counties and their commissioners. Carter v. Butts Cnty., Ga., 821 F.3d 1310, 1323 (11th Cir. 2016). As such, counties and other political subdivisions of the state are absolutely immune from such suits, unless that immunity has been specifically waived pursuant to an act of the General Assembly. Hackett v. Fulton Cnty. Sch. Dist., 238 F. Supp. 2d 1330, 1367 (N.D. Ga. 2002). An individual defendant sued in his official capacity is also entitled to the benefit of

14

the sovereign immunity defense, so long as the State has not waived it. Carter, 821 F.3d at 1323.

At the time this action commenced, the doctrine of sovereign immunity precluded claims seeking injunctive and declaratory relief against the County and its commissioners in their official capacities. Lathrop v. Deal, 801 S.E.2d 867, 879-80 (Ga. 2017).[5] As a result, both the County and the board of commissioners are entitled to sovereign immunity against the state-law vested rights claim unless Plaintiff can show that sovereign immunity has been waived.

Plaintiff, however, presented no argument or evidence that sovereign immunity has been waived for the County as to the vested rights claim. And the Court can find no basis for concluding that sovereign immunity has been waived.[6] The burden of demonstrating a waiver of sovereign immunity falls on the party seeking to benefit from it. See Smith v. Chatham Cnty., 591 S.E.2d 388, 389 (Ga. Ct. App. 2003). Because Plaintiff has not satisfied this burden, Plaintiff is barred from seeking prospective relief

---

[5] The Court notes that a recent constitutional amendment has since altered the applicability of sovereign immunity to claims for declaratory and prospective relief. See Ga. Const. art. I, § 2, ¶ V. As of January 1, 2021, sovereign immunity is waived for actions seeking declaratory relief from acts of the state. However, such waiver applies only to acts which occur on or after January 1, 2021. Id.; see also Donaldson v. Dept. of Transp., 414 S.E.2d 638, 641 (Ga. 1992) ("Under Georgia law, a waiver of sovereign immunity occurs at the time that the cause of action arises.").

[6] While Plaintiff does assert a waiver for other claims—such as its supposed Takings Claim under Article I, Section III, Paragraph I of the Georgia Constitution—this does not extend a waiver of sovereign immunity to the remaining claims alleged.

against the County and the commissioners in their official capacities.

### b. Official Immunity

Unlike suits against state officers in their official capacities, claims seeking relief against public officials in their individual capacities are not barred by sovereign immunity. Lathrop, 801 S.E.2d at 876. With regard to Plaintiff's individual capacity state-law claims, Defendants contend the commissioners are entitled to official immunity. Dkt. No. 55 at 20-21. Official immunity generally applies "to government officials and employees sued in their individual capacities." Roberts v. Mulkey, 808 S.E.2d 32, 35 (Ga. Ct. App. 2017). The official immunity doctrine derives from Article I, Section II, Paragraph IX (d) of the Georgia Constitution, which states:

> all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.

Ga. Const. art. I, § 2, ¶ IX. This language applies to officers and employees of counties as well as those of state departments and agencies. Morgan v. Barnes, 472 S.E.2d 480, 481 (Ga. Ct. App. 1996). Importantly though, the Georgia Supreme Court has held that "Article I, Section II, Paragraph IX (d) concerns suits and

liabilities of public officers for monetary damages and other retrospective relief. It does not limit the availability of prospective relief." Lathrop, 801 S.E.2d at 891. As such, "the doctrine of official immunity does not bar suits for declaratory or injunctive relief brought against county officers in their individual capacities." Love v. Fulton Cnty. Bd. of Tax Assessors, 821 S.E.2d 575, 585 (Ga. Ct. App. 2018).

Here, Plaintiff seeks injunctive relief enjoining Defendants from enforcing regulations against Plaintiff's property. Dkt. No. 63 at 13; Dkt. No. 1 at 42. Plaintiff seeks this relief against the commissioners in their individual capacities. Consequently, for purposes of this Motion for Preliminary Injunction, official immunity does not bar Plaintiff from seeking such prospective relief from Defendants in their individual capacities.

Even so, Defendants insist that Plaintiff's claims are not against the commissioners as individuals, but are, in actuality, against the County. Dkt. No. 63 at 6. Thus, Defendants argue that Plaintiff is attempting to evade sovereign immunity by suing the State's agents instead. Id. The Court is unpersuaded by this argument.

Sovereign immunity "can not be evaded by making an action nominally one against the servants or agents of a State, when the real claim is against the State itself and it is the party vitally interested." Lathrop, 801 S.E.2d at 873. Defendants submit that

17

Plaintiff is "clearly suing the County" as the "real party in interest" and cites to a recent Georgia Court of Appeals case to support its proposition. Dkt. No. 63 at 6 (citing Bd. of Comm'rs v. Mayor of Valdosta, 834 S.E.2d 890, 893 (Ga. Ct. App. 2019), rev'd, 848 S.E.2d 857 (Ga. 2020)).

However, the Georgia Supreme Court has since reversed that case and clarified that "the real-party-in-interest limitation is not so broad," as Defendants claim. Mayor of Valdosta, 848 S.E.2d at 858. Instead, the limitation has been applied "primarily when the claimed relief would control or take the State's real property or interfere with contracts to which the State is a party." Id. Applying the limitation broadly "would eviscerate Georgians' well-established rights to seek redress against their government" and "yield a rule wholly incompatible with our long-standing precedent allowing individual-capacity claims for injunctive and declaratory relief." Id. That Plaintiff's request may direct the exercise of the commissioners' discretion does not alter the Court's analysis. As the Georgia Supreme Court noted, "any injunction or declaration as to an employee or official of the State could be said to 'control the actions of the State' to some extent." Id. at 862.

Following the standard as recently clarified by the Georgia Supreme Court, it is clear that the real-party-in-interest limitation does not apply here. Plaintiff's motion does not involve injunctive relief that would "alter the title, possession, or usage

18

of any real property of the State." Id. at 863. Further,
Plaintiff's request does not seek to enjoin any contracts that the
State is party to or "interfere with any state contracts." Id.
Consequently, Plaintiff's claims are properly considered to be
against the commissioners in their individual capacities, and
official immunity does not bar Plaintiff's claims from proceeding.

### c. Legislative Immunity

Finally, Defendants contend the individual commissioners are
entitled to legislative immunity for Plaintiff's claims related to
the commissioners' votes to adopt the zoning ordinances and Solid
Waste Management Plans at issue. Dkt. No. 87 at 10.

