IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC,<br><br>　　　　　Plaintiff,<br><br>V.<br><br>BRANTLEY COUNTY, GEORGIA by and through its CHAIRMAN and MEMBERS OF THE BRANTLEY COUNTY BOARD OF COMMISSIONERS; CHRIS "SKIPPER" HARRIS; RANDY DAVIDSON; BRIAN HENDRIX; JESSE MOBLEY and RAY GRIFFIN, all in their individual and official capacities as Commissioners,<br><br>　　　　　Defendants. | CIVIL ACTION FILE<br>NO. 5:19-CV-00109-LGW-BWC |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS FOR WHICH THERE EXIST NO GENUINE ISSUE OF DISPUTE TO BE TRIED AND CONCLUSIONS OF LAW

COME NOW Defendants Brantley County, Georgia, by and through its Chairman and Members of the Brantley County Board of Commissioners and Chris "Skipper" Harris, Randy Davison, Brian Hendrix, Jesse Mobley, and Ray Griffin, ("Defendants" or "the County") and hereby respond to Plaintiff Brantley County Development Partners, LLC's ("Development Partners") Statement of Material Facts for Which There Exist No Genuine Issue of Dispute to be Tried and Conclusions of Law. (Doc. 141-1).

## I.　RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS FOR WHICH THERE EXIST NO GENUINE ISSUE OF DISPUTE TO BE TRIED

1.

In 2014, Brantley County officials Carl Rowland and Mike Edgy approached and solicited Plaintiff to develop a 2,389 acre tract of land in unincorporated Brantley County known as the

Magnolia Holdings Business Park into a "Technology Park," which would include a subtitle "D" solid waste disposal facility, a thermal conversion process, and a mixed use light industrial and heavy industrial development (the "Property"). [Dkt. No. 58-3 at 2-3; Dkt. No. 58-2 at 2].

**RESPONSE**:

Disputed. To start, the Court should not consider Doc. 58-3 at 2-3, affidavit of Matthew Roper, as support for any allegations of discussions between Carl Rowland and County Commissioners as he has not shown he has any personal knowledge of the discussions between the County Commissioners and Carl Rowland. Fed. R. Civ. P. 56(c)(4); *Pace v. Capobianco*, 283 F.3d 1275, 1279 (11th Cir. 2002) *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).

Also, the unequivocal evidence is that Brantley County officials did not approach or solicit Plaintiff at all, let alone for the development of a solid waste disposal facility.  Development Partners' engineer Steve Harbin was introduced to Plaintiff's property while completing investigative work for County Manager Carl Rowland for a mining company that was looking at the property. (Doc. 88-1, pp. 37-38). "...Steve [Harbin] was introduced to the 2400-acre piece of property, right. And so Steve come back to me [Rowland] sometime later and he says what do y'all think about doing a landfill?" (Doc. 88-1, p. 38.) The first time Commissioner Mike Edgy heard about the anything going on the property related to Development Partners was when County Manager Carl Rowland came to mention it to him." (Doc. 88-2, p. 53:19-23.)

The origins of the landfill idea on the property came from one of Harbin's engineers who worked on an unrelated project. Rowland asked him for suggestions of how the County could raise revenue. The engineer suggested a landfill, which caused Harbin to commence discussions with Matt Roper. (Doc. 88-3, pp. 28:11-29:4.) Harbin stated it started with himself and Matt Roper having conversations about hosting a landfill. (Doc. 88-3, pp. 29:4, 31:19-32:6.) Development Partners *did not dispute* that Harbin contacted Rowland about a landfill, and the County therefore

did not solicit Development Partners. (Plaintiff 30(b)(6) deposition, Doc. 88-4, pp.11:3-6, 21-24, 15:17-20.) Development Partners agreed that either Harbin or Development Partners' principal Matt Roper found the property before Roper visited with Rowland and Edgy. (Doc. 88-4, pp. 34:19-35:4.)

Defendants dispute the statements made by Matthew Roper that the County approached Plaintiff due to the Disaster Plan. (Doc. 58-3, pp. 2-3). The Disaster Plan formation began August 7, 2015 and was adopted October 14, 2016. (Declaration of Jennifer Kline, Doc. 87-1, ¶¶ 7-8.) This was well after Plaintiff purchased the property and well after the February 5, 2015 meeting during which the commissioners thought they were giving the "green-light" for Plaintiff to explore options on the property and return with a plan. FEMA and GEMA did not recommend a subtitle D landfill as part of the Disaster Plan process; they recommended that the County identify alternatives for disposal of waste. (Rowland deposition, Doc. 88-1, p. 125:1-12; Doc. 87-1, ¶ 10.)

The only reason reference to a subtitle D landfill was included in the Disaster Plan was that in the event that grant money became available, the County could decide to apply for it. (Doc. 88-1, p. 126:17-22; 130:18-131:8.)

> And that did not commit us to going to building a facility, it committed us to, if the opportunity came up then we could receive funding for it, then, yes, we could move forward with it. It didn't commit the county to go out there – I mean, none of those things we put in there committed the county to go out and do immediately, but it provided a plan for doing that, if we needed to.

(Doc. 88-1, p. 129:3-11; *see also* Doc. 87-1, ¶ 9.)

The one reference in the Disaster Plan of a landfill was never tied to Plaintiff's property. (Doc. 88-1, p. 129:12-17; Doc. 87-1, ¶ 11.) There was no discussion of any potential subtitle-D landfill site location during the discussions of the disaster plan. (Doc. 87-1, ¶ 11.)

2.

In 2014, the Property had been foreclosed and was bank owned. [Id.].

3

**RESPONSE**: Not disputed.

3.

On November 21, 2014, before closing on the Property, Plaintiff sought and obtained written verification letters from County Manager Carl Rowland certifying that the proposed solid waste handling facilities on the Property were consistent with Defendants' solid waste management plan and local land use plan. The letters confirmed that "Brantley County at the present time does not have a zoning ordinance". [Dkt. No. 58-2 at 2; Dkt. No. 58-3 at 4, Exs."B", "C" and "D" thereto; Dkt. No. 74 at 2, Exs. "A" and "B" thereto].

**RESPONSE**: Defendants dispute that Plaintiff had any plan or proposal which constituted "proposed solid waste handling facilities on the Property" in 2014.  Plaintiff had no plans for the 2,389-acre property apart from a goal of establishing some subtitle-D landfill somewhere on the property. (Doc. 88-4, pp. 49:18-51:21).  Defendants do not dispute that Carl Rowland signed a letter dated November 21, 2014 which stated that Brantley County did not have a zoning ordinance.

4.

On December 22, 2014, Plaintiff bought the Property for over $2,632,000.00 to develop it with the solid waste handling facilities. When Plaintiff purchased the land, the solid waste handling facilities indisputably were permitted uses as evidenced by County certifications. Brantley County had no zoning restrictions at that time. [Dkt. No. 58-2 at 2-3; Dkt. No. 58-3 at 4, Ex. "E"].

