IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| BRANTLEY COUNTY DEVELOPMENT PARTNERS, LLC, <br><br> Plaintiff, <br><br> V. <br><br> BRANTLEY COUNTY, GEORGIA, et al., <br><br> Defendants. | CIVIL ACTION FILE <br> NO. 5:19-CV-00109-LGW-BWC |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

### I.     INTRODUCTION

Defendants Brantley County, Georgia, Chris "Skipper" Harris, Randy Davison, Brian Hendrix, Jesse Mobley, and Ray Griffin[1], ("Defendants" or "the County") and hereby file this Memorandum of Law in Support of their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. The Court should grant the County's motion because: (1) Plaintiff lacks standing to bring its claims; (2) Plaintiff does not have a valid vested rights claim; (3) Plaintiff does not have a valid void for vagueness claim; (4) Plaintiff has suffered no damages; and (5) to the extent there are damages, Defendants are entitled to legislative and official immunity.

### II.     STATEMENT OF FACTS AND PROCEDURE

The claims which remain after the Court's ruling on Defendants' motion to dismiss (Doc. 135) are the state law vested rights claim and void for vagueness due process claim against Defendants in their individual capacities, for prospective injunctive and declaratory relief. (Doc. 135, pp. 34, 37, 58, 68.)  It is on these claims Defendants now move for summary judgment.

---

[1] Ray Griffin is no longer a Brantley County Commissioner.

A.      **Material Facts**

Plaintiff Brantley County Development Partners ("Plaintiff" or "Development Partners") purchased the subject property ("Property") consisting of nearly 2,400 acres in December 2014. (Doc. 58-3, p.74; Doc. 88-4, p.95.)  The Property includes separate tracts on the north and south side of Highway 82/Georgia State Highway 520. (Doc. 88-4, p.113, 306-307.)

The origins of the landfill idea on Plaintiff's property came from an engineer who worked on an unrelated project for Plaintiff, Steve Harbin. (Doc. 88-3, p.28.) County Manager Carl Rowland asked the engineer for suggestions of how the County could raise revenue and the engineer suggested a landfill, which caused Harbin to begin discussions with Matt Roper, a member of Plaintiff. (Doc. 88-3, pp. 28:11-29:4.) Indeed, Harbin stated the landfill discussions started with himself and Roper having conversations about hosting a landfill. (Doc. 88-3, pp. 29:4, 31:19-32:6.) Harbin is also the one who first suggested a landfill on the Property to Rowland. (Doc. 88-1, pp. 37-38) ("…Steve [Harbin] was introduced to the 2400-acre piece of property, right. And so Steve come back to me [Rowland] sometime later and he says what do y'all think about doing a landfill?")

The County did not solicit Development Partners to buy the property or build a landfill. (Plaintiff 30(b)(6) deposition, Doc. 88-4, pp. 11:3-6, 14-15.) Development Partners agreed that either Harbin or Development Partners' principal Roper found the property before Roper visited with Rowland and then-Commissioner Mike Edgy. (Doc. 88-4, pp. 34-35.)

The County also did not approach Plaintiff because of the Disaster Plan.  (Doc. 58-3, pp. 2-3). The Disaster Plan formation began August 7, 2015 and was adopted October 14, 2016. (Doc. 87-1, ¶¶ 7-8.)  FEMA and GEMA did not recommend a subtitle D landfill as part of the Disaster Plan process; they recommended that the County identify alternatives for disposal of waste. (Doc. 88-1, p. 125:1-12; Doc. 87-1, ¶ 10.)  The only reason reference to a subtitle D landfill

was included in the Disaster Plan was that in the event that grant money became available, the County could decide to apply for it.  (Doc. 88-1, p. 126:17-22; 130:18-131:8.)

> And that did not commit us to going to building a facility, it committed us to, if the opportunity came up then we could receive funding for it, then, yes, we could move forward with it.  It didn't commit the county to go out there – I mean, none of those things we put in there committed the county to go out and do immediately, but it provided a plan for doing that, if we needed to.

(Doc. 88-1, p. 129:3-11; *see also* Doc. 87-1, ¶ 9.)

The single reference in the Disaster Plan of a landfill was never tied to Plaintiff's property. (Doc. 88-1, p. 129:12-17; Doc. 87-1, ¶ 11.)  There was no discussion of any potential subtitle-D landfill site location during the discussions of the disaster plan.  (Doc. 87-1, ¶ 11.)

In November 2014, Rowland signed letters stating that the "Solid Waste Handling Facility located at the Magnolia Holdings Business Park" is consistent with Brantley County's local land use plan and solid waste management plan ("SWMP"). (Doc. 1-2.)  Rowland did not receive authorization from the Board of Commissioners to execute either of these letters.  (Doc. 88-1 at 171) ("Q. … [B]efore you signed the letters in November of 2014 had there been a vote by the board of commissioners to authorize you to sign the letters? A. No.")

At a February 3, 2015 work session, Plaintiff's partners Roper and Donald Marks told the County Commissioners that Plaintiff was "pursuing development projects to include warehousing, technology related businesses such as call centers and software development and waste to energy operations." (Doc. 87-7.)  They further stated that "no firm commitments have been made, but [they] expected that efforts should result into specific development potentials in the future." (*Id*.)

At the February 5, 2015 Brantley County Board of Commissioners meeting, Commissioner Edgy made a motion to authorize two consistency letters, and the motion carried. (Doc. 1-4.)  The letters stated that: "the solid waste handling facilities proposed by Brantley Development Partners, LLC to be located on a site formerly known as Magnolia Holdings Business Park is consistent

with the approved Solid Waste Management Plan adopted by Brantley County and the cities of Hoboken and Nahunta on June 26, 2006, and our most recent 2011 Five-Year Short Term Work Program 2010-2019; and, the second letter acknowledging that the facilities proposed by the Brantley Development Partners, LLC is consistent with Brantley County's Local Land Use Plan." (Doc. 58-3, Ex. F.)

