IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

BRANTLEY COUNTY DEVELOPMENT
PARTNERS, LLC,

                Plaintiff,

V.

BRANTLEY COUNTY, GEORGIA , et al.,

                Defendants.

CIVIL ACTION FILE
NO. 5:19-CV-00109-LGW-BWC

**DEFENDANTS' STATEMENT OF MATERIAL FACTS FOR WHICH THERE EXIST NO GENUINE ISSUE OF DISPUTE TO BE TRIED AND CONCLUSIONS OF LAW**

COME NOW Defendants Brantley County, Georgia, by and through its Chairman and Members of the Brantley County Board of Commissioners and Chris "Skipper" Harris, Randy Davison, Brian Hendrix, Jesse Mobley, and Ray Griffin, ("Defendants" or "the County") and hereby submit this Statement of Material Facts for Which There Exist No Genuine Issue of Dispute to be Tried and Conclusions of Law in support of its Motion for Summary Judgment filed contemporaneously.

**I.      STATEMENT OF MATERIAL FACTS FOR WHICH THERE EXIST NO GENUINE ISSUE OF DISPUTE TO BE TRIED**

1.

Plaintiff Brantley County Development Partners' ("Plaintiff" or "Development Partners") purchased the subject property (the "Property") consisting of nearly 2,400 acres in December 2014. (Doc. 58-3, p.74; Doc. 88-4, p.95.)

2.

The Property includes separate tracts on the north and south side of Highway 82/Georgia State Highway 520. (Doc. 88-4, p.113, 306-307.)

3.

The origins of the landfill idea on Plaintiff's property came from an engineer who worked on an unrelated project for Plaintiff's engineer, Steve Harbin. (Doc. 88-3, p.28.)

4.

Carl Rowland asked the engineer for suggestions of how the County could raise revenue and the engineer suggested a landfill, which caused Harbin to commence discussions with Matt Roper, a member of Plaintiff. (Doc. 88-3, pp. 28:11-29:4.)

5.

The discussions of a landfill on the subject property started with Steve Harbin and Matt Roper having conversations about hosting a landfill. (Doc. 88-3, pp. 29:4, 31:19-32:6.)

6.

Steve Harbin is also the one who first made the suggestion of a landfill on the Property to County Manager Carl Rowland. (Doc. 88-1, pp. 37-38) ("…Steve [Harbin] was introduced to the 2400-acre piece of property, right. And so Steve come back to me [Rowland] sometime later and he says what do y'all think about doing a landfill?".)

7.

Because Harbin contacted Rowland about a landfill, the County did not solicit Development Partners. (Plaintiff 30(b)(6) deposition, Doc. 88-4, pp.11:3-6, 14-15.) Development Partners agreed that either Harbin or Development Partners' principal Matt Roper found the

property before Roper visited with County Manager Rowland and Commissioner Edgy. (Doc. 88-4, pp. 34-35.)

8.

The County did not approach Plaintiff because of the Disaster Plan.  (Doc. 58-3, pp. 2-3.)

9.

The Disaster Plan formation began August 7, 2015 and was adopted October 14, 2016. (Declaration of Jennifer Kline, Doc. 87-1, ¶¶ 7-8.)

10.

FEMA and GEMA did not recommend a subtitle D landfill as part of the Disaster Plan process; they recommended that the County identify alter-natives for disposal of waste. (Rowland deposition, Doc. 88-1, p. 125:1-12; Doc. 87-1, ¶ 10.)

11.

The only reason reference to a subtitle D landfill was included in the Disaster Plan was that in the event that grant money became available, the County could decide to apply for it.  (Doc. 88-1, p. 126:17-22; 130:18-131:8.)

> And that did not commit us to going to building a facility, it committed us to, if the opportunity came up then we could receive funding for it, then, yes, we could move forward with it.  It didn't commit the county to go out there – I mean, none of those things we put in there committed the county to go out and do immediately, but it provided a plan for doing that, if we needed to.

(Doc. 88-1, p. 129:3-11; *see also* Doc. 87-1, ¶ 9.)

12.