"Individuals acting in a legislative capacity are absolutely
immune from suit." Saleem v. Snow, 460 S.E.2d 104, 107 (Ga. Ct.
App. 1995). However, a distinction is to be drawn between voting
to *adopt* a regulation and *enforcement* of regulations already
established. Simply put, "the commissioners wear two hats—as
decision-makers voting on the [regulations] . . . and as enforcers
of already-established [regulations]." Dawson Cnty. Bd. of Comm'rs
v. Dawson Forest Holdings, LLC, 850 S.E.2d 870, 875 (Ga. Ct. App.
2020). Plaintiff here seeks non-monetary, injunctive relief from
future *enforcement* by the commissioners of the allegedly
unconstitutional regulation of Plaintiff's properties.
The enforcement of a previously-established regulation is not a
legislative act that warrants legislative immunity. Dawson Forest

19

Holdings, LLC, 850 S.E.2d at 876 ("[W]e are not persuaded that legislative immunity would bar a suit seeking relief against officials for acts taken while wearing their *enforcement*, rather than legislative, hats."). Thus, legislative immunity does not preclude the injunctive relief Plaintiff seeks against the commissioners in their individual capacities.

## II.  Preliminary Injunction Factors

Having determined that Plaintiff has standing and that immunity does not protect all of the Defendants, the Court turns to the merits of the preliminary injunction request. A plaintiff seeking preliminary injunctive relief must show the following: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002) (citing Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001)).

## A. Substantial Likelihood of Success on the Merits

A plaintiff seeking preliminary injunctive relief must show a substantial likelihood that he will ultimately prevail on the merits of his claim. Palmer, 287 F.3d at 1329. This factor is generally considered the most important of the four factors. Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986).

Plaintiff's Amended Complaint raises seven claims against Defendants. Dkt. No. 45. In its Motion for Preliminary Injunction, however, Plaintiff advances only two of the claims. First, Plaintiff contends Defendants' regulatory actions impermissibly interfere with Plaintiff's vested property right to develop its land with the Proposed Facility. Dkt. No. 58 at 2. Second, Plaintiff asserts that Defendants' regulatory actions violate the Dormant Commerce Clause. Id. Plaintiff insists that under one or both of these claims, it is entitled to preliminary injunctive relief.

## 1. Vested Rights Claim

The doctrine of vested rights applies when a "landowner, relying in good faith, upon some act or omission of the government, has made a substantial change in position or incurred such extensive obligation and expenses that it would be highly inequitable and unjust to destroy the rights he has acquired." Bickerstaff Clay Prods. Co. v. Harris Cnty., 89 F.3d 1481, 1487-88 (11th Cir. 1996) (quoting Cohn Cmtys., Inc. v. Clayton Cnty., 359 S.E.2d 887, 889 (Ga. 1987)). The term "vested rights" means "interests which it is proper for [the] state to recognize and protect and of which [the] individual cannot be deprived arbitrarily without injustice." Recycle & Recover, Inc. v. Ga. Bd. of Nat. Res., 466 S.E.2d 197, 199 (Ga. Ct. App. 1996). Under

Georgia Law,[7] if a property owner becomes an applicant who seeks to alter the use of his land, he has a vested right to consideration of his application under the statutory law in existence at the time of his application. Id. When a vested right is acquired, "a governing authority cannot deny or postpone requested authorization to use the land for a permitted use" in an attempt to defeat the applicant's rights. Banks Cnty. v. Chambers of Georgia, Inc., 444 S.E.2d 783, 786 (Ga. 1994). Moreover, the Georgia Constitution "prohibits a legislative exercise of the police power that results in the passage of retrospective laws which injuriously affect the 'vested rights' of citizens." S. States-Bartow Cnty., Inc. v. Riverwood Farm Homeowners Ass'n, 797 S.E.2d 468, 471 (Ga. 2017).

Plaintiff insists that three particular regulatory actions taken by Defendants impermissibly deprive Plaintiff of its vested property right. First, Plaintiff challenges Defendants' July 9, 2020 resolution purporting to withdraw the 2015 Verification Letters issued by the Brantley County commissioners. Dkt. No. 58 at 2. Second, Plaintiff challenges Defendants' refusal to issue reaffirmation of zoning consistency—based on the applicability of Defendant's 2016 Zoning Ordinance to Plaintiff's property. Dkt. No. 83 at 6. And third, Plaintiff challenges Defendants' June 15,

---

[7] In this case, Georgia law governs whether Plaintiff has a vested right. See Coral Springs St. Sys. v. City of Sunrise, 371 F.3d 1320, 1333 (11th Cir. 2004) ("Whether the right to a permit has vested is a question of state law.").

2017 regulatory actions which purport to rezone Plaintiff's property under the new 2017 zoning ordinance and adopt the 2017 Solid Waste Management Plan. Dkt. No. 83 at 9; Dkt. No. 45 ¶¶ 148-51.

All of these actions are outward attempts to impede Plaintiff from satisfying the requirements of O.C.G.A. § 12-8-24(g) that are necessary for Plaintiff to receive a determination on its EPD permit. Dkt. No. 63 at 12. Plaintiff requests injunctive relief enjoining Defendants from applying the regulations and allowing Plaintiff's EPD permitting process to proceed without hindrance. Dkt. No. 58 at 14.

Pursuant to O.C.G.A. § 12-8-24(g), prior to issuance of a solid waste handling permit may proceed, the Director of the EPD "shall require written verification to be furnished by the applicant . . . that the proposed facility complies with local zoning or land use ordinances . . . and . . . is consistent with the local, multijurisdictional, or regional solid waste management plan." O.C.G.A. § 12-8-24(g). Under the EPD's rules and regulations, preliminary SWMP verification "shall consist of letters from the host jurisdiction and generating jurisdictions verifying consistency with the approved local solid waste plans." Ga. Comp. R. & Regs. 391-3-4-.02(9). Further, preliminary verification of zoning compliance "shall include a letter from the local governmental authority stating that the proposed site

complies with local zoning or land use ordinances, if any." Id. 391-3-4-.05(1)(a). In addition to preliminary verification, local zoning compliance must also be "reaffirmed by the governmental authority prior to permit issuance." Id.

### a. July 9, 2020 Resolution

As noted above, O.C.G.A. § 12-8-24(g) and the EPD's rules and regulations require preliminary verification from the local governing authority for Plaintiff's Proposed Facility. No permit shall issue if it "will result in any violation of [O.C.G.A. § 12-8-24] or any rule or regulation promulgated pursuant to [O.C.G.A. § 12-8-24]." O.C.G.A. § 12-8-24(d).