**RESPONSE**: Disputed. Assuming that "the solid waste handling facilities" refers to the facility proposed in Plaintiff's EPD permit application, such facility was not permitted by State or County law because it did not comply with Brantley County's Solid Waste Management Plan. The 2006 SWMP requires any applicant for an EPD Permit must explain in writing how a proposed solid waste management facility is consistent with the plan. (Doc. 58-4 at 232-233 (pp. 70-71 of the 2006 SWMP).  Development Partners admitted that it never presented a proposal prior to the 2015

letters being issued. (Doc. 88-4, p.133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou *didn't present anything in writing* to the board, correct? [A.] That is *correct*.") (emphasis added); (Doc. 64-2 (Declaration of Brian Hendrix) at 3, ¶ 7) ("Development Partners never presented the County with any plan showing what they intended to do on the property.  At no time did Development Partners provide a written statement of any sort and did not ever provide a description of the items listed on pages 70 and 71 of the County's 2006 Solid Waste Management Plan.")

Also, the County provided no "certifications" as of December 2014.   Mr.  Rowland acknowledged in his deposition testimony that he did not receive authorization from the Board of Commissioners to execute either of the consistency letters he sent to the EPD in November 2014. (Doc. 88-1 at 171) ("Q. … [B]efore you signed the letters in November of 2014 had there been a vote by the board of commissioners to authorize you to sign the letters? A. No.")

5.

Plaintiff purchased the Property to develop it with the solid waste handling facilities. Plaintiff would never have bought it as a speculative investment. [Id.].

**RESPONSE**: Disputed. Plaintiff had no plans to build on the southern tract of its property, where it has told the EPD it intends to locate the landfill, when the property was purchased.  As of February 22, 2015, Plaintiff was still trying to sell the entire southern tract of the property.  (Doc. 88-4, pp.146:20-148:2, and Ex. 21.) Further, as of February 8, 2016, Plaintiff still had not decided where it planned to put solid waste handling facilities.  (Doc. 88-4, p.172:7-22, and Ex. 18.)

6.

On February 5, 2015, at a regularly scheduled meeting, the Brantley County Board of Commissioners took official action by vote to again confirm, ratify and approve Plaintiff's

proposed solid waste handling facilities as "consistent with our local land use plan and our Solid

Waste Management Plan" and Defendants authorized their Chairman:

> to execute two letters; the first letter acknowledging that the solid
> waste handling facilities proposed by [Plaintiff] … is consistent
> with the approved Solid Waste Management Plan adopted by
> Brantley County and the cities of Hoboken and Nahunta on June 26,
> 2006, and our most recent 2011 Five- Year Short Term Work
> Program 2010-2019; and, the second letter acknowledging that the
> facilities proposed by [Plaintiff] is consistent with Brantley
> County's Local Land Use Plan.

[Dkt. No. 58-2 at 3; Dkt. No. 58- 3 at 6, Ex. "F"; Dkt. No. 100, Plaintiff's Ex. "5"].

**RESPONSE**:  Disputed in part.  Defendants admit the County minutes reflect a vote as quoted

above. Defendants deny any approval was a repeat of a previous approval – responding to "again."

Mr. Rowland acknowledged the Board of Commissioners did not authorize him to execute either

of the consistency letters he signed in November 2014.  (Doc. 88-1 at 171) ("Q. … [B]efore you

signed the letters in November of 2014 had there been a vote by the board of commissioners to

authorize you to sign the letters? A. No.")

Plaintiff also had no "proposed solid waste handling facilities." As of February 22, 2015,

Plaintiff was still trying to sell the entire southern tract of the property.  (Doc. 88-4, pp.146:20-

148:2, and Ex. 21.) As of February 8, 2016, Plaintiff *still* had not decided where it planned to put

solid waste handling facilities.  (Doc. 88-4, p.172:7-22, and Ex. 18.)  The Commissioners did not

believe it was approving any plans or proposals at the February 5, 2015 vote. (*See* testimony

excerpted in Doc. 87, pp.3-5.)

Further, the February 5, 2015 minutes state that Commissioner Edgy made a motion to

authorize two letters which state that: "the solid waste handling facilities proposed by Brantley

Development Partners, LLC to be located on a site formerly known as Magnolia Holdings Business

Park is consistent with the approved Solid Waste Management Plan adopted by Brantley County

and the cities of Hoboken and Nahunta on June 26, 2006, and our most recent 2011 Five-Year

6

Short Term Work Program 2010-2019; and, the second letter acknowledging that the facilities proposed by the Brantley Development Partners, LLC is consistent with Brantley County's Local Land Use Plan." (Doc. 58-3, Ex. F.)  Plaintiff's EPD permit application is not "located on a site formerly known as Magnolia Holdings Business Park" because Magnolia Holdings Business Park is a 89.65-acre project site located north of Highway 82.   (Department of The Army Permit documents provided by Plaintiff to the County, Doc. 87-8.)  Plaintiff's planned facility is not located at the site of Magnolia Holdings Business Park, as the EPD cite is on the southern tract of the property. (Doc. 87-9.)

7.

The February 5, 2015 Minutes acknowledge Defendants knew that the February 6, 2015 letters were necessary for Plaintiff to obtain permits from the EPD in order to conduct solid waste material activities. [Dkt. No. 58-3, Ex. "F"].

**RESPONSE**: Disputed. The minutes state that the letter "is necessary to obtain the necessary permits from the State of Georgia in operating an activity that deals with the use of waste material, be wood chips or any form of solid waste material." (Doc. 58-3, Ex. F.) Plaintiff had no specific plan for the property on February 5, 2015.  As of February 22, 2015, Plaintiff was still trying to sell the southern tract of the property.  (Doc. 88-4, pp.146:20-148:2, and Ex. 21.) As of February 8, 2016, Plaintiff *still* had not decided where it planned to put solid waste handling facilities.  (Doc. 88-4, p.172:7-22, and Ex. 18.)   The Commissioners and county manager did not believe Defendants were approving any plans or proposals at the February 5, 2015 vote:

- Q:  [W]hat [the Board of Commissioners] signed in February, February 6, 2015, was just to say it's a possibility?
  A:  That's in my mind what they were saying.  (Rowland dep., Doc. 88-1, p. 71:16-19.)

- Q:  So, in 2015 when – you were not intending to commit the board when you asked the board to make the vote – you asked Mike – you amended the agenda, then you asked Mike to make the motion and you were not – you didn't expect that to be the one

hundred percent they get to do whatever they want to do out there on that property, did you?

A:  No, I did not.  I knew that the board had other opportunities to address the matter, if specific plans didn't come up to what they wanted.