Plaintiff did not present any information in writing to the Board of Commissioners before the February 5, 2015 vote. (Doc. 88-4, p.133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou didn't present anything in writing to the board, correct? [A.] That is correct."); (*id*. at 135) ("Q. You did not have any plans, specific plans as of the 5th of February 2015, for what you were going to do, specifically, on the Property, correct, other than you knew that, generally, you wanted a landfill somewhere? [A.] We had no concrete plans.").  The Commissioners and county manager also did not believe Defendants were approving any plans or proposals at the February 5, 2015 vote. (*See* Statement of Material Facts, No. 20, submitted contemporaneously herewith.)

These February 2015 consistency letters did not apply to the proposed plan Plaintiff submitted to the EPD, because the EPD proposal was never presented to the Board of Commissioners.  The letters pertained to a development located at the <u>former Magnolia Holdings Business Park</u>. Magnolia Holdings Business Park is a 89.65-acre project site located <u>north</u> of Highway 82.  (Doc. 87-8.)  Plaintiff's planned facility which is the subject of the EPD permit application is on the <u>southern tract</u> of property. (Doc. 87-9.)

Plaintiff had no plans to build on the southern tract of its property when the property was purchased.  As of February 22, 2015, Plaintiff was still trying to sell the entire southern tract. (Doc. 88-4, pp.146:20-148:2, and Ex. 21.) As of February 8, 2016, Plaintiff had *still* not decided

whether it wanted to locate solid waste handling facilities on the north or south tract of property. (Doc. 88-4, p.172:7-22, and Ex. 18.)

Plaintiff submitted its EPD permit application on December 29, 2016. (Doc. 1-11.) There is no evidence in the record that the County ever knew of, saw, considered or approved the project Plaintiff proposed to the EPD in its December 2016 application. Development Partners admitted it never presented a proposal prior to the 2015 letters being issued. (Doc. 88-4, p.133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou *didn't present anything in writing* to the board, correct? [A.] That is *correct*.") (emphasis added); (Doc. 64-2 at 3, ¶ 7) ("Development Partners never presented the County with any plan showing what they intended to do on the property.  At no time did Development Partners provide a written statement of any sort and did not ever provide a description of the items listed on pages 70 and 71 of the County's 2006 Solid Waste Management Plan.")  Plaintiff never submitted anything to the County, including the EPD application. (Doc. 88-1, p. 108 [p.107 of the transcript].)

The proposed facility was also not permitted by State or County law, because it did not comply with Brantley County's Solid Waste Management Plan. *See* O.C.G.A. §§ 12-8-24; 12-8-31.1 (requiring local SWMPs and requiring consistency letters); O.C.G.A. §§ 12-8-26 (requiring public meetings on site selection). The 2006 SWMP mandates that any applicant for an EPD Permit must explain in writing how a proposed solid waste management facility is consistent with the plan. (Doc. 58-4 at 232-233 (pp. 70-71 of the 2006 SWMP)).  As stated above, though, Development Partners never presented a proposal prior to the 2015 letters being issued. (Doc. 88-4, p.133; Doc. 64-2 at 3, ¶ 7.) The consistency letters issued by the County also did not verify that Plaintiff's proposed solid waste handling facilities were consistent with the County's zoning or

SWMP, because Plaintiff's EPD permit application property is not located at the former Magnolia Holdings Business Park. (Doc. 87-8; Doc. 87-9.)

Moreover, the northern and southern pieces of property are separate tracts of land. (Doc. 88-4, pp.306-310.) When County Manager Carl Rowland learned that Plaintiff planned to switch the location of its planned development from the north tract of property to the south tract, he warned Plaintiff's representatives that doing so would be a problem:

> I texted one of them and I told him, I said if you insist on the south side you're gonna run into political opposition, I know that ….because – well, because you had subdivisions that were right to the east of that property that had been platted and developed.  I mean, it don't take a rocket scientist. I've been in this business long enough to say you're gonna have some problems and, by damn it, they did have problems on that one….But, I did point out that'll be a hotly discussed issue and it turned out it was."

(Doc. 88-1, p. 154:7-24.)

During the review of Plaintiff's EPD permit application, the EPD itself affirmed that the County did not put pressure on the EPD, the EPD did not require additional field work or testing as a result of public comments or any act of the County, and Plaintiff's EPD application review was not delayed. (Doc. 88-5, pp. 35:10-21,37:6-39:2.)  There is no evidence in the record that anything the County did delayed or impeded the EPD's consideration of Plaintiff's landfill permit application.

Plaintiff submitted its required D&O Plan to the EPD on August 26, 2021. (Docs. 136, 136-1.) The EPD explicitly did not guarantee that it would approve the D&O plan or that a permit would issue and stated that the review process is an "involved" one and the D&O plan would be "thoroughly reviewed." (Doc. 88-5, pp. 39:12-24, 49:17-24.)

And a permit did issue. On May 9, 2022, the EPD issued a solid waste handling permit to Plaintiff for "Brantley County – Coastal Terrace Solid Waste Handling Facility, US Highway 82

East, Municipal Solid Waste Landfill…" at the following address: "Coastal Terrace Solid Waste Handling Facility, US Highway 82 East, Waynesville, GA 31566." (Doc. 164-1.)