The one reference in the Disaster Plan of a landfill was never tied to Plaintiff's property. (Doc. 88-1, p. 129:12-17; Doc. 87-1, ¶ 11.)

13.

There was no discussion of any potential subtitle-D landfill site location during the discussions of the disaster plan.  (Doc. 87-1, ¶ 11.)

14.

Carl Rowland sent two consistency letters to the EPD in November 2014 and did not receive authorization from the Board of Commissioners to execute either of the letters.  (Doc. 88-1 at 171) ("Q. … [B]efore you signed the letters in November of 2014 had there been a vote by the board of commissioners to authorize you to sign the letters? A. No.")

15.

As of February 3, 2015, Plaintiff was telling the County Commissioners that it was "pursuing development projects to include warehousing, technology related businesses such as call centers and software development and waste to energy operations" and that "no firm commitments have been made, but [Matt Roper and Donald Marks, members of Plaintiff] expected that efforts should result into specific development potentials in the future." (Doc. 87-7.)

16.

At the February 5, 2015 Brantley County Board of Commissioners meeting, Commissioner Edgy made a motion to authorize two consistency letters. (Doc. 58-3, Ex. F.)

17.

The February 2015 zoning consistency letter states that "the proposed private Solid Waste Handling Facility proposed by the Brantley County Development Partners, LLC at the former Magnolia Holdings Business Park is consistent with Brantley County's local land use plan" and that the County did not have an ordinance. (Doc. 58-3, Ex. G.) The SWMP consistency letter states that "the solid waste handling facilities being proposed by Brantley Development Partners, LLC

to be located on a site formerly known as Magnolia Holdings Business Park is consistent with [the

SWMP 2011 and Five-Year Short Term Work Program 2010-2019]." (Doc. 58-3, Ex. G.)

18.

Magnolia Holdings Business Park is a 89.65-acre project site located north of Highway 82.

(Department of The Army Permit documents provided by Plaintiff to the County, Doc. 87-8.)

19.

Plaintiff's planned facility is not located at the site of Magnolia Holdings Business Park,

as the site is on the southern tract of the Plaintiff's property. (Doc. 87-9.)

20.

The Commissioners and county manager did not believe Defendants were approving any

plans or proposals at the February 5, 2015 vote:

- Q:  [W]hat [the Board of Commissioners] signed in February, February 6, 2015, was just to say it's a possibility?
  A:  That's in my mind what they were saying.  (Rowland dep., Doc. 88-1, p. 71:16-19.)

- Q:  So, in 2015 when – you were not intending to commit the board when you asked the board to make the vote – you asked Mike – you amended the agenda, then you asked Mike to make the motion and you were not – you didn't expect that to be the one hundred percent they get to do whatever they want to do out there on that property, did you?
  A:  No, I did not.  I knew that the board had other opportunities to address the matter, if specific plans didn't come up to what they wanted.
  Q:  Okay.  They had another opportunity.  So you weren't intending to bind them forever to it?
  A: What they – Brantley Development Partners wanted, which I thought was a reasonable request, they wanted to proceed with the purchase of the property and they wanted some assurance that, yes, **they had the latitude at least to go in and present specific plans to the board of commissioners on landfill development.**  (Rowland dep., Doc. 88-1, p. 73:12-25-74:1-7 [emphasis added].)

- When considering the vote on February 5, 2015 authorizing the chairman to sign letters, Commissioner Jesse Mobley "thought they were just exploring projects. And they had spoken about the wood waste to energy and doing warehouses and call centers.  And **I thought that what we were doing at that time is giving them a green light to be able to explore the options of what they could do.  And I thought they were coming back to us**."  (Jesse Mobley Deposition, Doc. 91-1, p. 19:15-21 [emphasis added].)

- "I actually thought the letter was basically not green lighting and giving a final approval on anything.  In conversations with Carl Rowland about what we were actually doing is we – the way it was relayed to me and my understanding, is that we were – **they needed these letters to be able to go out and explore their options at this property** and see if they could do the warehousing, see what was going to be feasible for them.  And that they were going to **come back at a later date and we would have to go through all of these processes again and they would specify exactly what project they were going to go with**."  (Mobley dep., Doc. 91-1, p. 35:7-23 [emphasis added].)