On February 6, 2015, Chairman Summerlin purportedly signed and issued two letters to Claudia Moeller, a program manager at the EPD. Dkt. No. 1-5. The first letter confirmed that Plaintiff's proposal was consistent with the 2006 SWMP. Id. at 3. The second letter confirmed that Plaintiff's proposal was consistent with the County's local land use ordinances and that the County, at that time, did not have a zoning ordinance. Id. at 2. The EPD has confirmed that these letters satisfied the preliminary verification required by O.C.G.A. § 12-8-24(g). Dkt. No. 64-4; Dkt. No. 88-5 at 120.

Defendants, however, dispute the validity of these preliminary verification letters and, on July 9, 2020, took official action to pass a resolution withdrawing the 2015

Verification Letters. Dkt. No. 52-5 at 2. In the resolution, Defendants allege that these letters were invalid because: (i) Chairman Summerlin never signed the letters issued, and (ii) the letters were issued ultra vires for failing to comply with the 2006 SWMP.[8] Id.

### i. Signature Invalidity

In his deposition, Chairman Summerlin testified that he did not sign the 2015 Verification Letters; Summerlin insists that the signatures present on the 2015 Verification Letters and the related 2015 meeting minutes (attended by Summerlin) appear "too small" to be his signature. Dkt. No. 89-1 at 29, 33-38, 50-51, 59.

In stark contrast to Defendants' position, Plaintiff disputes Chairman Summerlin's testimony and contends that it "lacks any modicum of credibility." Dkt. No. 83 at 15. Plaintiff submits that Carl Rowland's deposition demonstrates that Chairman Summerlin did, in fact, sign the letters in the presence of multiple people.[9] Id. at 17; Dkt. No. 88-1 at 20-22. Rowland also submitted a sworn statement to the Court, in which he specifically states:

> I was present with Charles Summerlin and County Attorney Deen Strickland and Mr. Summerlin had the certification letters before him. Mr. Summerlin initially balked at signing the certification letters. In my presence, County Attorney Deen Strickland then told Mr. Summerlin that he was required to sign the letters because the

---

[8] The July 9, 2020 Board of Commissioners minutes acknowledge that these letters were necessary to obtain permits from the EPD in conducting an activity that deals with solid waste material. Id. at 3.

[9] Carl Rowland was the County Manager for Brantley County at all times relevant to this dispute. Dkt. No. 74 at 1.

> Board of Commissioners had unanimously voted for
> approval and to require that the certification letters
> be re-issued. In my presence, I then saw Mr. Summerlin
> sign the letters. Deen Strickland was also present when
> Mr. Summerlin signed the letters.

Dkt. No. 74 ¶ 7. On February 19, 2021, the Court held an evidentiary
hearing to resolve the validity of the February 6, 2015 letters.
Dkt. No. 97; see also Cumulus Media, Inc. v. Clear Channel
Commc'ns, Inc., 304 F.3d 1167, 1178 (11th Cir. 2002) (holding that
an evidentiary hearing is required for entry of a preliminary
injunction "where facts are bitterly contested and credibility
determinations must be made to decide whether injunctive relief
should issue.").

Based on the evidence submitted to the Court and the testimony
of witnesses at the hearing, the Court easily concludes that
Chairman Summerlin did, in fact, sign the two letters dated
February 6, 2015 to Claudia Moeller. The Court finds credible the
testimony of Mr. Rowland, who swore under oath that he personally
witnessed Chairman Summerlin sign those letters. Further, the
credible sworn testimony is entirely consistent with Chairman
Summerlin's behavior during the years after the letters were
issued. As Plaintiff points out, Chairman Summerlin was present
during other Board meetings where the 2015 Verification Letters
were a focal topic of discussion. For example, on March 5, 2015,

just one month after issuance of the letters, Betty Jean Smith,[10] at a regular meeting, addressed the Board and asked the Board to rescind the 2015 Verification Letters. Dkt. No. 89-8 at 2. Summerlin, who was in attendance, neither denied signing the letters nor questioned the initial issuance of those letters. Id. For years, everyone, including Chairman Summerlin, proceeded as though those letters were validly issued. Under oath at the hearing, the most that Chairman Summerlin could find to call into question the legitimacy of his signatures was that they *did* look like his signatures, but they were just too small.

The credible direct testimony of an eyewitness and the behavior of the alleged signer is sufficient evidence to conclude that the signature is valid and is, in fact, what it purports to be.

### ii. Ultra Vires

In Defendants' July 9, 2020 resolution, Defendants also insisted that Brantley County commissioners lacked legal authority to issue one of the two 2015 Verification Letters, namely, the letter verifying SWMP consistency.[11] In other words, Defendants

---

[10] Betty Jean Smith is a Brantley County citizen who appeared before the Board of Commissioners to advocate against Plaintiff's Proposed Facility.

[11] It is undisputed that the letter verifying zoning consistency was valid and accurate. Dkt. No. 66 at 55. It is only the 2015 letter verifying consistency with the 2006 SWMP that Defendants contend was illegally issued.

argue that the SWMP letter was ultra vires[12] and, thus, void from its inception.

Defendants contend the 2015 SWMP consistency letter was ultra vires because it was "given in violation of the 2006 SWMP." Dkt. No. 55 at 10. Because Plaintiff did not meet certain procedural requirements[13] in the SWMP, Defendants argue, the County "was not permitted to issue certification letters for [Plaintiff's] EPD permit application." Dkt. No. 55 at 10; see also Dkt. No. 63 at 8 ("It was always against the law for the County to issue the consistency letters.").

An act is ultra vires when a "government official had *no authority* to take the action in question," and is, thus, void as a matter of law. Dukes v. Bd. of Trustees for Police Officers Pension Fund, 629 S.E.2d 240, 242 (Ga. 2006). However, there is a "broad distinction . . . between an irregular exercise of a granted power, and the total absence or want of power." Id. Only in the latter circumstance does an action qualify as ultra vires under Georgia law. Quillian v. Emp's' Retirement Sys. of Ga., 379 S.E.2d 515, 517 (Ga. 1989).