Q:  Okay.  They had another opportunity.  So you weren't intending to bind them forever to it?

A:  What they – Brantley Development Partners wanted, which I thought was a reasonable request, they wanted to proceed with the purchase of the property and they wanted some assurance that, yes, **they had the latitude at least to go in and present specific plans to the board of commissioners on landfill development.**  (Rowland dep., Doc. 88-1, p. 73:12-25-74:1-7 [emphasis added].)

- When considering the vote on February 5, 2015 authorizing the chairman to sign letters, Commissioner Jesse Mobley "thought they were just exploring projects.  And they had spoken about the wood waste to energy and doing warehouses and call centers.  And **I thought that what we were doing at that time is giving them a green light to be able to explore the options of what they could do.  And I thought they were coming back to us**."  (Jesse Mobley Deposition, Doc. 91-1, p. 19:15-21 [emphasis added].)

- "I actually thought the letter was basically not green lighting and giving a final approval on anything.  In conversations with Carl Rowland about what we were actually doing is we – the way it was relayed to me and my understanding, is that we were – **they needed these letters to be able to go out and explore their options at this property** and see if they could do the warehousing, see what was going to be feasible for them.  And that they were going to **come back at a later date and we would have to go through all of these processes again and they would specify exactly what project they were going to go with**."  (Mobley dep., Doc. 91-1, p. 35:7-23 [emphasis added].)

- "They were still exploring what they were going to do out there.  They had no definite plan on exactly what it was going to be.  At no time did they ever mention a landfill, as in bringing in garbage and stuff like that."  (Mobley dep., Doc. 91-1, p. 36:14-18.)

- Within two and one-half months of the February 2015 vote, Commissioner Mobley explained to a citizen that the vote was not to approve a permit.  He explained it as follows:

> I think there is a lot of confusion going on with this issue and a lot of assumptions. That company approached the board and introduced themselves. They explained that they are going to try to bring in a mixture of industries onto the property. One was dry storage warehouses to serve the Brunswick Ports, one was a rural outsourcing call center, and another they have talked about is wood waste to energy similar to the same thing Magnolia was going to do before going bankrupt. From what I understand, they are still in the idea stage on exactly how they want to use the land. The only vote we have had on the issue was to approve a letter signed by the Chairman stating that a solid waste management plan presented by them to the county manager and after being reviewed by him was found to be in compliance with the Brantley County Solid Waste Management plan. This was not a vote to approve any business or permit.
>
> This is my opinion on the issue and the reason I voted yes for the letter. Our county is starved for industry, we have to bring businesses in. If not, the tax payers are not going to feel any relief. A company is knocking on our door and saying hey we bought a bunch of land and have a lot of ideas for it, but before we spend a ton of money on planning out exactly what we're going to do, we want to know what we can and can't do. Once we know what we can do, we'll come back to you with our plans for the development of that property. I don't feel that I would have been serving the citizens of Brantley properly if I shunned the company from the get go and sent a message that I'm not interested in hearing about anything they want to do. I don't think that would send the right message to other potential developers either.
>
> In the brief talks I have had with the company, they have never mentioned a landfill or anything of that nature as many are speculating. It has been all talks about dry storage, converting wood waste to energy, and tech businesses such as the call center.

(Jesse Mobley Apr. 2, 2015 email, Doc. 91-2.)

- In 2015, Commissioner Mobley explained to the local newspaper editor that the vote could not possibly have been an approval and that Brantley Development would have to come comply with the requirements of the County's Solid Waste Management Plan.  (Jesse Mobley Aug. 12, 2015 email, Doc. 91-2.)

- "They started moving away from the regular landfill pretty quickly after they started exploring these other options they had and they started talking more solid waste facility that handled the bi-product of waste-to-energy stuff or a possibility at one time of even using some parts of the household garbage to fuel a waste-to-energy – the options were all over the smorgasbord at that time – but it moved from a traditional landfill to a solid waste facility that handled the bi-products of waste-to-energy facilities." (Rowland dep., Doc. 88-1, p. 141:22-142:7.)

- Q: [At the December 22nd meeting at the Courthouse] do you remember Mike [Edgy] saying they can't talk about it because they have a non-disclosure agreement but it's not landfill, it's waste-to-energy?
  A:  Yeah, I think because that's pretty much what everybody was thinking at that time and that's probably a fairly accurate statement on Mike's part …. I think Brantley Development Partners had talked enough about it being for waste-to-energy type solid waste facility and I think that was a fairly accurate statement. They had moved off of the center of it being a traditional landfill … (Rowland dep., Doc. 88-1, p. 142:24-143:15.)

- "I could have lived with it because everything was going to be recycled, in my opinion. One way or another it was going to run through all of this recycling stuff and it would have just been great for this county." (Edgy dep., Doc. 88-2, p. 33:2-6.)

- "[M]y understanding was you could run 70 percent bio with 30 percent household waste and it would get rid of everything." (Edgy dep., Doc. 88-2, p. 34:17-19.)

- Everything other than PVC was going to be recycled.  (Edgy dep., Doc. 88-2, p. 67:7-25.)

- "It's a biofacility."  (Edgy dep., Doc. 88-2, p. 119:24.)

- "[I]t was green – and that's the only reason I agreed to it.  Because it was all going to be recycled.  That's what we ought to be doing with all of it instead of doing what we're doing. But people live in fear of that new technology."  (Edgy dep., Doc. 88-2, p. 149:9-14.)

- On October 5, 2016, Plaintiff's investor, Don Marks, wrote to Matt Roper, Steve Harbin and John Kelly:

  > I have mentioned multiple times (twice I know in email which included Bob) that the majority of all communications to the BOC has been waste to energy/fuel and solid waste handling facility (SWHF) on the north side. There hasn't been any good follow up conversation about the status of the SWHF. So, the request for a siting meeting without first talking with each commissioner is no

> different than John finding out about a big issue in his company from
> an employee in the plant vs. his leadership.
>
> Imagine the hail storm when people see the siting meeting in the
> paper, call their favorite commissioner and the commissioners are
> uninformed and already pissed because [we] didn't personally
> communicate to them (leadership) and give them a chance to ask all
> the questions they need to ask.

(Doc. 87-6, p.3.)

8.

Pursuant to such official action, the Chairman of the Board of Commissioners signed and

re-issued letters dated February 6, 2015 verifying Plaintiff's proposed solid waste handling

facilities on the Property are consistent with Defendants' solid waste handling plan and "consistent

with Brantley County's local land use plan. Brantley County at the present does not have a

zoning ordinance". [Dkt. No. 58-2 at 3; Dkt. No. 58-3 at 6, Ex. "G"; Dkt. No. 100, Plaintiff's

Exs. "6" and "7"].

**RESPONSE**: Disputed in part.  Defendants admit there are letters with the Chairman's signature

dated February 6, 2015.  The Commissioners did not "re-issue" anything, because they took no

official action prior to February 2015 and there is no evidence in the record that they did.  Mr.