The County also passed a zoning ordinance during the pendency of Plaintiff's EPD permit application -on September 8, 2016. (*See* Doc. 1-8.) The County later adopted an amended zoning ordinance on June 15, 2017. In that ordinance, Plaintiff's property was zoned 'high industrial'. (Doc. 58-4, p.96 *et seq*.) Citizens were permitted to come in and request rezoning of their property without going through formal rezoning application process.  (Doc. 91-1, pp.25:10-26:3.)

Plaintiff previously complained that the County prevented it from entering "non-contingent contracts," but has since acknowledged that it could not enter non-contingent contracts unless and until the EPD issued a permit. (Doc. 88-4, pp.219:19-22, 220:11-221:1.)  Indeed, Plaintiff has produced evidence of only one single contingent contract dated September 2, 2020, which "terminates under its own terms if [Plaintiff] does not receive a permit within Nine (9) months of signing." (Doc. 58-2, p.8, Ex. 5.)  Plaintiff failed to even submit its D&O plan before this contract expired "under its own terms" on June 2, 2020.[2]

Plaintiff's costs to purchase the property, to conduct all of the necessary studies and perform all of the necessary work and create the necessary plans for its EPD permit application would have been incurred regardless of the County's action or inaction.  This is because, as stated above, the EPD acknowledged that the County did not put pressure on the EPD, the EPD did not require additional field work or testing as a result of public comments or any act of the County, and Plaintiff's EPD application review was not delayed. (Doc. 88-5, pp. 35:10-21,37:6-39:2.)

**B.**   **Statement of Proceedings**

Plaintiff filed the instant lawsuit on November 26, 2019, and later filed an amended complaint on July 8, 2020. (Docs. 1; 45.) Plaintiff filed a motion for preliminary injunction, which

---

[2] Plaintiff submitted its D&O Plan on August 26, 2021. (Docs. 136, 136-1.)

was granted on May 14, 2021. (Doc. 114.) The County also filed a renewed motion to dismiss, which this Court granted in part and denied in part on September 21, 2021. (Doc. 135.)  Following the Court's order on Defendants' motion to dismiss, the remaining claims are the state law vested rights and the federal void for vagueness. (*Id.* at pp.70-71.) The Court dismissed the official capacity vested rights claim, so only an individual capacity vested rights claim remains. (*Id.* at p.71.)

On October 8, 2021, Plaintiff filed a motion for summary judgment on the remaining claims and sought a permanent injunction. (Doc. 141.) On November 5, 2021, Defendants filed their response opposing Plaintiff's motion. (Doc. 150.) This motion remains pending.

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment may only be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" and a dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Brazell Holdings, LLC v. USI Ins. Servs. Nat'l, Inc.*, 378 F. Supp. 3d 1253, 1259 (S.D. Ga. 2019) (quoting *FindWhat Invir Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011)).

When the non-moving party bears the burden of proof, as is the case here, "the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim.'" *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986)). Rather, "the moving party simply may 'show[]--that is[], point out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325 (internal quotation marks omitted) (alterations in original)). "Alternatively, the moving party may support its motion for summary judgment with

affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citations omitted).

The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. *Brazell Holdings, LLC*, 378 F. Supp. 3d at 1259 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).  If the non-moving party does not "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court "must enter summary judgment for the moving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438 (quoting *Celotex Corp.*, 477 U.S. at 323)).

In reviewing a motion for summary judgment, the Court must construe the evidence and draw all inferences from the evidence in the light most favorable to the non-moving party. *Washington v. Durand*, 25 F.4th 891, 2022 U.S. App. LEXIS 3420, *5 (11th Cir. Feb. 7, 2022). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Moreover, the Court must only draw inferences which are *reasonable*. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Mount Zion Baptist Church of Marietta v. Guideone Elite Ins. Co.*, 808 F. Supp. 2d 1322, 1324 (N.D. Ga. 2011) (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)). "If the evidence is merely colorable, or is not significantly probative," the non-moving party does not satisfy its rebuttal burden and summary judgment should be granted. *Id.* (quoting *Anderson*, 477 U.S. at 249-50 (internal citations omitted)).

## IV.    ARGUMENT AND CITATION TO AUTHORITY

### A.    Plaintiff Lacks Standing

Plaintiff lacks standing for the two remaining claims.  Plaintiff has the burden of establishing all elements of standing in accordance with its evidentiary burden. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, "[i]n response to a summary judgment motion, … the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts, Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.*  Plaintiff can no longer simply allege that Defendants have applied certain regulations or state that Defendants have not shown that they have not applied the regulations.  Rather, Plaintiff must *affirmatively* show through evidence that it has standing.[3]

In order to establish standing, Plaintiff must make a showing (through evidence, not allegations) of three elements: (1) that it "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]" (2) that there exists "a causal connection between the injury and the conduct complained of[;]" and (3) that the subject injury is "likely, as opposed to merely speculative, [and] that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted).

### 1.    Plaintiff Has Not Suffered an Injury

"To establish an injury in fact, the plaintiff must demonstrate that he suffered an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1112-13

---

[3] Evidence in the form of affidavits or declarations must meet the requirements of Fed. R. Civ. P. 56 (c)(4). ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")

(11th Cir. 2021) (citation and internal quotation marks omitted). Plaintiff previously alleged that three injuries satisfy the injury-in-fact requirement for standing: the 2017 zoning change decision, Development Partners' expenditure of money, and the alleged delay of EPD's consideration of Plaintiff's EPD Permit Application. (*See* Doc. 135, pp.13-15; Doc. 114 at p.13.) None of these alleged injuries is sufficient to confirm standing before this Court.