- "They were still exploring what they were going to do out there.  They had no definite plan on exactly what it was going to be. At no time did they ever mention a landfill, as in bringing in garbage and stuff like that." (Mobley dep., Doc. 91-1, p. 36:14-18.)

- Within two and one-half months of the February 2015 vote, Commissioner Mobley explained to a citizen that the vote was not to approve a permit.  He explained it as follows:

> I think there is a lot of confusion going on with this issue and a lot of assumptions. That company approached the board and introduced themselves. They explained that they are going to try to bring in a mixture of industries onto the property. One was dry storage warehouses to serve the Brunswick Ports, one was a rural outsourcing call center, and another they have talked about is wood waste to energy similar to the same thing Magnolia was going to do before going bankrupt. From what I understand, they are still in the idea stage on exactly how they want to use the land. The only vote we have had on the issue was to approve a letter signed by the Chairman stating that a solid waste management plan presented by them to the county manager and after being reviewed by him was found to be in compliance with the Brantley County Solid Waste Management plan. This was not a vote to approve any business or permit.
>
> This is my opinion on the issue and the reason I voted yes for the letter. Our county is starved for industry, we have to bring businesses in. If not, the tax payers are not going to feel any relief. A company is knocking on our door and saying hey we bought a bunch of land and have a lot of ideas for it, but before we spend a ton of money on planning out exactly what we're going to do, we want to know what we can and can't do. Once we know what we can do, we'll come back to you with our plans for the development of that property. I don't feel that I would have been serving the citizens of Brantley properly if I shunned the company from the get go and sent a message that I'm not interested in hearing about anything they want to do. I don't think that would send the right message to other potential developers either.
>
> In the brief talks I have had with the company, they have never mentioned a landfill or anything of that nature as many are speculating. It has been all talks about dry storage, converting wood waste to energy, and tech businesses such as the call center.

(Jesse Mobley Apr. 2, 2015 email, Doc. 91-2.)

- In 2015, Commissioner Mobley explained to the local newspaper editor that the vote could not possibly have been an approval and that Brantley Development would have to come comply with the requirements of the County's Solid Waste Management Plan.  (Jesse Mobley Aug. 12, 2015 email, Doc. 91-2.)

- "They started moving away from the regular landfill pretty quickly after they started exploring these other options they had and they started talking more solid waste facility that handled the bi-product of waste-to-energy stuff or a possibility at one time of even using some parts of the household garbage to fuel a waste-to-energy – the options were all over the smorgasbord at that time – but it moved from a traditional landfill to a solid waste facility that handled the bi-products of waste-to-energy facilities." (Rowland dep., Doc. 88-1, p. 141:22-142:7.)

- Q: [At the December 22nd meeting at the Courthouse] do you remember Mike [Edgy] saying they can't talk about it because they have a non-disclosure agreement but it's not landfill, it's waste-to-energy?
  A: Yeah, I think because that's pretty much what everybody was thinking at that time and that's probably a fairly accurate statement on Mike's part …. I think Brantley Development Partners had talked enough about it being for waste-to-energy type solid waste facility and I think that was a fairly accurate statement. They had moved off of the center of it being a traditional landfill … (Rowland dep., Doc. 88-1, p. 142:24-143:15.)

- "I could have lived with it because everything was going to be recycled, in my opinion. One way or another it was going to run through all of this recycling stuff and it would have just been great for this county." (Edgy dep., Doc. 88-2, p. 33:2-6.)

- "[M]y understanding was you could run 70 percent bio with 30 percent household waste and it would get rid of everything." (Edgy dep., Doc. 88-2, p. 34:17-19.)

- Everything other than PVC was going to be recycled.  (Edgy dep., Doc. 88-2, p. 67:7-25.)

- "It's a biofacility."  (Edgy dep., Doc. 88-2, p. 119:24.)