In Quillian, the plaintiff received official acknowledgement from the Employees Retirement System ("ERS") that he would be

---

[12] Ultra vires means "beyond the scope of power allowed or granted by a corporate charter or by law." Black's Law Dictionary (11th ed. 2019).
[13] Defendants allege Plaintiff did not comply by failing to issue a "written submission to the County, paying fees, and attending a public meeting on the proposal." Dkt. No. 55 at 10.

credited for a certain number of service years in receiving his monthly pension allowance. Id. at 516. Six months later, the ERS declared that it had erred in the calculation it issued and reduced appellant's pension accordingly. Id. The Court held that the ERS had the legal authority to determine what pension should be paid—even though it made an incorrect decision in the pension calculation. Id. Thus, because the ERS had the power to calculate the plaintiff's pension, the error in making the calculation did not render the official act of calculating ultra vires. Id.; compare Dukes, 629 S.E.2d at 241 (board lacked legal authority to disburse benefits beyond what was permitted in the relevant ordinance).

As Defendants point out, "the County has the general authority to issue consistency letters for EPD permit applicants." Dkt. No. 55 at 12. Under this authority, the Brantley County commissioners can assess the consistency of Plaintiff's proposal with all the provisions found within the SWMP. Further, "in determining whether a proposed facility is consistent with its SWMP, a local government is authorized to consider any relevant factor that it appropriately considered in the SWMP itself." Murray Cnty. v. R & J Murray, LLC, 627 S.E.2d 574, 578 (Ga. 2006). As such, the commissioners were empowered with the discretion to determine an initial verification of consistency and issue a SWMP consistency letter.

Like the ERS in _Quillian_, the Brantley County commissioners did not exceed this authority by issuing the SWMP consistency letter. Plaintiff's alleged noncompliance with the SWMP does not go to whether the Brantley County commissioners _exceeded_ their authority, but instead goes to whether the commissioners _correctly exercised_ their authority in determining consistency. See _City of Summerville v. Ga. Power Co._ 55 S.E.2d 540 (Ga. 1949) (city's grant of franchise was not ultra vires because of applicant's failure to post notice of an application for franchise or publish it in official newspaper); _City of Holly Springs v. Cherokee Cnty._, 682 S.E.2d 644, 649 (Ga. Ct. App. 2009) (county approval of property annexation was not ultra vires even though County failed to follow certain requisite procedures); _City of Duluth v. Riverbrooke Props., Inc._, 502 S.E.2d 806, 813 (Ga. Ct. App. 1998) (issuance of occupancy permits was not an ultra vires act even though developer failed to follow procedural requirements in preliminary development plans).

The essence of the commissioners' authority is to make an initial decision on SWMP compliance. If commissioners determine a proposal complies with the SWMP, they have the power to issue the requisite verification letter; if they find that the proposal is not compliant, they may decline to issue the letter. Importantly though, if—as Defendants allege here—the commissioners issue a letter for a proposal which is _not_ in compliance, the issuance of

this letter does not turn into an action which the Brantley County commissioners had no authority to take; rather, the letter's issuance was "an error made during the commission of an otherwise authorized action (determined not to be an ultra vires action)." Mullis v. Bibb Cnty., 669 S.E.2d 716, 719 (Ga. Ct. App. 2008).

Notably, it is not the Court's role to make the determination of whether Plaintiff's proposal is indeed consistent with the 2006 SWMP for issuance of a solid waste permit.[14] At this stage, that determination is left to the EPD. O.C.G.A. § 12-8-24(d). The Court's task is limited to determining whether issuance of the SWMP consistency letter was illegal—lacking all authority—such that the act itself was ultra vires. The Court concludes, regardless of whether the Defendants erred in their determination, it cannot be said that the letters were issued in the "total absence or want of power." City of Summerville, 55 S.E.2d at 543.

In sum, the 2015 Verification Letters bear a valid signature, and they were not issued ultra vires. The July 9, 2020 resolution,

---

[14] Defendants' ultra vires argument focuses on the *authority* of the Brantley County commissioners. Determining the authority of a governing entity is properly within the realm of this Court. However, whether the commissioners abused its discretion in its consistency determination is not before us. Compare R&J Murray, LLC v. Murray Cnty., 653 S.E.2d 720, 723 (Ga. 2007). Deciding whether to issue a permit falls within the purview of executive powers vested in the EPD. O.C.G.A. § 12-2-2(c)(1). This authority includes making an independent determination of SWMP consistency. Id. § 12-8-31.1(e). After careful discernment, the Court does not reach an independent conclusion on consistency in order to refrain from usurping powers secured in another branch of government.

in effect, seeks to eliminate a previously-acquired vested right by retroactively preventing the consideration of Plaintiff's EPD application. Consequently, Plaintiff has sufficiently demonstrated that the July 9, 2020 resolution is retrospective and injuriously impairs Plaintiff's vested right to develop its land free from restriction. See S. States-Bartow Cnty., Inc., 797 S.E.2d at 472.

### b. Reaffirmation of Zoning Consistency

In addition to preliminary verification, zoning consistency must also be "reaffirmed by the governmental authority prior to permit issuance." Ga. Comp. R. & Regs. 391-3-4-.05(1)(a). Here, as confirmed by the site suitability notice, "a reaffirmation of zoning consistency must be submitted to [the] EPD prior to a final decision regarding the issuance of a permit for the proposed solid waste disposal facility." Dkt. No. 48-2.

Defendants refuse to reaffirm verification of zoning consistency to the EPD, claiming that Plaintiff's proposal is inconsistent with the 2016 Zoning Ordinance—the law that was in effect at the time Plaintiff's application was filed. Dkt. No. 66 at 79-80. Plaintiff, however, submits that the 2016 ordinance is unconstitutionally vague and, thus, inapplicable to its EPD permit application. Dkt. No. 83 at 8. Put another way, Plaintiff insists that there was *no* valid or applicable zoning ordinance in place when its rights vested in 2016.

Georgia law makes clear that a permit applicant has a vested right to consideration of its application based on the law as it existed at the time of filing the application. Recycle & Recover, Inc., 466 S.E.2d 197 at 199. When a vested right is acquired, "a governing authority cannot deny or postpone requested authorization to use the land for a permitted use" in an attempt to defeat the applicant's rights. Banks Cnty., 444 S.E.2d at 786. Moreover, a permit application is required to comply only with ordinances or regulations that were "valid and applicable" at the time of filing. See Trinity Outdoor, LLC v. Oconee Cnty., No. 3:02 CV 67 CAR, 2004 WL 5026733, at *4 (M.D. Ga. May 20, 2004). Where a "zoning ordinance is invalid, there is no valid restriction on the property, and the [landowner] has the right under the law to use the property as it so desires." Tilley Props., Inc. v. Bartow Cnty., 401 S.E.2d 527, 529 (Ga. 1991) (compelling a local official to issue a verification of zoning consistency for an EPD permit after finding the zoning ordinance to be invalid); Crown Media, LLC v. Gwinnett Cnty., GA, 380 F.3d 1317, 1328 (11th Cir. 2004) (noting that the validity of a zoning ordinance is relevant to whether a property owner is entitled to a requested certificate).