Rowland acknowledged the Board of Commissioners did not authorize him to execute either of

the consistency letters he signed in November 2014.  (Doc. 88-1 at 171) ("Q. … [B]efore you

signed the letters in November of 2014 had there been a vote by the board of commissioners to

authorize you to sign the letters? A. No.").

The zoning consistency letter states that "the proposed private Solid Waste Handling

Facility proposed by the Brantley County Development Partners, LLC at the former Magnolia

Holdings Business Park is consistent with Brantley County's local land use plan" and that the

County did not have an ordinance. (Doc. 58-3, Ex. G.) The SWMP consistency letter states that

"the solid waste handling facilities being proposed by Brantley Development Partners, LLC to be

10

located on a site formerly known as Magnolia Holdings Business Park is consistent with [the SWMP 2011 and Five-Year Short Term Work Program 2010-2019]." (Doc. 58-3, Ex. G.)

These letters did not apply to the proposed plan Plaintiff submitted to the EPD, because that proposal was not what was presented to the Board of Commissioners.  The letters pertained to a development located at the former Magnolia Holdings Business Park. Magnolia Holdings Business Park is a 89.65-acre project site located north of Highway 82.  (Doc. 87-8.)  Plaintiff's planned facility is not located at the site of Magnolia Holdings Business Park, as it is on the south tract of the property. (Doc. 87-9.) There is no evidence in the record that the County ever considered or approved the project Plaintiff proposed to the EPD in December 2016.

9.

On February 6, 2015 at 3:55 p.m., Defendants sent an email to Matt Roper attaching the February 6, 2015 certification letters bearing the signature of Chairman Charlie Summerlin. [Dkt. No. 100 at 36, Plaintiff's Ex. "3".]

**RESPONSE**: Disputed. Plaintiff has shown no personal knowledge of who sent the email from the address bcbc@btconline.net, so this authority should be disregarded.  Fed. R. Civ. P. 56(c)(4). Plus, there is no indication from the email or otherwise that Defendants (a group of individuals) sent the single email.

10.

Defendants' issuance of these certification letters was a required precondition for the Plaintiff to file its permit application with the Georgia EPD for the solid waste handling facilities. [Dkt. No. 58-1 at 3].

**RESPONSE**:  Defendants do not dispute that the County was required to issue consistency letters in order for Plaintiff to file an EPD permit application. Defendants dispute that Plaintiff's application relates to the property or proposal on which the County voted. (Doc. 58-3, Ex. G.)

These letters did not verify that Plaintiff's proposed solid waste handling facilities were consistent with the County's zoning or SWMP, because Plaintiff's EPD permit application property is not located at the former Magnolia Holdings Business Park. Magnolia Holdings Business Park is a 89.65-acre project site located north of Highway 82. (Doc. 87-8.) Plaintiff's planned facility is not located at the site of Magnolia Holdings Business Park, as it is on the south tract of the property. (Doc. 87-9.)

11.

On August 19, 2015, Defendants' County Manager Carl Rowland issued an additional letter confirming that Defendants consider Plaintiff's Property situated on the north and south boundaries of State Highway 520 as one and the same tract. This was done to clarify and confirm that compliance with local land use laws and the solid waste management plan is consistent on both the northern and southern tracts of the Property. [Dkt. No. 74 at 2, Ex. "C"].

**RESPONSE**: Disputed. This letter is not material to this litigation and should be disregarded. S.D. Ga. L.R. 56.1. Defendants admit that this document exists, but deny that it carries the meaning ascribed to it by Plaintiff. There is no evidence in the record that the County found that the southern tract of the Property was consistent with local land use law and the solid waste management plan. In fact, Carl Rowland did not consider the northern and southern parcels to be the same. When Rowland learned of the switch in location of the planned development, he warned Development Partners that it was not the same thing:

> I texted one of them and I told him, I said if you insist on the south side you're gonna run into political opposition, I know that ….because – well, because you had subdivisions that were right to the east of that property that had been platted and developed. I mean, it don't take a rocket scientist. I've been in this business long enough to say you're gonna have some problems and, by damn it, they did have problems on that one….But, I did point out that'll be a hotly discussed issue and it turned out it was."

(Rowland Dep., Doc. 88-1, p. 154:7-24.)

12.

Plaintiff engaged Harbin Engineering, P.C. ("Harbin") to perform and coordinate all of the extensive work and studies required to submit an application to the Georgia EPD for determination of the Property's suitability and issuance of a permit for the solid waste handling facilities. [Dkt. No. 58-1 at 2].

**RESPONSE**: Not disputed.

13.

On behalf of Plaintiff, Harbin completed the necessary work to prepare the application for site suitability and permit for the solid waste handling facilities on the Property and on December 29, 2016, Plaintiff filed with Georgia EPD its permit application for the solid waste handling facilities on the Property ("Application"). [Dkt. No. 58-1 at 4; Dkt. No. 58-3 at 4-7, Ex. "H"; Dkt. No. 58-2 at 3-4].

**RESPONSE**: Not disputed.

14.

The Application was complete and was accepted for processing by the Georgia EPD. [Id.]

**RESPONSE**: Not disputed with reference to the contents of the application. Defendants deny the application was complete to the extent it was required to comply with the County's Solid Waste Management Plan, which it did not. *See* O.C.G.A. §§ 12-8-24; 12-8-31.1 (requiring local SWMPs and requiring consistency letters). *See also* O.C.G.A. §§ 12-8-26 (requiring public meetings on site selection).

15.

Plaintiff complied with all applicable state laws and EPD rules and regulations with respect to submission of its December 29, 2016 Application for site suitability and permit to the Georgia EPD. [Dkt. No. 58-1 at 4.]

**RESPONSE**: Disputed. Plaintiff's application was not permitted by State or County law because it did not comply with Brantley County's Solid Waste Management Plan. *See* O.C.G.A. §§ 12-8-24; 12-8-31.1 (requiring local SWMPs and requiring consistency letters). *See also* O.C.G.A. §§ 12-8-26 (requiring public meetings on site selection).

The 2006 SWMP requires any applicant for an EPD Permit to explain in writing how a proposed solid waste management facility is consistent with the plan. (Doc. 58-4 at 232-233 (pp. 70-71 of the 2006 SWMP).  Development Partners admitted that it never presented a proposal prior to the 2015 letters being issued. (Doc. 88-4, p.133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou *didn't present anything in writing* to the board, correct? [A.] That is *correct*.") (emphasis added); (Doc. 64-2 (Declaration of Brian Hendrix) at 3, ¶ 7) ("Development Partners never presented the County with any plan showing what they intended to do on the property.  At no time did Development Partners provide a written statement of any sort and did not ever provide a description of the items listed on pages 70 and 71 of the County's 2006 Solid Waste Management Plan.".)