### a.   No injury related to the zoning on Plaintiff's Property

In its Motion to Dismiss Order, the Court found "[t]he 2017 rezoning decision forbids Plaintiff from using its Property in a particular manner—namely, as a solid waste handling facility." (Doc. 135, p.13). The record, however, is devoid of any evidence to support Plaintiff's contention in this regard. At this motion for summary judgment stage, Plaintiff must, but cannot, provide evidence to support its contention that the 2017 zoning ordinance has ever been applied to its property in a way that has impeded its claimed goal of developing a landfill. While the Property is zoned light industrial, Plaintiff has not and cannot submit evidence to the Court that the County has ever claimed Plaintiff's property could not be developed as a landfill based on the zoning. In fact, Plaintiff cannot present the Court with any evidence of any concrete and particularized injury related to the zoning of its property.

### b.   No injury related to Plaintiff's Expenditures

Development Partners has not suffered an injury due to money spent on the Property because the County did not induce Plaintiff to purchase the property to build a landfill. As Plaintiff itself admitted, it had no plans for the property in February 2015 and was still in the exploration phase. (Doc. 88-4, pp.114-115, 131-132.) In fact, as of February 22, 2015, Plaintiff was trying to sell the land where it now wants to locate the landfill. (Doc. 88-4, pp.146:20-148:2, and Ex. 21.) In February 2015, Plaintiff's partners told the County Commissioners that Plaintiff was "pursuing development projects to include warehousing, technology related businesses such as call centers

and software development and waste to energy operations." (Doc. 87-7.)  They further stated that "no firm commitments have been made, but [they] expected that efforts should result into specific development potentials in the future." (*Id*.) Since Plaintiff did not know what it wanted to build in February 2015, the County could not have induced Plaintiff to purchase the property for a landfill in 2014.

Furthermore, as set out in the factual section above, the undisputed evidence shows the County did not solicit Plaintiff. (Doc. 88-4, pp.11:3-6, 21-24, 15:17-20.) Development Partners itself agreed that either Harbin or Development Partners' principal Roper found the property before Roper visited with the County Manager and Commissioner Edgy. (Doc. 88-4, pp. 34:19-35:4.)

Plaintiff also did not suffer an injury due to money spent on plans and site studies for the landfill or lost business commitment opportunities. Plaintiff acknowledged that potential contracts are contingent on receiving an EPD permit, not on Defendants' conduct. (Doc. 88-4, pp.219:19-22, 220:11-221:1.) Plaintiff identified one single contract that it alleges Defendants interfered with. (Doc. 58-2, p.8, Ex. 5.) That single contingent contract is dated September 2, 2020 and "terminates under its own terms if [Plaintiff] does not receive a permit within Nine (9) months of signing." (*Id*.)  Plaintiff failed to even submit its D&O plan, a prerequisite for a permit, before the contract expired "under its own terms" on June 2, 2020. Plaintiff submitted its D&O Plan on August 26, 2021. (Docs. 136, 136-1.)

c.      **The County's conduct did not impede EPD's processing of the permit**

Regarding the third injury – delay of the EPD permit – the undisputed evidence shows the County did not cause any delay in the EPD's processing of Plaintiff's application. (Doc. 88-5, p.35) ("Q. Do you have any knowledge of EPD hindering the application process? A. No."); (*id*. at 37) ("Q. Are you aware of any delay? A. No.")  After Plaintiff submitted its required D&O Plan to the EPD on August 26, 2021. (Docs. 136, 136-1), the EPD went through its "involved"

process of "thoroughly review[ing]" Plaintiff's D&O plan. (Doc. 88-5, pp. 39:12-24, 49:17-24.)
And on May 9, 2022, the EPD issued Plaintiff its desired solid waste handling permit.
(Doc. 164-1.)

As the EPD itself testified, the County has *not* delayed the permit application review
process and the County did *not* cause the EPD to require any extra expenditure. (Doc. 88-5,
pp. 35:10-21,37:6-39:2.)  Everything Plaintiff spent on the project, it was always required to
spend regardless of the County.  This makes sense, because the County has no input in the permit
review process and the County clearly did not prevent Plaintiff from obtaining the permit.

### 2.     Plaintiff's Alleged Injury Is Not Redressable by any Decision of This Court

Finally, it is not likely that Plaintiff's alleged injury will be redressed by a favorable
decision.  For an injury to be redressable, "it must be likely, as opposed to merely speculative, that
the injury will be redressed by a favorable decision."  *KH Outdoor, LLC v. Clay Cty.*, 482 F.3d
1299, 1303 (11th Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).
Redressability requires "a significant increase in the likelihood that the plaintiff would obtain relief
that directly redresses the injury." *Fla. Wildlife Fed'n., Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d
1296, 1304 (11th Cir. 2011) (quoting *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290
(11th Cir. 2010)).

There is nothing to be redressed because the County's conduct has done nothing to impede
the EPD's processing of Plaintiff's application.  The EPD granted Plaintiff a solid waste handling
permit and affirmed that the County did not affect the permit review process at all.

### B.     Plaintiff Did Not Obtain Vested Rights

Even if this Court determines Plaintiff has standing to assert its claims, Plaintiff still fails
to assert a valid vested rights claim and the Court should grant Defendants summary judgment.

Vested rights under Georgia law are based on the theory of estoppel. *See Union Cty. v. CGP, Inc.*, 277 Ga. 349, 589 S.E.2d 240, 242 (Ga. 2003).

> To acquire a vested right to development, a property owner must prove one of four conditions: (1) the property owner actually obtained a valid building permit authorizing a specific use under an existing ordinance; (2) the property owner actually applied for a building permit authorizing a specific use under an existing ordinance that authorizes the use, or the purchaser of land contracts to buy land based on the condition that it will be rezoned to allow a specific use; (3) the property owner had a development plan that was approved either formally or informally by the zoning authority, and the property owner expended money in reliance on the development plan; or (4) the property owner made a substantial change in position by expenditures in reliance upon the probability of the issuance of a building permit, based on an existing zoning ordinance and the assurance of zoning officials.

*Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1241 (11th Cir. 2011) (citing *WMM Props., Inc. v. Cobb Cty.*, 255 Ga. 436, 339 S.E.2d 252, 254-55 (1986)).  For Plaintiff to get a vested right from Brantley County such that Defendants are estopped from enforcing certain ordinances and regulations, it must have complied with any approval processes in place at the time it obtained approval for its project.  It is the process of receiving the local government's approval that estops the government from enforcing its laws against the applicant.  Plaintiff did not comply with the approval process in place.

The approval process Brantley County had in place when Plaintiff submitted its EPD application was the 2006 SWMP.[4]  Not only did Plaintiff not comply with the requirements of the SWMP, it provided absolutely none of the information contained in the 2016 EPD permit application prior to receiving the consistency letters.  Therefore, County's execution of the

---

[4] Plaintiff did not comply with the regulations contained in the 2006 SWMP. In an attempt to overcome this obvious deficiency, Plaintiff contends the County's consistency letters served to obviate the need for actual SWMP compliance.  Defendants explain below why such approval was ultra vires and is null and void.

approval letters cannot stand for the proposition that the County formally or informally approved Plaintiff's development plan set out in its 2016 EPD application.

In February 2015, Development Partners had no definite plans for the property and was only in the exploration phase.  (Doc. 88-4, pp.114:15-115:5, 131:21-132:2.)  After Plaintiff had concluded its exploration and had a plan, it was to return to the County for approval.  (*See* Doc. 88-1, pp.141:5-13, 141:22-142:7, 142:24-143:15; Doc. 88-2, pp.33:2-6, 34:17-19, 67:7-25, 149:9-14.)  The undisputed evidence is that what was in Plaintiff's 2016 EPD application was never presented to the County before the February 2015 SWMP letter was signed. (Doc. 64-2 at 3, ¶ 7; Doc. 88-1, p.108 (p.107 of the transcript); Doc. 88-4, p.133.)

As described in the Brantley County Commission work session on February 3, 2015, Development Partners did not communicate anything remotely specific about its plans with the property.  Plaintiff's partners Roper and Marks told the County commissioners "they were currently pursuing development projects to include warehousing, technology related businesses such as call centers and software development and waste to energy operations."  (Doc. 87-7, p.3.)  Roper and Marks told the County that at that time "no firm commitments have been made, but [they] expected that efforts should result into specific development potentials in the future." (*Id.*)

Of the four conditions to obtain vested rights, Plaintiff certainly does not meet either of the first two conditions because it never submitted any type of application to the County. (Doc. 64-2 at 3, ¶ 7; Doc. 88-1, p.108 (p.107 of the transcript); Doc. 88-4, p.133.)

Discussing the third condition, the Georgia Court of Appeals explained that a vested property right "arises where there was a substantial change of position in reliance with legal or economic liability resulting through expenditures based upon the *probability of approval of the development plan*, and there was conditional or tentative approval; where assurances and representations made by governmental authority, or by someone with the delegated authority to

approve the *preliminary developmental plan*; that the plans would allow such development under something other than a final plan; or where regulations existing at the time of *submission of the plan of development* supported such developmental plan. *City of Duluth v. Riverbrooke Props.*, 233 Ga. App. 46, 502 S.E.2d 806, 811 (1998) (citations omitted) (emphasis added).

Here, Plaintiff plans to build an approximately 100-acre landfill on a southern tract of the nearly 2,400 acres of property. (Doc. 58-2, p.2.) As of February 22, 2015, Plaintiff was still trying to sell the entire south tract of the property. (Doc. 88-4, pp.135,146-148); (*See also* Site Assessment Report Map attached to EPD Application, Doc. 87-9.)  Plaintiff never submitted anything to the County, including the EPD application. (Doc. 64-2 at 3, ¶ 7; Doc. 88-1, p. 108 (p.107 of the transcript); Doc. 88-4, p.133.)

Plaintiff also fails to meet the fourth condition of vested rights because it did not make a "substantial change in position by expenditures in reliance upon the probability of the issuance of a building permit, based on … [official] assurance[s]." *Covenant Christian Ministries, Inc.*, 654 F.3d at 1241.  Plaintiff simply received letters stating that the Magnolia Holdings project was consistent with then-existing zoning ordinances and the SWMP. Plaintiff could not have received any official assurances that a building permit would "probably issue," because Plaintiff did not know *what* it wanted to build or *where* it wanted to build in February 2015, as discussed above. Even over a year later, as of February 8, 2016, Plaintiff had still not decided whether it wanted to locate solid waste handling facilities on the north or south tract of property.  (Doc. 88-4, p.172:7-22, and Ex. 18.) Moreover, Plaintiff could not build a landfill without a permit from the EPD director, so the County could not make that assurance. O.C.G.A. § 12-8-24.

At the most, the County approved a development located at the Magnolia Holdings Business Park, as referenced in the consistency letters. (Doc. 100, Exs. 6-7.)  These letters did not verify that Plaintiff's proposed solid waste handling facilities were consistent with the County's

zoning or SWMP, as Plaintiff's EPD permit application is not located at the former Magnolia Holdings Business Park. Magnolia Holdings Business Park is a 89.65-acre project site located <u>north</u> of Highway 82. (Doc. 87-8.)