- "[I]t was green – and that's the only reason I agreed to it.  Because it was all going to be recycled.  That's what we ought to be doing with all of it instead of doing what we're doing.  But people live in fear of that new technology."  (Edgy dep., Doc. 88-2, p. 149:9-14.)

- On October 5, 2016, Plaintiff's investor, Don Marks, wrote to Matt Roper, Steve Harbin and John Kelly:

  > I have mentioned multiple times (twice I know in email which included Bob) that the majority of all communications to the BOC has been waste to energy/fuel and solid waste handling facility (SWHF) on the north side. There hasn't been any good follow up conversation about the status of the SWHF.  So, the request for a siting meeting without first talking with each commissioner is no different than John finding out about a big issue in his company from an employee in the plant vs. his leadership.

  > Imagine the hail storm when people see the siting meeting in the paper, call their favorite commissioner and the commissioners are uninformed and already pissed because [we] didn't personally communicate to them (leadership) and give them a chance to ask all the questions they need to ask.

  (Doc. 87-6, p.3.)

21.

Plaintiff did not present any information in writing to the Board of Commissioners before the February 5, 2015 vote authorizing the consistency letters. (Doc. 88-4, p.133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou didn't present anything in writing to the board, correct? [A.] That is correct."); (*id*. at 135) ("Q. You did not have any plans, specific plans as of the 5th of February 2015, for what you were going to do, specifically, on the Property, correct, other than you knew that, generally, you wanted a landfill somewhere? [A.] We had no concrete plans.").

22.

Plaintiff had no plans to build on the southern tract of its property, where the permitted landfill is located, when the property was purchased, because as of February 22, 2015, Plaintiff was still trying to sell the entire southern tract of the property.  (Doc. 88-4, pp.146:20-148:2, and Ex. 21.)

23.

As of February 8, 2016, Plaintiff had still not decided whether it wanted to locate solid waste handling facilities on the north or south tract of property.  (Doc. 88-4, p.172:7-22, and Ex. 18.)

24.

Plaintiff submitted its EPD permit application on December 29, 2016. (Doc. 1-11.)

25.

Plaintiff never submitted anything to the County, including the EPD application. (Doc. 88-1, p. 108 (p.107 of the transcript).)

26.

The facility proposed in Plaintiff's EPD permit application in December 2016 facility was not permitted by State or County law because it did not comply with Brantley County's Solid Waste Management Plan. *See* O.C.G.A. §§ 12-8-24; 12-8-31.1 (requiring local SWMPs and requiring consistency letters). *See also* O.C.G.A. §§ 12-8-26 (requiring public meetings on site selection).

27.

The 2006 SWMP mandates that any applicant for an EPD Permit must explain in writing how a proposed solid waste management facility is consistent with the plan. (Doc. 58-4 at 232-233 (pp. 70-71 of the 2006 SWMP)).

28.

Development Partners never presented a proposal prior to the 2015 letters being issued. (Doc. 88-4, p.133) ("Q. … Where is the documentation of your proposal that was considered on the 5th of February 2015? … [Y]ou *didn't present anything in writing* to the board, correct? [A.] That is *correct*.") (emphasis added); (Doc. 64-2 (Declaration of Brian Hendrix) at 3, ¶ 7) ("Development Partners never presented the County with any plan showing what they intended to do on the property.  At no time did Development Partners provide a written statement of any sort and did not ever provide a description of the items listed on pages 70 and 71 of the County's 2006 Solid Waste Management Plan.")

29.

The consistency letters did not verify that Plaintiff's proposed solid waste handling facilities were consistent with the County's zoning or SWMP, because Plaintiff's EPD permit

application property is not located at the former Magnolia Holdings Business Park. (See Doc. 87-8; 87-9.)

The northern and southern pieces of property are separate tracts of land. (Appraisal, Doc. 88-4, pp.306-310.)

30.

When County Manager Carl Rowland learned that Plaintiff planned to switch the location of its planned development from the north tract of property to the south tract, he warned Plaintiff that doing so would be a problem:

> I texted one of them and I told him, I said if you insist on the south side you're gonna run into political opposition, I know that ….because – well, because you had subdivisions that were right to the east of that property that had been platted and developed. I mean, it don't take a rocket scientist. I've been in this business long enough to say you're gonna have some problems and, by damn it, they did have problems on that one.…But, I did point out that'll be a hotly discussed issue and it turned out it was."