It is undisputed that Plaintiff's rights vested in December 2016.[15] Dkt. No. 66 at 79-80; Dkt. No. 83 at 5. Plaintiff submitted

---

[15] Plaintiff has also asserted that it accrued vested rights as early as 2014 and/or 2015—when the County had no zoning ordinances in place—based upon Defendants' issuance of verification letters and Plaintiff's reliance upon

its application on December 29, 2016, which the EPD accepted along with a filing fee for processing. Dkt. No. 58-1 ¶ 9. Consequently, the dispositive issue is whether the 2016 Zoning Ordinance was valid and applicable at the time Plaintiff filed its application with the EPD.

Defendants insist that Plaintiff must comply with the Heavy Industrial zoning allegedly placed on the Property pursuant to the September 8, 2016 Zoning Ordinance. Dkt. No. 66 at 79-80; Dkt. No. 83 at 5. Plaintiff, however, submits that the September 8, 2016 Zoning Ordinance is void for vagueness because it did not incorporate an official zoning map as required to satisfy the requirements of due process. Dkt. No. 83 at 6.

The evidence shows that on September 8, 2016, Defendants adopted the text of a zoning ordinance which purports to incorporate by reference a set of maps entitled "Official Land Use Districts Map of Brantley County, Georgia". Dkt. No. 1-8 at 17. During discovery, Plaintiff specifically requested that Defendants produce a certified copy of any zoning map adopted in connection with the September 8, 2016 Zoning Ordinance and to produce any minutes, ordinances, or resolutions reflecting the adoption of any

---

Defendants' official assurances. Dkt. No. 58 at 21; see also Dkt. No. 1-2 at 2. Defendants dispute Plaintiff's contention. Dkt. No. 87 at 20-21.  As explained *infra*, however, whether Plaintiff accrued vested rights earlier than 2016 is not material to the Court's analysis of the present motion.  Because both parties agree that Plaintiff's vested rights accrued by at least December 2016, the Court will use that date in its analysis.

such zoning map. Dkt. No. 86-1 ¶¶ 3-4. In reply, Defendants said they would produce all documents responsive to these requests. Dkt. No. 86-2 at 3. However, Defendants produced no minutes, ordinances, or resolutions showing the adoption of any land use districts map for the September 8, 2016 Zoning Ordinance.[16] Dkt. No. 83 at 7. As for maps submitted as evidence, Defendants produced only a few pages of what is claimed to be a quadrant map of Brantley County. Dkt. No. 86-3.

As such, Plaintiff insists that no zoning map was adopted in connection with the September 8, 2016 Zoning Ordinance. Dkt. No. 83 at 7. Defendants, on the other hand, argue that the law does not require incorporating official maps. Dkt. No. 48 at 20. Further, Defendants seem to contend that by readopting a zoning ordinance and official zoning map on June 15, 2017, Defendants cured any deficiencies that may have previously existed. Dkt. No. 55 at 14.

Here, the 2016 Zoning Ordinance identifies the land to which its various zoning classifications apply only by reference to the maps. Dkt. No. 1-8 at 17 ("The boundaries of each district are shown on maps entitled 'Official Land Use Districts Map of Brantley County, Georgia.'"). As such, these maps are an integral part of

---

[16] "[T]he adoption of a zoning map . . . must comply with the same notice and hearing requirements as the adoption of a zoning ordinance." Mid Ga. Envt'l Mgmt. Grp., LLLP v. Meriwether Cnty., 594 S.E.2d 344, 348 (Ga. 2004).

the zoning ordinance. Therefore, "without the maps, the zoning ordinance would be too indefinite and vague to satisfy the requirements of due process." Newton Cnty. v. E. Ga. Land & Dev. Co., LLC, 764 S.E.2d 830, 831 (Ga. 2014).[17]

For an ordinance to properly incorporate a map or other document by record, four criteria must be satisfied:

> (1) The document must be sufficiently identified so that there is no uncertainty as to what was adopted. (2) The document must be made a public record. (3) It must be accessible to members of the public who are, or may be, affected by it. (4) The adopting resolution must give notice of this accessibility.

Id. at 832 (quoting E. Ga. Land & Dev. Co., LLC v. Newton Cnty., 723 S.E.2d 909, 913 (Ga. 2012)). Defendants have failed to satisfy the first criterion because they fail to sufficiently identify the map adopted into the 2016 Zoning Ordinance. For a zoning map to be sufficiently identified, "it must be apparent from documents or records thereof that the map was identical to the one which was incorporated by reference into the zoning [ordinance]." See E. Ga. Land & Dev. Co., LLC, 723 S.E.2d at 914; Foskey v. Kirkland, 147 S.E.2d 310, 312 (Ga. 1966).

---

[17] Under both Georgia and federal law, the void-for-vagueness doctrine requires that an ordinance give a person of ordinary intelligence notice of the conduct prohibited and provide enough specificity so as not to encourage arbitrary and discriminatory enforcement. Izzo v. State, 356 S.E.2d 204, 205 (Ga. 1987) (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983)); Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1319 (11th Cir. 2017).

In Foskey, a zoning resolution included reference to a map entitled "Zoning Map, Coffee County, Georgia" and "certified by the County Clerk of Coffee County." 147 S.E.2d at 312. The county there tendered a map into evidence entitled "Zoning Map, Coffee County, Georgia," but it was not dated or certified by the county clerk. Id. The Court held that the map was not sufficiently identified because the required designation (date and certification) did not appear on the map. Id. Therefore, the county failed to show "that the map referred to in the zoning resolution and the map tendered as evidence were one and the same." Id.

Here, the 2016 Zoning Ordinance required the map to be identified as the "Official Land Use District Maps for Brantley County, Georgia," and "shall be dated and certified by the Chairman of the County Commission and County Clerk." Dkt. No. 1-8 at 17. However, no such designation is attached to the quadrant maps; indeed, the record is void of any map with such a designation. Dkt. No. 86-3.[18] Accordingly, uncertainty remains as to which maps were allegedly incorporated into the 2016 ordinance, and incorporation by reference must fail.