The consistency letters issued by the County also did not verify that Plaintiff's proposed solid waste handling facilities were consistent with the County's zoning or SWMP, because Plaintiff's EPD permit application property is not located at the former Magnolia Holdings Business Park. Magnolia Holdings Business Park is a 89.65-acre project site located north of Highway 82.  (Doc. 87-8.)  Plaintiff's planned facility is not located at the site of Magnolia Holdings Business Park, as it is on the south tract of the property. (Doc. 87-9.)

16.

The Georgia EPD has confirmed that the 2015 verification letters issued by Defendants to Plaintiff satisfy the preliminary verification required by O.C.G.A. § 12-8-24(g). [Dkt. No. 64-4; Dkt. No. 88-5 at 120].

**RESPONSE**: Disputed. Document 64-4 states that the 2015 letter verifying SWMP consistency was consistent with Rule 391-3-4-.02.  Document 88-5 at page 120 states that "the confirmation letters for zoning and solid waste management plan consistency provided on October 3 are sufficient to complete your application." Neither of the cited documents state that the 2015 verification letters satisfy O.C.G.A. § 12-8-24(g).

17.

With respect to the Application, Plaintiff has provided all information to the Georgia EPD requested or required by that agency. [Dkt. 88-5 at 49.]

**RESPONSE**: Not disputed.

18.

On September 8, 2016, Defendants adopted the text of a new zoning ordinance which purports to incorporate by reference maps entitled "Official Land Use Districts Map of Brantley County, Georgia". [Dkt. No. 1-8 at 17; Dkt. No. 64-3.]

**RESPONSE**: Not disputed.

19.

The September 8, 2016 Meeting Minutes fail to show the adoption of any zoning map in connection with adopting the text of the September 8, 2016 zoning ordinance. [Dkt. No. 64-3.]

**RESPONSE**: Not disputed.

20.

The September 8, 2016 zoning ordinance identifies the lands to which its various zoning classifications apply only by reference to the maps. [Dkt. 1-8 at 17 "the boundaries of each district are shown on maps"; see also Section 4.3 on same page, Interpretation of Land Use Districts].

**RESPONSE**: Not disputed.

21.

During discovery, Plaintiff specifically asked Defendants to produce a certified copy of any zoning map adopted in connection with the September 8, 2016 zoning ordinance and to produce any minutes, ordinances or resolutions reflecting the adoption of any such zoning map. [Dkt. No. 86-1.]

**RESPONSE**: A discovery request during litigation is not material to Plaintiff's claims in this litigation and should be disregarded. Fed. R. Civ. P. 56; S.D. Ga. L.R. 56.1.

22.

In response, Defendants said they would produce all documents responsive to these requests, but Defendants failed to produce any minutes, ordinances or resolutions showing the adoption of any zoning map for the September 8, 2016 zoning ordinance. [Dkt. No. 86-2.]

**RESPONSE**: A response to a discovery request during this litigation is not material to Plaintiff's claims in the same litigation and should be disregarded. Fed. R. Civ. P. 56; S.D. Ga. L.R. 56.1.

23.

Defendants only produced multiple pages of a quadrant map which was never adopted. [Dkt. No. 86-3.]

**RESPONSE**: This is not material to this litigation, as Plaintiff has shown no evidence that the 2016 Zoning Ordinance was applied to its proposed development. Fed. R. Civ. P. 56; S.D. Ga. L.R. 56.1.  Further, Plaintiff's cited authority is four quadrant maps which do not support the proposition that "the quadrant map" was never adopted. As there is no support for this contention, it should be disregarded.  Fed. R. Civ. P. 56(c).

24.

No zoning map was adopted in connection with the September 8, 2016 zoning ordinance. [Dkt. No. 74 at 3-4].

**RESPONSE**: This is not material to this litigation, as Plaintiff has shown no evidence that the 2016 Zoning Ordinance was applied to its proposed development. Fed. R. Civ. P. 56; S.D. Ga. L.R. 56.1.

25.

Instead of adopting a finalized zoning map designating land in Brantley County to various zoning districts at the time the text of the September 8, 2016 zoning ordinance was adopted, Defendants worked off quadrant maps and employed a process where landowners had a period of time to request that the County zone land parcels to certain districts. [Dkt. No. 89 at 69; Dkt. No. 88-1 at 163-165; Dkt. No. 90 at 71-74; Dkt. No. 91 at 25-26].

**RESPONSE**: This is not material to this litigation, as Plaintiff has shown no evidence that the 2016 Zoning Ordinance was applied to its proposed development. Fed. R. Civ. P. 56; S.D. Ga. L.R. 56.1.  Defendants admit citizens were permitted to come in and request rezoning of their property without going through formal rezoning application process.  (Mobley Dep., Doc. 91-1, pp.25:10-26:3.)

26.

On June 15, 2017, Defendants took further regulatory action to adopt a County-wide zoning ordinance, to downzone Plaintiff's Property, and to amend the solid waste management plan. [Dkt. 58-2 at 5-6; Dkt. No. 58-4; Dkt. No. 86-4].

**RESPONSE**: Admitted in part.  Defendants admit the County adopted an amended zoning ordinance on June 15, 2017. If Plaintiff alleges that the 2017 zoning ordinance constituted a "downzoning" of its property, it must admit also that the 2016 zoning ordinance is valid.  (*See* Doc. 1, pp.28-29). Otherwise, there could be no downzoning.

27.

On June 19, 2019, Plaintiff demanded that Defendants certify in writing, as needed to complete processing and approval of Plaintiff's EPD Application, that Plaintiff's solid waste handling facilities are neither subject to zoning ordinance nor the June 15, 2017 solid waste management plan and that Plaintiff has a vested right to develop the Property with the solid waste handling facilities sought with its Application. Defendants failed and refused to provide the requested certification letters. [Dkt. No. 58-2 at 6; Dkt. No. 58-3 at 7, Ex. "I"].

**RESPONSE**: Admitted in part.  Defendants admit the County did not comply with Plaintiff's demand but deny such letters are needed to complete processing and approval, because the EPD has yet to approve prerequisites for the permit and may never approve the prerequisites. The EPD has not requested an additional zoning consistency letter and will not request or require additional consistency letter unless and until after the D&O Plan is approved. (EPD deposition, Doc. 88-5, pp. 20:24-21:17). (*See also* Declaration of Richard Deason, Doc. 64-5, p.5.)  The D&O plan review process is an involved one, and the EPD explicitly did not guarantee that it will approve a D&O plan or that a permit will issue. (Doc. 88-5, pp. 39:12-24, 49:17-24.)

The County has not put pressure on the EPD and Plaintiff's application has not been delayed, so the lack of such letter is not needed to "complete processing" of Plaintiff's application. (Doc. 88-5, pp. 35:10-21,37:6-39:2.)