Development Partners switched locations and decided to try to build a landfill on the south tract of property, south of Highway 82, well after the 2015 consistency letters were issued. (Doc. 88-3, pp. 96-97.) What was included in the EPD application is decidedly different than what was mentioned in the 2015 letters. When the County Manager learned of the switch in location of the planned development, he warned Development Partners that it was not the same property so there would be opposition:

> I texted one of them and I told him, I said if you insist on the south side you're gonna run into political opposition, I know that ….because – well, because you had subdivisions that were right to the east of that property that had been platted and developed. I mean, it don't take a rocket scientist. I've been in this business long enough to say you're gonna have some problems and, by damn it, they did have problems on that one.…But, I did point out that'll be a hotly discussed issue and it turned out it was."

(Doc. 88-1, p.154:7-24.) If the Court considers the consistency letters as creating the vested rights, what would be vested is the Magnolia Holdings project.

### 1.    Consistency Letters Were Issued Ultra Vires

The 2006 SWMP requires potential solid waste handling facility developers to submit a written statement of consistency to the County, the County's Board of Commissioners was required to review the written statement of consistency, and the County was required to conduct a public hearing before taking official action. (Doc. 58-4 at 232-23.) There is no evidence in the record that Plaintiff ever submitted the SWMP-mandated written statement, and necessarily, therefore, Plaintiff also could not present any proof that the Board of Commissioners reviewed any such written statement. (Doc.88-4, p. 133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou *didn't present anything in writing* to

the board, correct? [A.] That is *correct*.") (emphasis added).  And, there was no public hearing required by the 2006 SWMP.  (Doc. 88-1, p.116.)

There is no doubt that the 2014 and 2015 SWMP Consistency Letters were issued without adherence to the Plan Consistency requirements of the 2006 SWMP.  This cannot be characterized as an immaterial failing because it precluded any meaningful review for SWMP consistency. Thus, the 2014 and 2015 SWMP Consistency Letters were issued unlawfully.[5]

There is a distinction between when a government official acts without legal authority (which is *ultra vires*) and when that official merely mistakenly exercises power that is granted (which is not *ultra vires*).  This distinction is discussed in two opinions from the Supreme Court of Georgia: *Dukes v. Bd. of Trustees for Police Officers Pension Fund*, 280 Ga. 550, 629 S.E.2d 240 (Ga. 2006) and *Quillian v. Emp's' Retirement Sys. of Ga.*, 259 Ga. 253, 379 S.E.2d 515 (Ga. 1989).  Though the Board of Commissioners had the authority to review SWMP consistency for EPD Permit applicants, the Board of Commissioners nonetheless acted without legal authority; it did not simply incorrectly exercise discretion in applying legal requirements of the 2006 SWMP when it voted to issue the 2015 SWMP Consistency Letter, it did not apply key procedural requirements of the 2006 SWMP at all.

*Dukes* and *Quillian* both addressed mistaken awards of pensions to government employees who relied on the pension determinations in deciding to retire.  *Quillian* involved a reduction of a retired judge's previously-determined pension benefit, which resulted from a miscalculation by the Employees' Retirement System ("ERS").  The Supreme Court of Georgia held, consistent with the district court's analysis, that the ERS was estopped from reducing the judge's originally-

---

[5]  Rowland executed the 2014 SWMP Consistency Letter without obtaining Board of Commissioners approval (Doc. 88-1, p.171), which unquestionably was illegal and beyond the scope of his power (*ultra vires*) under the 2006 SWMP.

calculated pension benefit because it had erred in exercising its power to determine pension

benefits but had not acted *ultra vires* – beyond its powers – in doing so.

> [T]he initial calculation of retirement benefit calculations made by the Employees' Retirement System was *not* beyond its powers. The duties of the retirement system include the assessment and calculation of entitlements. Even if the computation here were in error, nevertheless it was not ultra vires. * * * Although a municipality or other governmental agency cannot be estopped by its ultra vires acts, there is nevertheless a broad distinction to be observed between an irregular exercise of a granted power, and the total absence or want of power, and the rule is that it may be estopped, as right and justice may require, where the act or contract relied on to create the estoppel was within its corporate powers, although the method of exercising the power was irregular or unauthorized.

*Quillian*, 259 Ga. at 254 (emphasis in original; internal quotation marks omitted).

By contrast, the *Dukes* decision – which arose from a pension benefit reduction for a retired

Atlanta police officer – went the other way because the pension fund did not merely make a

computational error, as in *Quillian*, but instead, it failed to recognize an unsatisfied legal predicate

to the officer's eligibility to credit for prior service, which led to the conferral of an illegally

elevated benefit.

> § 6–222(k)(1) of the 1978 Pension Act authorizes credit for prior service only when two criteria are met: the officer must have completed a minimum of five years of service with the city and must have filed an application with the board five years prior to retirement. Because Dukes did not satisfy the second condition, his entitlement to prior service *never vested*. Thus, the board's action in rescinding the credited service was not a recalculation; it was an annulment of an entitlement that had *no legal basis*.

*Dukes*, 280 Ga. at 553 (emphasis added).

The difference between *Quillian* and *Dukes*, therefore, is that *Quillian* involved a mistaken

exercise of an otherwise legally-conferred power to determine a pension benefit, whereas *Dukes*

involved a bestowal of benefits that were not authorized by law in the first place. In other words,

in *Dukes*, because the law did not permit the benefit, the plaintiff's right to it "never vested."  The pension board's decision was illegal, and thus *ultra vires* and void.

This assessment of the *ultra vires* doctrine in the vested rights context was more recently confirmed by the Supreme Court of Georgia in *Union County v. CGP, Inc.,* 277 Ga. 349 (2003).  In *Union County*, the county had issued several building permits to a developer to build several houses in a subdivision, but then stopped issuing such permits for further homes until the development was brought into compliance with a flood ordinance (which apparently previously had been overlooked).  The Court held that the fact that the county had issued building permits to the developer, which ordinarily confers vested rights, did not apply in the circumstances presented because a permit issued in violation of the law is void:

> The issuance of a building permit results in a vested right only when the permit has been legally obtained and is valid in every respect, and has been validly issued. Where a permit is issued by a governing body *in violation of an ordinance*, even under a mistake of fact, it is *void*, and its holder does not acquire *any rights*; even a substantial expenditure in reliance on a void permit *does not raise an estoppel*.