(Rowland Dep., Doc. 88-1, p. 154:7-24.)

31.

The County adopted a zoning ordinance on September 8, 2016. (*See* Doc. 1-8.)

32.

The County adopted an amended zoning ordinance on June 15, 2017 and Plaintiff's property was zoned 'high industrial'. (Doc. 58-4, p.96 *et seq*.)

33.

Citizens were permitted to come in and request rezoning of their property without going through formal rezoning application process. (Mobley Dep., Doc. 91-1, pp.25:10-26:3.)

34.

The County did not put pressure on the EPD, the EPD did not require additional field work or testing as a result of public comments or action of the County, and Plaintiff's EPD application review was not delayed. (Doc. 88-5, pp. 35:10-21,37:6-39:2.)

35.

Plaintiff submitted its required D&O Plan to the EPD on August 26, 2021. (Docs. 136, 136-1.)

36.

The D&O plan review process is an involved one, and the EPD explicitly did not guarantee that it would approve Plaintiff's D&O plan or that a permit would issue. (Doc. 88-5, pp. 39:12-24, 49:17-24.)

37.

On May 9, 2022, the EPD issued a solid waste handling permit to Plaintiff for "Brantley County – Coastal Terrace Solid Waste Handling Facility, US Highway 82 East, Municipal Solid Waste Landfill…" at the following address: "Coastal Terrace Solid Waste Handling Facility, US Highway 82 East, Waynesville, GA 31566." (Doc. 164-1.)

38.

Plaintiff funds itself through periodic capital calls, whereby Plaintiff's members/partners each pay a proportion of the total capital raised themselves or through their LLCs. (Doc. 88-4, pp.228:15-229:16.)

39.

Plaintiff has produced no evidence that all members have the financial capability to fully fund the project construction, apart from affidavits from members John Kelly and Matt Roper who

do not have personal knowledge of all the members' finances and/or willingness to fund the project.  (*See* John Kelly affidavit, Doc. 58-2; Matt Roper affidavit, Doc. 58-3.)

40.

Plaintiff alleges that it has been harmed by an inability to enter into final non-contingent contracts with market participants. (Doc. 58-2 at 8-9, Doc. 58-3 at 8-9.)

41.

Plaintiff itself acknowledged that it could not enter non-contingent contracts unless and until the EPD issued a permit. (Doc. 88-4, pp.219:19-22, 220:11-221:1.)

42.

Plaintiff has produced evidence of only one contingent contract dated September 2, 2020, which "terminates under its own terms if [Plaintiff] does not receive a permit within Nine (9) months of signing." (Doc. 58-2, p.8, Ex. 5.)

43.

Plaintiff did not submit its D&O plan before that contingent contract expired "under its own terms" on June 2, 2020, as it submitted its D&O Plan on August 26, 2021. (Docs. 136, 136-1.)

44.

Plaintiff's costs to purchase the property, to conduct all of the necessary studies and perform all of the necessary work and create the necessary plans for its EPD permit application would have been incurred regardless of the County's action or inaction. (CITE?)

45.

Plaintiff's description of costs incurred includes the land purchase price, as well as engineers, geologists, hydrologists, other professionals, and carrying costs. (Doc. 58-2, p.9.)

46.

The approximately $1.1 million figure includes costs for lobbyists to the Georgia legislature, consultants, and insurance. (Doc. 88-4, p.227:1-22.)

47.

Plaintiff seeks the following damages: (1) Compensatory damages, consisting of "Mental Anguish/Emotional Distress for deprivation of Plaintiff's Due Process Rights. $150.00 per diem from September 9, 2016 through the date of trial or in such other amount as determined by the jury;" (2) Nominal damages, "As awarded to vindicate deprivation of rights;" and (3) Attorney's Fees, which are "Approximately $633342.32 and continuing to accrue…" (Plaintiff's Second Supplement to Initial Disclosures, attached hereto as Exhibit A.)