---

[18] Two additional maps are also found in the record (attached to Plaintiff's complaint as Exhibits R and I) but fail for the same reasons discussed. Exhibit R is labeled the "Official Land Use Districts Map of Brantley County, Georgia," but it does not bear any signature or date. Dkt. No. 1-18 at 2. Exhibit I appears to have a date and signature but is not labeled and designated as the "Official Land Use Districts Map of Brantley County, Georgia." Dkt. No. 1-9 at 2. Thus, neither sufficiently demonstrates that it is the map referenced and designated in the 2016 Zoning Ordinance.

The Georgia Supreme Court has made clear that zoning laws require formalism in lawmaking—especially when it comes to the enactment of laws restraining citizens' property rights. Newton Cnty., 764 S.E.2d at 833 n.2. Such formalism is necessary "to provide certainty to the public as to what was actually adopted by the County and also to protect the public from any arbitrary changes of the ordinance or the maps that do not go through the . . . notice process." Id. Concisely put, a law is unconstitutionally vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." Wollschlaeger, 848 F.3d at 1319 (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000); see also Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (stating ordinances must "provide explicit standards for those who apply" them to avoid "resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application").

Likewise, because zoning ordinances restrict an owner's right to freely use his property, they are in derogation of common law. Cherokee Cnty. v. Martin, 559 S.E.2d 138, 140 (Ga. Ct. App. 2002). Thus, all ambiguities must be strictly construed against the local government and in favor of free use of property. Id. Such restrictions must never extend beyond their plain and explicit terms. May v. Morgan Cnty., 807 S.E.2d 28, 31 (Ga. Ct. App. 2017).

When official maps are missing from a zoning ordinance, Georgia courts have held that "an essential part of the zoning ordinance [is] missing" and "the ordinance [is therefore] void at the moment of its enactment." See e.g., Newton Cnty., 764 S.E.2d at 832. The evidence demonstrates that Brantley County failed to incorporate the requisite map identified in the 2016 Zoning Ordinance. Because the relevant 2016 zoning classifications are defined *only* by reference to the official map, the missing map was an essential part of the 2016 Zoning Ordinance. See Dkt. No. 1-8 at 17. As such, the 2016 Zoning Ordinance is invalid because, at the time of its enactment, it was incomplete and, thus, "void from its inception." Id.

Moreover, Defendants did not remedy the 2016 Zoning Ordinance's deficiency by readopting a zoning ordinance and official zoning map on June 15, 2017. Instead, they enacted a *new* ordinance and official zoning map effective on June 15, 2017—*after* Plaintiff's rights had vested. The Georgia Supreme Court has "rejected the idea that an ordinance void at the moment of its enactment can somehow be revived without the formality required to fully enact it again." Newton Cnty., 764 S.E.2d at 833. A void ordinance cannot be vitalized by amendment or later adoption of maps. Id. Accordingly, the 2017 ordinance did nothing to revive the presumptively invalid ordinance of 2016.

Because the 2016 Zoning Ordinance is likely invalid, Defendants are required to comply with Plaintiff's request for zoning reaffirmation. In determining whether a property owner is entitled to a particular land use, Georgia courts at times have assessed the validity of the relevant zoning ordinance restricting the sought-after land use. See Crown Media, 380 F.3d at 1328 (discussing Georgia case law); see also Covenant Christian Ministries, Inc. v. City of Marietta, 654 F.3d 1231, 1242 n.8 (11th Cir. 2011) (same). For example, in Fulton County v. Action Outdoor Advertising, JV, 711 S.E.2d 682 (Ga. 2011), the Georgia Supreme Court held that various sign companies obtained vested rights to have sign permits issued because the companies applied for the permits under a sign ordinance that was unconstitutional in its entirety. Id. at 685. Because the ordinance was entirely unconstitutional, it was "wholly void and of no force and effect from the date it was enacted." Id. at 684. Consequently, when the companies filed applications for permits under the unconstitutional ordinance, "there was no valid restriction on the construction of signs." Id. at 685. As such, the Court concluded that the sign companies "obtained vested rights in the issuance of the permits they sought." Id.

This logic has also been applied to instances where a company requests *verification* that a particular land use is permitted. See S. States-Bartow Cnty., Inc. v. Riverwood Farm Homeowners Ass'n,

797 S.E.2d 468, 470 (Ga. 2017); Tilley Props., 401 S.E.2d at 528;
see also Tanner Advert. Grp., L.L.C. v. Fayette Cty., GA, 451 F.3d
777, 789 (11th Cir. 2006) ("Tilley teaches that the validity of a
zoning ordinance is relevant to whether a property owner is
entitled to a requested certificate."). In 1989, an entity called
Southern States filed an application with the EPD to develop and
operate a solid-waste landfill on property that it owned in Bartow
County. S. States-Bartow Cnty., Inc. v. Riverwood Farm Prop. Owners
Ass'n, Inc., 769 S.E.2d 823, 824 (Ga. Ct. App. 2015). Pursuant to
Ga. Comp. R. & Regs. 391-3-4-.05(1)(a), Southern States was
required to obtain verification of zoning compliance from Bartow
County. Id. However, at that time, Bartow County's applicable
zoning ordinance did not allow for a landfill on the subject
property. Id. Consequently, Bartow County refused Southern States'
request for verification of zoning compliance. Id.

Thereafter in 1991, in a separate but related action, the
Georgia Supreme Court declared that same Bartow County zoning
ordinance invalid. See Tilley Props., 401 S.E.2d at 528. In doing
so, the court stated "where, as in this case, the zoning ordinance
is invalid, there is no valid restriction on the property, and the
[property owner] has the right under the law to use the property
as it so desires." Id. Thus, the court concluded it would be
appropriate to compel a Bartow County official to issue a

certificate of land use to the property owner so that it might attempt to obtain an EPD surface mining permit. Id.

Consequently, in the Southern States litigation, the Superior Court of Bartow County—in light of the Georgia Supreme Court's decision in Tilley—held that "in the absence of a *valid* zoning ordinance in existence at the time of its application to the EPD, Southern States acquired a vested right to obtain a certificate of the right to use its real property without county use restrictions." S. States-Bartow Cnty., 797 S.E.2d at 470 (emphasis added). Because the zoning ordinance was invalid, the court determined that Southern States had a vested right "in *all the necessary certificates* to be issued [by Bartow County] to get approval from the necessary agency to operate a landfill." Id. (emphasis added). Bartow County complied and issued the requisite verification of zoning compliance. Id.