Finally, Plaintiff cites no authority (as none exists) for the proposition that the EPD requires any certification that Plaintiff's proposed facilities with reference to the 2017 SWMP or that Plaintiff has a vested right, so this 'fact' should be disregarded. Fed. R. Civ. P. 56(c). Therefore, Defendants deny that Plaintiff was entitled to any of the confirmations from the County in this regard.

28.

On May 28, 2020, after years of study and analysis, the Georgia EPD issued a Site Suitability Notice for Plaintiff's solid waste handling facilities on the Property. Therein, the Georgia EPD stated that no permit will be issued for Plaintiff's proposed solid waste disposal site unless: "a reaffirmation of zoning consistency must be submitted to EPD prior to a final decision regarding the issuance of a permit for the proposed solid waste disposal facility." This is the same reaffirmation demanded by Plaintiff on June 19, 2019, which Defendants still fail and refuse to provide. [Dkt. No. 58-2 at 6-7, Ex. "2"; Dkt. No. 58-3 at 7, Ex. "J"; Dkt. No. 58-1 at 5, Ex. "2"].

**RESPONSE**: Denied in part. There is no evidence in the record that EPD has requested a zoning verification reaffirmation. (EPD deposition, Doc. 88-5, pp. 20:24-21:17; s*ee also* Declaration of Richard Deason, Doc. 64-5, p.5.)  Additionally, there is no evidence in the record that EPD has or will request a statement that Plaintiff's property is not subject to the June 15, 2017 solid waste management plan or that Plaintiff has a vested right to develop its property consistent with the 2016 application.

29.

Issuance of the Site Suitability Notice means Georgia EPD has determined that applicable siting regulatory standards for the solid waste handling facilities can be met. As required to receive a permit, Plaintiff will perform and meet the site limitations provided with Georgia EPD's May 28, 2020 Site Suitability Notice. [Dkt. No. 58-1 at 5].

**RESPONSE**: Denied.  The Site Suitability Notice contains only a *conditional* determination of site suitability subject to site limitations, discovery of errors, and new information. The letter states that the "EPD has determined that the applicable siting standards can be met in accordance with Chapter 391-3-4-.05(1), provided the attached 'Site Limitations' are met.  This determination is

subject to revision … should errors be found in the submitted information or new information be provided relevant to this determination. This letter denotes only the demonstration of the ability to comply with siting standards for the proposed site and does not constitute approval to begin construction or operation of the disposal site." (Site Suitability Notice, Doc. 58-1, p.10, Ex. 2.)

30.

Upon issuing the May 28, 2020 Site Suitability Notice, the Georgia EPD publicly determined that Plaintiff's solid waste handling facilities on the Property can safely meet applicable state laws and EPD rules and regulations, including but not limited to, the required regulatory siting criteria for airport safety, floodplains, wetlands, fault areas, seismic impact zones, groundwater recharge areas, unstable areas, and hydrogeological assessment. [Dkt. No. 58-1 at 5].

**RESPONSE**: Denied. The Site Suitability letter states only that the EPD has made a conditional determination that the proposed facility can meet applicable siting standards: "This letter denotes only the demonstration of the ability to comply with siting standards for the proposed site..." (Doc. 58-1, p.10, Ex. 2.)  It does not include any determination that Plaintiff's proposed facility can safely meet all applicable state laws and EPD rules and regulations.  The letter states: "EPD has determined that the applicable siting standards can be met in accordance with Chapter 391-3-4-.05(1), provided the attached 'Site Limitations' are met.  This determination is subject to revision. … should errors be found in the submitted information or new information be provided relevant to this determination." (Doc. 58-1, p.10, Ex. 2.)

31.

Defendants continue to refuse to provide the necessary reaffirmation of zoning consistency requested by Plaintiff on June 19, 2019 and Defendants remain unwilling to provide reaffirmation of zoning consistency without the Court ordering them to do so. [Dkt. No. 66 at 59-60].

**RESPONSE**: This is not a material fact related to the claims on which Plaintiff seeks summary judgment. *See* Fed. R. Civ. P. 56(a).  Plaintiff cites to arguments by counsel and no admissible authority for this alleged 'fact,' so it should be disregarded.  Fed. R. Civ. P. 56(c).  Further, the zoning reaffirmation letters are not "necessary." The EPD has not requested additional consistency letters and will not request or require additional consistency letters unless and until after the D&O Plan is approved. (EPD deposition, Doc. 88-5, pp. 20:24-21:17; s*ee also* Doc. 64-5, p.5.)  The D&O plan review process is an involved one, and the EPD explicitly did not guarantee that it will approve a D&O plan or that a permit will issue. (Doc. 88-5, pp. 39:12-24, 49:17-24.) The County has also not put pressure on the EPD and Plaintiff's application has not been delayed, so the lack of such letter is not needed for Plaintiff's application to continue processing. (Doc. 88-5, pp. 37:6-39:2.)

32.

On July 9, 2020, Defendants adopted a Resolution which purports to withdraw the certification letters issued by County Manager Rowland in 2014 and by Defendants' Chairman in 2015. [Dkt. No. 58-2 at 7, Ex. "4"].

**RESPONSE**: Plaintiff fails to cite to any appropriate authority for this alleged fact. Document 58-2 is an affidavit of John Kelly, who lacks personal knowledge of the meaning of the resolution, *see* Fed. R. Civ. P. 56(c)(4), and exhibit 4 to the affidavit is a June 15, 2017 resolution adopting an amendment to the Solid Waste Management Plan. (Doc. 58-2, Ex. 4.) Defendants admit that the County Commissioners adopted a resolution withdrawing the certification letters and clarifying its position that Plaintiff did not comply with the SWMP in place at that time.

33.

In the July 9, 2020 Resolution, Defendants acknowledge that the consistency letters they have purported to withdraw are required in order for Plaintiff to obtain a permit from the Georgia EPD for a solid waste handling facility. [Id.].

**RESPONSE**: Plaintiff fails to cite to any appropriate authority for this alleged fact. Document 58-2 is an affidavit of John Kelly, who lacks personal knowledge of the meaning of the resolution, *see* Fed. R. Civ. P. 56(c)(4), and exhibit 4 to the affidavit is a June 15, 2017 resolution adopting an amendment to the Solid Waste Management Plan. (Doc. 58-2, Ex. 4.) Defendants admit that the County Commissioners adopted a resolution withdrawing the certification letters and clarifying its position that Plaintiff did not comply with the SWMP in place at that time.

34.

On August 6, 2020, Defendants adopted an amended Solid Waste Management Plan. [Dkt. No. 64-6 at 4].

**RESPONSE**: Not disputed.

35.