*Id*. at 351 (emphasis added; internal quotation marks omitted).

Because the County did not hold a public hearing and Plaintiff never submitted a SWMP Consistency Written Statement with respect to the proposed landfill – which obviously the Board of Commissioners could not have reviewed for consistency with the 2006 SWMP – the 2014 and 2015 SWMP Verification Letters were issued *in violation of the express terms of the 2006 SWMP*, which, by law is a resolution or ordinance of the County.[6]

Therefore, under the rationale of *Dukes* and *Union County*, the 2014 and 2015 Verification Letters are void.  It was always against the law for the County to issue the consistency letters

---

[6] O.C.G.A. § 12-8-31.1(c) ("To be included as part of a local, multijurisdictional, or regional solid waste plan, each city and county included as part of the plan shall adopt the plan and any plan updates by *local ordinance or resolution*.") (emphasis added).

without meeting the requirements in the SWMP, so Development Partners could get no vested rights from those letters. *See Corey Outdoor Advertising, Inc. v. Bd. of Zoning Adjustments*, 254 Ga. 221 (1985).

**C.**    **Plaintiff Failed to Assert Void for Vagueness Claim**

Plaintiff has failed to state a void for vagueness claim from the failure to provide an official map for the 2016 Zoning Ordinance. (*See* Doc. 135, pp.56, 58.)  Plaintiff has the burden of proof and has not asserted any facts showing that the 2016 Zoning Ordinance has ever been applied to it. Because there is no evidence in the record to show that that zoning of the Property had any impact on the processing of the EPD permit, Plaintiff has no standing to contest the 2016 Zoning Ordinance.

The void for vagueness claim also was mooted by the 2017 Zoning Ordinance. The claim was a facial challenge (Doc. 1, ¶¶ 21, 75, 78.), seeking "to invalidate a statute or regulation itself." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir. 2013) (quoting *Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir. 2001)).[7] Facial vagueness occurs when "no set of circumstances exists under which the [law] would be valid." *Indigo Room, Inc.*, 710 F.3d at 1302 (quoting *Horton*, 272 F.3d at 1329). The County's adoption of the 2017 Zoning Ordinance makes this facial claim moot.  "As the Eleventh Circuit has held, 'a challenge becomes moot when the challenged policy was repealed by the governmental authority and there was no reasonable expectation that the governmental authority would return to the prior policy.'" *Stardust, 3007 LLC v. City of Brookhaven*, 2016 U.S. Dist. LEXIS 196088, *55-*56 (N.D. Ga. Sept. 29, 2016) (quoting *Granite State Outdoor Adver. Inc. v. City of St. Pete Beach*, 322 F. Supp. 2d 1335, 1341 (M.D. Fla. 2004)). *See also Reyes v. City of Lynchburg*, 300 F.3d 449, 453 (4th Cir. 2002); *Lockridge v. City of Oldsmar*, 475 F. Supp. 2d 1240 (M.D. Fla. 2007).  There is no evidence, nor is it reasonable,

---

[7] The Court also found it was a facial challenge. (Doc. 135, pp.53-54.)

that the County will return to a zoning ordinance without a zoning map or apply an ordinance which no longer exists.

Additionally, Plaintiff asserts a federal constitutional due process as well as a state law due process claim.  "The degree of vagueness that the Constitution tolerates -- as well as the relative importance of fair notice and fair enforcement -- depends in part on the nature of the enactment." *Hoffman Estates*, 455 U.S. 489 at 498. And "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id*. at 499.  Since Plaintiff *knew* the zoning classification for its property and *was present* when Defendants decided said classification, the absence of the map does not "threaten to inhibit" any of Plaintiff's constitutionally protected rights.  Thus, Plaintiff cannot succeed on a void for vagueness claim.

Further, the Court dismissed all claims against Defendants for monetary relief. (Doc. 135, pp. 30-31,34-35,37) (dismissing official capacity claims and claims for monetary relief against Defendants and upholding individual capacity claims for prospective injunctive and declaratory relief).  So even if Development Partners had alleged that the 2016 Zoning Ordinance had been applied to its property, the Court has already determined that Defendants are immune from claims of retrospective injury.  Plaintiff has not asserted an injury due to the 2016 Zoning Ordinance and cannot assert claim for damages. There is no basis for declaratory relief, either, as the 2016 Ordinance was replaced by the 2017 Zoning Ordinance five years ago. (Doc. 58-4, p.96 *et seq*.) This claim is, importantly, *separate* from the vested rights claim. Void for vagueness is a constitutional claim, whereas vested rights are based on estoppel. Even if the Court were to find that Plaintiff asserted a vested rights claim, that does not mean Plaintiff has produced (or is able to produce) any evidence of any application or injury from the 2016 Zoning Ordinance. Therefore, there is no case or controversy with respect to the 2016 Zoning Ordinance.