## II.   <u>CONCLUSIONS OF LAW</u>

## 1.   <u>Plaintiff Lacks Standing to Bring this Lawsuit</u>

Plaintiff has failed to show it meets the elements of standing: it did not suffer a concrete and particularized injury in fact, there is no "causal connection between the injury and the conduct complained of," and the subject injury will not be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiff did not suffer an injury in fact. Consequently, Plaintiff cannot meet the causation element. Plaintiff cannot allege that the County caused the injury complained of, because Plaintiff has put forth no evidence of an adverse decision from the County. Plaintiff has never submitted a plan or proposal to the County, so the County has had no occasion to approve or deny Plaintiff's plan to build a landfill.  (Doc. 88-1, p. 108 (p.107 of the transcript).) Furthermore, the EPD testified that the County did not delay the process or cause any extra work or expenditure for Plaintiff.

(Doc. 88-5, pp. 35:10-21,37:6-39:2.) Because the County has not done anything, Plaintiff's alleged injury will not be redressed by a favorable decision.

## 2.    <u>No Valid Vested Rights Claim</u>

Plaintiff fails to assert a valid vested rights claim.  The only thing that could have triggered a vested right was the County's issuance of the 2015 consistency letters.  Plaintiff did not apply for or obtain a building permit from the County, so it could only obtain vested rights if it "had a development plan that was approved either formally or informally by the zoning authority, and the property owner expended money in reliance on the development plan," or if Plaintiff "made a substantial change in position by expenditures in reliance upon the probability of the issuance of a building permit, based on an existing zoning ordinance and the assurance of zoning officials." *Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1241 (11th Cir. 2011) (citing *WMM Props., Inc. v. Cobb Cty.*, 255 Ga. 436, 339 S.E.2d 252, 254-55 (1986)).

Plaintiff had no development plan in February 2015, so the former condition was not met. (Doc. 88-4, pp.114:15-115:5, 131:21-132:2.)

Plaintiff also does not meet the latter condition, as it simply received letters stating that Magnolia Holdings was consistent with then-existing zoning ordinances and the SWMP. Plaintiff could not have received any official assurances that a building permit would "probably issue," because Plaintiff did not know *what* it wanted to build or *where* it wanted to build in February 2015, as discussed above. (Doc. 88-4, pp.114:15-115:5, 131:21-132:2.)

At the most, the County approved a development located at the Magnolia Holdings Business Park, specifically referenced in the consistency letters.  (Doc. 100, Exs. 6-7.)  These letters did not verify that Plaintiff's proposed solid waste handling facilities were consistent with the County's zoning or SWMP, as Plaintiff's EPD permit application, and now its solid waste

handling permit, is not located at the former Magnolia Holdings Business Park. Magnolia Holdings

Business Park is a 89.65-acre project site located north of Highway 82.  (*See* Docs. 87-8; 87-9.)

Additionally, the 2015 consistency letters were ultra vires, as they were issued in violation

of the express terms of the 2006 SWMP, which, by law is a resolution or ordinance of the County.

*See* O.C.G.A. § 12-8-31.1(c) ("To be included as part of a local, multijurisdictional, or regional

solid waste plan, each city and county included as part of the plan shall adopt the plan and any

plan updates by local ordinance or resolution.") It was always against the law for the County to

issue the consistency letters without meeting the requirements in the SWMP, so Development

Partners could get no vested rights from those letters. *See Corey Outdoor Advertising, Inc. v. Bd.*

*of Zoning Adjustments*, 254 Ga. 221 (1985).

### 3.    No Valid Void for Vagueness Claim

Plaintiff has failed to state a void for vagueness claim from the failure to provide an official

map for the 2016 Zoning Ordinance. (*See* Doc. 135, pp.56, 58.)  Plaintiff has not asserted any facts

showing that the 2016 Zoning Ordinance has ever been applied to it.