Here, like the ordinance in Action Outdoor, Plaintiff has shown a substantial likelihood that the 2016 Zoning Ordinance was "wholly void and of no force and effect from the date it was enacted." 711 S.E.2d at 685. As discussed above, the official map was an essential part of the 2016 Zoning Ordinance that was missing when Brantley County enacted the ordinance on September 8, 2016. As a result, the 2016 Zoning Ordinance must be considered "void at the moment of its enactment." Newton Cnty., 764 S.E.2d at 832.

Therefore, like the applicant in Southern States-Bartow County, no *valid* zoning ordinance controlled in 2016 when Plaintiff submitted its EPD application. 797 S.E.2d at 470. Accordingly, under Georgia's vested rights doctrine, Plaintiff is entitled to "all the necessary certificates to be issued [by Defendants] to get approval from the [EPD]." Id. This includes the necessary reaffirmation of zoning consistency that Defendants refuse to issue. Simply put, "because [Plaintiff] was in compliance at the time of its application, it had a vested right to verification of that compliance, *even at the time of reaffirmation*." BFI Waste Sys. of N. Am. v. Dekalb Cnty., 303 F. Supp. 2d 1335, 1353 (N.D. Ga. 2004) (emphasis added).

In sum, Plaintiff has sufficiently demonstrated that the 2016 Zoning Ordinance is likely invalid. In the absence of valid zoning regulations at the time of Plaintiff's application, Defendants are required to issue the necessary reaffirmation of zoning consistency to avoid a deprivation of Plaintiff's vested rights.[19]

### c. The 2017 Regulations

Finally, the Court concludes applying the provisions of the 2017 zoning ordinance or the 2017/2020 amended SWMP would be an unconstitutional deprivation of Plaintiff's vested rights.

---

[19] If Plaintiff's vested rights accrued earlier than 2016—when the County had no zoning ordinances in place—the Court would similarly conclude that Defendants are required to issue the necessary reaffirmation of zoning consistency. See supra n.15.

"Laws prescribe . . . for the future; they cannot . . . ordinarily, have a retrospective operation." O.C.G.A. § 1-3-5. The Georgia Constitution prohibits legislative exercise of the police power that results in the passage of retrospective laws which injuriously affect the "vested rights" of citizens. Ga. Const., art. I, sec. I, ¶ X. This prohibition against retroactive impairment of vested rights extends to the enactment of zoning regulations, which is an exercise of police powers. See Michiels v. Fulton Cnty., 405 S.E.2d 40 (Ga. 1991). Therefore, land use regulations cannot be applied retroactively to "'take[] away or impair[] vested rights acquired under existing laws or create[] a new obligation, impose[] a new duty, or attach[] a new liability in respect to transactions or considerations already past.'" S. States-Bartow Cnty., Inc., 797 S.E.2d at 471.

As noted above, both parties contend that Plaintiff's rights vested in 2016. Thus, retrospective application of regulations enacted in 2017 would impair Plaintiff's vested right to develop its land free from later restriction. Neither the 2017 zoning ordinance nor the 2017/2020 SWMP plan is applicable to the development of Plaintiff's property.

For the reasons discussed above, Plaintiff has demonstrated a likelihood of success on its vested rights claim. Accordingly, this factor weighs in favor of Plaintiff.

## 2. Dormant Commerce Clause Claim

Plaintiff also contends that both the SWMP adopted on June 15, 2017 and the corrected SWMP adopted on August 6, 2020 violate the Dormant Commerce Clause—facially and as applied. Dkt. No. 45 ¶ 151; Dkt. No. 58 at 14, 17; Dkt. No. 83 at 9. Defendants, however, insist that Plaintiff cannot prevail on these claims because neither the 2017 nor the 2020 SWMP has ever been applied to Plaintiff's property. Dkt. No. 63 at 5. Defendants are correct.

Plaintiff may challenge only the constitutionality of regulations that are being applied to it. Action Outdoor Advert. II, LLC v. Lumpkin Cnty., Ga., 543 F. Supp. 2d 1334, 1343 (N.D. Ga. 2008). Because Defendants concede that Plaintiff's rights vested in 2016 when Plaintiff filed its permit application, Defendants also concomitantly recognize that the 2006 SWMP—rather than the later-enacted regulations—applies to Plaintiff's property. Dkt. No. 63 at 5. As such, Plaintiff cannot suffer any actual or threatened injury from either the 2017 or 2020 SWMP—which are not being enforced against Plaintiff's property.

As a result, Plaintiff has not shown that it is substantially likely to prevail on the merits of its Dormant Commerce Clause claim. Consequently, the Dormant Commerce Clause cannot serve as a basis for Plaintiff's preliminary injunction.

### B. Substantial Threat of Irreparable Harm

Even if Plaintiff shows a substantial likelihood of success on the merits of its vested rights claim, "the absence of a

substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Brown v. Azar, No. 1:20-CV-03702-JPB, 2020 WL 6364310, at *17 (N.D. Ga. Oct. 29, 2020). "[T]he harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." Georgia v. Pruitt, 326 F. Supp. 3d 1356, 1366 (S.D. Ga. 2018) (quoting United States v. Lambert, 695 F.2d 536, 540 (11th Cir. 1983)).

Here, Plaintiff suffers irreparable harm from the EPD's delayed permitting decision because Plaintiff is precluded from entering and finalizing solid waste disposal contracts with market participants. See Pine Ridge Recycling, Inc. v. Butts Cnty., Ga., 864 F. Supp. 1338, 1342 (M.D. Ga. 1994) (finding irreparable harm where Plaintiff had not received a permit from Georgia EPD, could not begin construction of the proposed facility, and could not enter into disposal contracts). The EPD has been clear that a permit cannot be issued to Plaintiff until Defendants provide reaffirmation of zoning consistency. Dkt. No. 48-2. Moreover, Plaintiff testified that it has reached out to market participants who are interested in doing business with Plaintiff but will not proceed further with any agreement unless Plaintiff is able to continue with the permitting process. Dkt. No. 88-4 at 223-25; see also GSW, Inc. v. Long Cnty., Ga., 999 F.2d 1508, 1519 (11th Cir.

1993) ("The district court determined that [plaintiff] would suffer irreparable injury because cities and counties would not be willing to enter agreements with [plaintiff] for waste disposal services due to the [defendant's actions]. . . . [T]his deprivation satisfies the test for injunctive relief.").

Defendants claim that they have no control over what the EPD does going forward. Dkt. No. 63 at 14. However, while it is true that Defendants do not make decisions on the EPD's behalf, the EPD has made it clear that it will not make a permitting decision without reaffirmation of zoning consistency from Defendants. Dkt. No. 66 at 59-60. In turn, Defendants have made clear that they will not issue reaffirmation of zoning consistency without a court order. Id. Thus, the hindrance caused by Defendants will certainly prevent Plaintiff from being able to enter into contracts with market participants.