The solid waste handling facilities sought by Plaintiff with the Application will receive, handle and dispose of solid waste generated from outside both Brantley County and the State of Georgia and will compete in the interstate market for the transfer, transportation, handling and disposal of solid waste. Plaintiff's solid waste handling facilities on the Property will not accept hazardous waste. [Dkt. No. 58-2 at 7-8; Dkt. No. 58-3 at 7-8].

**RESPONSE**: This is not a material fact related to the claims on which Plaintiff seeks summary judgment. *See* Fed. R. Civ. P. 56(a). Defendants do not dispute Plaintiff's agents have made these statements, but this purported 'fact' is actually speculation. Plaintiff cannot show what a

hypothetical facility will do before it knows whether the EPD will grant a permit to develop the facility.  (*See* EPD dep., Doc. 88-5, p.49:17-24; Declaration of Richard Deason, Doc. 64-5, p.5.)

36.

Plaintiff has the financial capability to construct and complete the solid waste handling facilities sought with the Application. [Dkt. No. 58-2 at 9; Dkt. No. 58-3 at 9].

**RESPONSE**: Denied.  Plaintiff testified that it funds itself through periodic capital calls, whereby Plaintiff's members/partners each pay a proportion of the total capital raised themselves or through their LLCs. (Plaintiff 30(b)(6) Dep., Doc. 88-4, pp.228:15-229:16).  Plaintiff cites to affidavits of two of its members. (John Kelly affidavit, Doc. 58-2; Matt Roper affidavit, Doc. 58-3).  Plaintiff has no evidence which supports its allegation that all members have the financial capability to fully fund the project construction, nor does it show evidence that Kelly and Roper have personal knowledge of all the members' finances.  Thus, this allegation should be disregarded. Fed. R. Civ. P. 56(c)(4).

37.

Plaintiff has marketed to, and received interest and inquiry from, out-of-state market participants for the handling and disposal of solid waste generated from outside the State of Georgia at the proposed solid waste handling facilities on the Property sought with the Application. However, given Defendants' actions, Plaintiff cannot enter into final non-contingent contracts with these or any other market participant because, due to Defendants' actions, Plaintiff cannot give assurances to prospective customers that Plaintiff will actually be able to construct and operate the facilities on the Property. [Dkt. No. 58-2 at 8-9, Ex. "5"; Dkt. No. 58-3 at 8-9].

**RESPONSE**: Denied. The only contingent contract to which Plaintiff cites is dated September 2, 2020, and "terminates under its own terms if [Plaintiff] does not receive a permit within Nine (9) months of signing." (Doc. 58-2, p.8, Ex. 5.)  Plaintiff failed to even submit its D&O plan before

the contract expired "under its own terms" on June 2, 2020.  Plaintiff submitted its D&O Plan on August 26, 2021. (Docs. 136, 136-1.)

There is also no guarantee that the EPD will issue Plaintiff a solid waste handling permit. The D&O plan review process is an involved one, and the EPD explicitly did not guarantee that it will approve a D&O plan or that a permit will issue. (Doc. 88-5, pp. 39:12-24, 49:17-24.)  The EPD has not requested additional consistency letters and will not require additional consistency letters unless and until after the D&O Plan is approved.  (Doc. 88-5, pp. 20:24-21:17.)

Finally, Plaintiff itself has acknowledged that it cannot enter non-contingent contracts unless and until the EPD issues a permit. (Doc. 88-4, pp.219:19-22, 220:11-221:1.)  The County does not issue the permit (O.C.G.A. § 12-8-24), and Defendants have not delayed the permitting process. O.C.G.A. § 12-8-24. (Doc. 88-5, pp. 35:10-21,37:11-39:2.)

38.

Plaintiff is precluded from entering into any final non-contingent contracts with market participants, including out-of-state customers, unless and until Plaintiff is able to receive a permit from Georgia [EPD] authorizing construction and operation of the solid waste handling facilities sought with the Application. [Dkt. No. 58-2 at 9; Dkt. No. 58-3 at 9.]

**RESPONSE**:  Disputed.  It is not clear to what "non-contingent contracts" Plaintiff refers. Plaintiff's partners Matt Roper and Donald Marks told the County Commissioners that Plaintiff was "pursuing development projects to include warehousing, technology related businesses such as call centers and software development and waste to energy operations." (Doc. 87-7.)  Plaintiff has not shown that there is a bar to entering non-contingent contracts for these operations or other ventures.

39.

Operation of the subtitle "D" solid waste disposal facility on the Property as sought with the Application will generate approximately 100 good paying jobs for local residents. Additional phases and other planned facilities on the Property will create many more good paying jobs in Brantley County. [Dkt. No. 58-3 at 9].

**RESPONSE**: The above-stated fact is not material to this litigation and should be disregarded. *See* Fed. R. Civ. P. 56(a).  Further, Plaintiff cites to the affidavit of Matt Roper (Doc. 58-3).  The statement of "good paying jobs" is an opinion, not a fact, as Matt Roper's affidavit includes no indication that he has any personal knowledge of what constitutes a "good paying job."  The Court should disregard this alleged fact for this reason, as well. *See* Fed. R. Civ. P. 56(c)(4).

40.

Operation of the solid waste handling facilities on the Property will generate significant revenue for Brantley County, as the host local government, in the form of "tipping fees" which are authorized by the Georgia Code, Section 12-8-39. [Dkt. No. 58-3 at 9-10.]

**RESPONSE**: The above-stated fact is not material to this litigation and should be disregarded. *See* Fed. R. Civ. P. 56(a).  Further, Plaintiff cites to the deposition of Matt Roper (Doc. 58-3), and Matt Roper's deposition includes no indication that Roper has any personal knowledge of what the cost of the landfill will be to the County.  The Court should disregard this alleged fact for this reason, as well. *See* Fed. R. Civ. P. 56(c)(4).

41.

In addition to the Property purchase price of over 2.6 million dollars, Plaintiff has spent $1,109,436.15 on engineers, geologists, hydrogeologists, other professionals, and carrying costs, pursuing development of the solid waste handling facilities on the Property as sought with the Application and in reliance on Defendants' verbal and written assurances that the project was

authorized and that Defendants wanted the solid waste handling facilities sited on the Property. This figure does not include BCDP's legal fees. [Dkt. No. 58-2 at 9.]

**RESPONSE**: Denied. Plaintiff admitted that this $1.1 million figure includes costs for lobbyists to the Georgia legislature, consultants, and insurance. (Doc. 88-4, p.227:1-22).

The Defendants also did not provide any verbal or written assurances that the project was authorized and that Defendants wanted the solid waste handling facilities sited on the Property, because Defendants did not believe they were approving any plans or proposals at the February 5, 2015 vote. (*See* testimony excerpted in Doc. 87, pp.3-5.) Plaintiff's partners Matt Roper and Donald Marks told the County commissioners that "they were currently pursuing development projects to include warehousing, technology related businesses such as call centers and software development and waste to energy operations." (Doc. 87-7.)

Plaintiff also had no "project" that the County could authorize. As of February 22, 2015, Plaintiff was still trying to sell the south tract of the property.  (Doc. 88-4, pp.146:20-148:2, and Ex. 21.) As of February 8, 2016, Plaintiff *still* had not decided where it planned to put solid waste handling facilities.  (Doc. 88-4, p.172:7-22, and Ex. 18.)  Further, Plaintiff did not present any information in writing to the Board of Commissioners before the February 5, 2015 vote. (Doc. 88-4, p.133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou didn't present anything in writing to the board, correct? [A.] That is correct."); (*id*. at 135) ("Q. You did not have any plans, specific plans as of the 5th of February 2015, for what you were going to do, specifically, on the Property, correct, other than you knew that, generally, you wanted a landfill somewhere? [A.] We had no concrete plans.") (emphasis added).  Plaintiff never submitted anything to the County, including the EPD application. (Doc. 88-1, p. 107.)

42.

Following issuance of the May 28, 2020 Site Suitability Notice from Georgia EPD, on

August 14, 2020, Plaintiff received and approved a scope of work and cost estimate from Harbin

for preparation of Design and Operation plans, and other required submittals, to complete the

processing of Plaintiff's Application with the Georgia EPD. [Dkt. No. 58-1 at 6, Ex. "3"; Dkt.

No. 58-3 at 9].

**RESPONSE**: Not disputed.

43.

On May 14, 2021, this Court entered an Order granting Plaintiff's Motion for Preliminary

Injunction which, among other things, ordered Defendants to "issue the reaffirmation of zoning

consistency required by Ga. Comp. R. & Regs. 391-3-4-.05(1)(a)". [Dkt. 114 at 52].

**RESPONSE**: Not disputed, but this is not an evidentiary fact.

44.

On May 20, 2021, Plaintiff directed written correspondence via overnight delivery to the

Defendants demanding that Defendants comply with this Court's May 14, 2021 Order by issuing

the required reaffirmation of zoning consistency. On May 21, 2021, Defendants received

Plaintiff's May 20, 2021 correspondence. [Dkt. 129 at 2; 13-20].

**RESPONSE**: The above-stated fact is not material to the Court's consideration of this motion for

summary judgment and should be disregarded. *See* Fed. R. Civ. P. 56(a).  Plaintiff's letter went

beyond the Court's May 14, 2021 Order and demanded that the County:

> … issue letters of reaffirmation of zoning compliance with any
> applicable zoning ordinance, if any, and of consistency with any
> Solid Waste Management Plan, if any.   The County must
> immediately confirm to the [EPD], with copies to the Brantley
> County Development Partners that Brantley County Development
> Partners, LLC's proposed development of the Solid Waste Handling
> Facilities are in compliance with any applicable local land use laws
> and is consistent with any applicable Solid Waste Management Plan.

(Doc. 129, p.13, Ex. A.)

45.

Defendants failed and refused to respond to Plaintiff's May 20, 2021 correspondence and

have refused to obey this Court's May 14, 2021 Order. [Dkt. 129 at 2.]

**RESPONSE**: Denied.  The above-stated 'fact' is not material fact relevant to Plaintiff's motion

for summary judgment and should be disregarded. *See* Fed. R. Civ. P. 56(a).  Also, Plaintiff's letter

went beyond the Court's May 14, 2021 Order.

46.

On August 26, 2021, Plaintiff timely submitted the Design and Operation plans to the

Georgia EPD. [Dkt. No. 136.]

**RESPONSE**: Not disputed.

47.

The parties do not dispute Plaintiff acquired vested rights in December of 2016 by

submission of the Application to the Georgia EPD. [Dkt. No. 66 at 79-80; Dkt. No. 85 at 5.]

**RESPONSE**: Denied. First, this is not a material fact, but is instead a legal conclusion which

Defendants dispute. Fed. R. Civ. P. 56 (a). Second, Plaintiff failed to cite to appropriate authority.

Plaintiff cites to counsel's legal arguments in a motion hearing transcript (Doc. 66), which is not

admissible evidence and should be disregarded. Fed. R. Civ. P. 56 (c)(2).  Plaintiff also cites to

Matthew Roper's second affidavit. (Doc. 85). This affidavit does not have a page 5, and Mr. Roper

has no personal knowledge of Plaintiff's legal rights, as they have yet to be determined by this

Court.

Defendants admit that Plaintiff claims it has a vested right to develop the property in

accordance with its 2016 EPD application, and therefore, it is Plaintiff's contention that any rule,

regulation, ordinance, or other law adopted by the County thereafter would not be applicable to

28

Plaintiff's proposed development. Defendants deny Plaintiff acquired vested rights by filing the EPD permit application because it did not comply with the SWMP in existence when the EPD application was submitted, as explained in the accompanying Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment.

48.

The text of the September 8, 2016 Zoning Ordinance imposes criminal penalties if land is used in violation of its terms: "the offender shall, upon conviction in Magistrate Court, be fined no more than five hundred ($500) dollars or imprisoned for not more than sixty (60) days, or both, for each offense. Each day of continued violation shall be considered a separate offense." [Dkt. 1-8 at 46.]

**RESPONSE**: The above-stated fact is not material to the Court's consideration of this motion for summary judgment and should be disregarded. *See* Fed. R. Civ. P. 56(a).

This 5th day of November, 2021.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Dana K. Maine*
Dana K. Maine
Georgia Bar No. 466580
dmaine@fmglaw.com
Rachael Slimmon
Georgia Bar No. 831661
rslimmon@fmglaw.com

*Attorneys for Defendants*

100 Galleria Parkway, Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (telephone)

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically submitted the foregoing DEFENDANTS'

RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS FOR WHICH THERE

EXIST NO GENUINE ISSUE OF DISPUTE TO BE TRIED to the Clerk of Court using the

*CM/ECF* system which will automatically send electronic mail notification of such filing and

service to the following counsel of record:

L. Robert Lovett
Lovett Law Group
5400 Riverside Drive, Suite 203
Macon, GA 31210
Bob@LovettLawGroup.com

George Rountree
Brown Rountree, P.C.
26 North Main Street
Statesboro, GA 30458
george@br-firm.com

Kyler L. Wise
Wilson Brock & Irby, LLC
2849 Paces Ferry Road, Suite 700
Atlanta, GA 30339
kwise@wbilegal.com

Mark D. Johnson
Gilbert, Harrell, Sumerford & Martin, PC
PO Box 190
Brunswick, GA 31521-0190
mjohnson@gilbertharrelllaw.com

This 5th day of November, 2021.

/s/ Dana K. Maine
Dana K. Maine
Georgia Bar No. 466580
dmaine@fmglaw.com

*Attorney for Defendants*

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (telephone)
17675675