**D.**   <u>**No Damages**</u>

After the Court's Order on Defendants' Renewed Motion to Dismiss, a federal void for vagueness claim and an individual capacity state law vested rights claim remain. (Doc. 135, pp.70-71.) The Court effectively dismissed all claims against Defendants for monetary relief. (*Id.*, pp. 30-31,34-35,37.) For federal claims, the Court found that qualified immunity bars damages claims against the Commissioners in their individual capacities. (*Id.*, p.31.) For state law claims, the Court dismissed all official capacity claims (*Id.*, p.34), and found that official immunity precludes damages in all state law individual capacity claims. (*Id.*, p.35 n.10) ("To the extent Plaintiff does seek retrospective relief under state law, the complaint fails to identify such requested damages and, thus, fails to make the allegations necessary to overcome official immunity pursuant to Georgia law.") (citations omitted).  Thus, the only way for Plaintiff to obtain a damages award is through a federal official capacity claim, and the only such remaining claim is the void for vagueness claim. (*See id.*) The Court found that Plaintiff does not seek damages in the void for vagueness claim. (*See id.*, p.31 n.9.)

However, Plaintiff recently listed its demanded damages in its Second Supplement to Initial Disclosures dated May 20, 2022 as follows: (1) Compensatory damages, consisting of "Mental Anguish/Emotional Distress for deprivation of Plaintiff's Due Process Rights. $150.00 per diem from September 9, 2016 through the date of trial or in such other amount as determined by the jury;" (2) Nominal damages, "As awarded to vindicate deprivation of rights;" and (3) Attorney's Fees, which are "Approximately $633342.32 and continuing to accrue…" (Exhibit A to Statement of Undisputed Material Facts, filed contemporaneously herewith.)

Regarding the third request, attorney fees are not actually "damages." Rather, they are "costs" that a party may request after it prevails on a § 1983 claim. 42 U.S.C. § 1988(b) ("the court, in its discretion, may allow the prevailing party…a reasonable attorney's fee as part of the

costs…")  Other than nominal damages, then, Plaintiff's only damages request is for "Mental Anguish/Emotional Distress."

Plaintiff cannot recover damages for mental anguish or emotional distress because it is a limited liability corporation, not a natural person. "[B]usiness entities, including limited liability companies, cannot recover on claims of intentional or negligent infliction of emotional distress as a matter of law because *business entities lack 'the cognizant ability to experience emotions*. …" *Osprey Cove Real Estate, LLC v. Towerview Constr., LLC*, 343 Ga. App. 436, 440, 808 S.E.2d 425, 429 (2017) (emphasis added). *See also Lampliter Dinner Theater v. Liberty Mut. Ins. Co.*, 792 F.2d 1036, 1039 n.2 (11th Cir. 1986) ("corporations cannot experience emotional distress"); *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 n.2 (1st Cir. 2000) ("Because corporations, unlike natural persons, have no emotions, they cannot press claims for intentional infliction of emotional distress."); *Nicor Intern. Corp. v. El Paso Corp.*, 292 F. Supp. 2d 1357, 1378 (S.D. Fla. 2003) ("This claim is fatally flawed because a corporation is incapable of suffering any emotional distress."). Plaintiff is an LLC which cannot experience emotions.  It is incapable of suffering mental anguish or emotional distress, so it cannot receive a damage award for either.

**E.     Legislative Immunity**

The Court also should grant Defendants' motion for summary judgment because the commissioners are entitled to legislative immunity for the claims against them related to their votes to adopt the 2016 Zoning Ordinance (and later, the amended 2017 Zoning Ordinance and SWMP).  It is black-letter law that the individual commissioners are entitled to absolute legislative immunity as to both the state law and federal law claims brought against them as a result of the legislative function of voting on ordinances and the like.  *See Brown v. Crawford Cty.*, 960 F.2d 1002, 1011-12 (11th Cir. 1992); *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989); *Fulton Cty. v. Dangerfield*, 260 Ga. 665, 398

S.E.2d 14, 15 (1990); *Jackson v. Delk*, 257 Ga. 541, 543, 361 S.E.2d 370, 372 (1987).  There is

no dispute in this case that the conduct on the part of the commissioners was a legislative act –

the commissioners voted to enact and amend local ordinances. The Eleventh Circuit was explicit

in *Brown* that absolute immunity applied regardless of the individual motivations of the elected

officials.  *Brown*, 960 F.2d at 1012.  The Court should grant the individual Defendants summary

judgment related to the federal void for vagueness claim.

## CONCLUSION

For the reasons discussed herein, Defendants respectfully request that the Court grant

Defendants' Motion for Summary Judgment.

This 1st day of June, 2022.

FREEMAN MATHIS & GARY, LLP

*/s/ Dana K. Maine*
DANA K. MAINE
Georgia Bar No. 466580
dmaine@fmglaw.com
ROBERT P. MARCOVITCH
Georgia Bar No. 469979
Robert.Marcovitch@fmglaw.com
RACHAEL SLIMMON
Georgia Bar No. 831661
rslimmon@fmglaw.com

*Attorneys for Defendants*

100 Galleria Parkway, Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (telephone)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have this day electronically submitted the foregoing DEFENDANTS'

MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

THEREOF to the Clerk of Court using the *CM/ECF* system which will automatically send

electronic mail notification of such filing and service to the following counsel of record:

L. Robert Lovett
Lovett Law Group
5400 Riverside Drive, Suite 203
Macon, GA 31210
Bob@LovettLawGroup.com

George Rountree
Brown Rountree, P.C.
26 North Main Street
Statesboro, GA 30458
george@br-firm.com

Kyler L. Wise
Wilson Brock & Irby, LLC
2849 Paces Ferry Road, Suite 700
Atlanta, GA 30339
kwise@wbilegal.com

Mark D. Johnson
Gilbert, Harrell, Sumerford & Martin, PC
PO Box 190
Brunswick, GA 31521-0190
mjohnson@gilbertharrelllaw.com

This 1st day of June, 2022.

*/s/ Dana K. Maine*
DANA K. MAINE
Georgia Bar No. 466580
dmaine@fmglaw.com

*Attorney for Defendants*

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)
20095713