The void for vagueness claim was also mooted by the 2017 Zoning Ordinance, because

Development Partners asserted a facial challenge. (Doc. 1, ¶ 81.)  Because the void for vagueness

challenge was a facial challenge, the adoption of the 2017 Zoning Ordinance makes this claim

moot.  "As the Eleventh Circuit has held, 'a challenge becomes moot when the challenged policy

was repealed by the governmental authority and there was no reasonable expectation that the

governmental authority would return to the prior policy.'" *Stardust, 3007 LLC v. City of*

*Brookhaven*, 2016 U.S. Dist. LEXIS 196088, *55-*56 (N.D. Ga. Sept. 29, 2016) (quoting *Granite*

*State Outdoor Adver. Inc. v. City of St. Pete Beach*, 322 F. Supp. 2d 1335, 1341 (M.D. Fla. 2004)).

There is no evidence, nor is it reasonable, that the County will return to a zoning ordinance without a zoning map or apply an ordinance which no longer exists.

Moreover, Plaintiff's void for vagueness claim would not be saved even if it had asserted an as-applied challenge.  The doctrine of void for vagueness exists to provide "fair warning" of what is prohibited and to avoid "arbitrary and discriminatory applications" of laws. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972)). Plaintiff was well aware of its property's zoning classification without needing to review a map. Defendants agreed *at Plaintiff's request and with Plaintiffs present* that both the north and south parcels of Plaintiff's property be zoned "heavy industrial." (Doc.1-6.)

Since Plaintiff *knew* the zoning classification for its property and *was present* when Defendants decided said classification, the absence of the map does not "threaten to inhibit" any of Plaintiff's constitutionally protected rights.  Thus, Plaintiff cannot succeed on a void for vagueness claim.

### 4.     <u>No Damages</u>

The Court dismissed all claims against Defendants for monetary relief. (Doc. 135, pp. 30-31,34-35,37) (dismissing official capacity claims and claims for monetary relief against Defendants and upholding individual capacity claims for prospective injunctive and declaratory relief).

Thus, the only way for Plaintiff to obtain a damages award is through a federal official capacity claim, and the only such remaining claim is the void for vagueness claim. (*See id.*) The Court found that Plaintiff does not seek damages in the void for vagueness claim. (*See id.*, p.31 n.9.)

Even if the Court had not dismissed the damages claims, Plaintiff would not be entitled to damages for similar reasons discussed with regard to the lack of injury in section IV(A.) above. The County has not done anything to affect Plaintiff's permit application or the permit review process, and Plaintiff has not alleged that the County has enforced any law or regulation as to Plaintiff's property.

This 1st day of June, 2022.

FREEMAN MATHIS & GARY, LLP

*/s/ Dana K. Maine*
DANA K. MAINE
Georgia Bar No. 466580
dmaine@fmglaw.com
ROBERT P. MARCOVITCH
Georgia Bar No. 469979
Robert.Marcovitch@fmglaw.com
RACHAEL SLIMMON
Georgia Bar No. 831661
rslimmon@fmglaw.com

*Attorneys for Defendants*

100 Galleria Parkway, Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing DEFENDANTS' STATEMENT OF MATERIAL FACTS FOR WHICH THERE EXIST NO GENUINE ISSUE OF DISPUTE TO BE TRIED AND CONCLUSIONS OF LAW to the Clerk of Court using the *CM/ECF* system which will automatically send electronic mail notification of such filing and service to the following counsel of record:

L. Robert Lovett
Lovett Law Group
5400 Riverside Drive, Suite 203
Macon, GA 31210
Bob@LovettLawGroup.com

George Rountree
Brown Rountree, P.C.
26 North Main Street
Statesboro, GA 30458
george@br-firm.com

Kyler L. Wise
Wilson Brock & Irby, LLC
2849 Paces Ferry Road, Suite 700
Atlanta, GA 30339
kwise@wbilegal.com

Mark D. Johnson
Gilbert, Harrell, Sumerford & Martin, PC
PO Box 190
Brunswick, GA 31521-0190
mjohnson@gilbertharrelllaw.com

This 1st day of June, 2022.

/s/ Dana K. Maine
DANA K. MAINE
Georgia Bar No. 466580
dmaine@fmglaw.com

*Attorney for Defendants*

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)
20095704