Defendants argue that *other* factors could delay Plaintiff's EPD permit issuance, such as Plaintiff's pending submission of its D&O Plan. Dkt. No. 87. Thus, Defendants attempt to demonstrate that any future delay is entirely independent of their actions. However, the Eleventh Circuit has already addressed "whether the possibility that other factors might delay [a] project mean[s] that a delay prompted by Defendants' objections would not cause irreparable harm." Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less, 910 F.3d 1130, 1165 (11th Cir. 2018). The Court in

Transcontinental still found irreparable harm despite a "multitude of other potential or actual factors" that could delay the project at issue. Id. As best stated by the Eleventh Circuit, "[t]he preliminary injunction in this case is concerned with avoiding harm caused by [Defendants' objections], not with the possibility that future delay could conceivably occur based on other factors that might never occur." Id.[20]

Without issuance of an injunction, the EPD permitting process will not go forward until final resolution of this case on the merits. In the interim, Plaintiff will be unable to finalize contracts with potential customers.

While economic harm does not satisfy the irreparable harm element in many cases, that general rule does not apply where there is no adequate remedy at law to recover damages for the harm suffered. See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1289 (11th Cir. 2013). If Plaintiff incurs monetary losses as a result of an unlawful exercise of government authority, no avenue exists to recoup those losses because the State has not waived its sovereign immunity from suits seeking these sorts of damages. Id. ("In the context of preliminary

---

[20] Thus, even though Plaintiff has been granted a 90-day extension from the EPD to submit its final D&O Plan, this does not detract from the issue at hand. Dkt. No. 113. The preliminary injunction here is focused on harm prompted by Defendant's refusal to recognize Plaintiff's vested rights, not other potential delays.

injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable.").

Here, Plaintiff likely has no monetary recourse against Defendants due to sovereign and official immunity. Sovereign immunity extends to the State and all of its departments and agencies, including counties and their commissioners. Carter, 821 F.3d at 1323. Most commonly, this doctrine is employed to bar suits for damages and other monetary relief—including damages claims against state officials in their official capacities. Lathrop, 801 S.E.2d at 872. Likewise, the individual commissioners likely retain official immunity against any monetary loss at issue before the Court. Id. at 885–86 (when it comes to retrospective relief, "the doctrine of official immunity ordinarily would bar a suit against state officers in their individual capacities for official acts involving an element of discretion, including their enforcement of laws alleged to be unconstitutional").

In light of Defendants' immunity, Plaintiff will likely not be able to recover damages for its losses from Defendants.[21] In the absence of such retrospective relief, there is a substantial risk that Plaintiff's economic damage is irreparable. The Court finds

---

[21] Defendants have not pointed to any legal remedy through which Plaintiff might recover any economic harm it would suffer from hindrance of its EPD permitting process. To the contrary, Defendants insist that damages would not be available because of its retained immunity. Dkt. No. 55 at 20; Dkt. No. 87 at 9.

that irreparable harm here is sufficient such that this factor weighs in favor of Plaintiff.

### C. Balance of Injuries and Public Interest

Next, the Court finds that the balance of equities and the public interest support a preliminary injunction. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020). Thus, the Court proceeds with analyzing whether the threatened injury to Plaintiff outweighs the harm that the preliminary injunction would cause Defendants and the public. The injury faced by Plaintiff has already been articulated: Plaintiff would suffer harm in the loss of its ability to proceed with the EPD permitting process and finalize waste disposal contracts. On the other hand, harm to the public interest is properly characterized as minimal. For one, the public has no interest in enforcing what is likely unconstitutional regulations. Odebrecht Const., Inc., 715 F.3d at 1290. "The public interest does not support the [county]'s expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional." Fla. Businessmen for Free Enter. v. City of Hollywood, 648 F.2d 956, 959 (5th Cir. 1981). Thus, the Court can discern no public harm from Defendants' nonenforcement of invalid legislation.

Nonetheless, Defendants contend that allowing the EPD permitting process to proceed would be detrimental to the public health of Brantley County's citizens. Dkt. No. 63 at 16. However, much of Defendants' alleged harm is ephemeral because the EPD, as the administrative agency tasked with ultimately reviewing Plaintiff's permit application, will make a final determination on safety and compliance of Plaintiff's proposal. O.C.G.A. § 12-8-24(d). The EPD will review Plaintiff's permit application and "such other information as may be necessary to ascertain the effect of such solid waste handling upon air, water, and land resources and human health." Ga. Comp. R. & Regs. 391-3-4-.02(9). The EPD's determination is conducted independently of the County's position on the matter. See e.g., S. States-Bartow Cnty., Inc. v. Barnes, No. OSAH-BNR-SW-1014459-33-Miller, 2010 WL 1321921 (Ga. Bd. Nat. Res. Apr. 1, 2010) (demonstrating the EPD's denial of a solid waste handling permit for failure to comply despite local government's certification of compliance). Thus, Defendants' concern about public health is ameliorated by the EPD's independent decision-making authority and obligation to ensure compliance with health and safety regulations. Consequently, the Court finds that Plaintiff's harm outweighs the harm to the County and that the injunction would not disserve the public interest.

## Conclusion

The Court concludes Plaintiff has standing to maintain this lawsuit and to seek injunctive relief, and Plaintiff's request for prospective relief is not barred by Defendants' immunity defense. At this point, the Court is persuaded that Plaintiff is substantially likely to prevail on the merits of its vested rights claim. Additionally, Plaintiff has shown that it will suffer irreparable injury absent an injunction; its injury outweighs whatever damage an injunction may cause Defendants; and the proposed injunction is not adverse to the public interest.

Thus, Plaintiff's Motion for Preliminary Injunction, dkt. no. 58 is **GRANTED**. Defendants are hereby **ENJOINED** from applying the July 9, 2020 resolution, the 2016 Zoning Ordinance, the 2017 SWMP, and the 2020 SWMP to Plaintiff's Property and its EPD permit application. Moreover, because Plaintiff has demonstrated there is likely no zoning ordinance applicable to Plaintiff's Property for purposes of the permit process, Defendants are **ORDERED** to issue the reaffirmation of zoning consistency required by Ga. Comp. R. & Regs. 391-3-4-.05(1)(a).

**SO ORDERED**, this 14th day of May, 2021.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA