<p style="text-align:center; color:red;">EXHIBIT 1</p>

<div style="text-align:center;">

**BEFORE THE OFFICE OF STATE ADMINISTRATIVE HEARINGS**
**STATE OF GEORGIA**

</div>



| | |
|---|---|
| **BOARD OF COMMISSIONERS OF**<br>**BRANTLEY COUNTY, GEORGIA,** | : <br> : <br> : |
| **Petitioner, and** | : |
| **SATILLA RIVERWATCH ALLIANCE,**<br>**INC., D/B/A SATILLA RIVERKEEPER,** | : <br> : <br> : |
| **Petitioner-Intervenor,** | : <br> : |
| **v.** | : **Docket No.: 2228917** <br> : **2228917-OSAH-EPD-SW-13-SCHROER** |
| **RICHARD E. DUNN, DIRECTOR,**<br>**ENVIRONMENTAL PROTECTION**<br>**DIVISION, GEORGIA DEPARTMENT OF**<br>**NATURAL RESOURCES,** | : <br> : <br> : <br> : |
| **Respondent, and** | : <br> : |
| **BRANTLEY COUNTY DEVELOPMENT**<br>**PARTNERS, LLC,** | : <br> : |
| **Respondent-Intervenor.** | : <br> : |

<div style="text-align:center;">

## FINAL DECISION

</div>

### I.   INTRODUCTION

Petitioner Board of Commissioners of Brantley County, Georgia ("Petitioner," the "County," or the "Board") has appealed the decision by Respondent, the Director of the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources ("DNR"), to issue a Solid Waste Handling Permit (the "Permit") to Respondent-Intervenor Brantley County Development Partners ("BCDP"). The Permit allows BCDP to operate a municipal solid waste disposal facility[1] in Brantley County. Petitioner and Petitioner-Intervenor

---

[1]    "Solid Waste Handling Facility," "Municipal Solid Waste Disposal Facility," and "Landfill" are all defined terms under the Georgia Code. See O.C.G.A. § 12-8-22(14), (19), (35). However, unless such distinctions are relevant to the Final Decision, the Court generally will refer to the proposed project at issue in this matter as a "landfill."

Satilla Riverwatch Alliance, Inc. ("Riverkeeper") contend that the Permit is invalid because it violates Georgia's Comprehensive Solid Waste Management Act ( "Act").  O.C.G.A. § 12-5-20, et seq.  The administrative hearing took place in January 2022, and the record closed on February 3, 2023.  Based on the following findings of fact and conclusions of law, the Director's decision is hereby **REVERSED**.

## II.   FINDINGS OF FACT[2]

### A.   Introduction

1.

Brantley County is a largely rural county in the southeastern part of the State.  The county seat is the City of Nahunta.  The Satilla River runs through Brantley County, flowing eastward from the county's northwest corner before joining the Little Satilla River and turning south.  A four-lane highway, U.S. Highway 82 ("Hwy. 82"), bisects the county from east to west, and a CSX rail line parallels Hwy. 82 to the north.  (Ex. P-1, at pp. 5, 12; Ex. J-10.)

2.

The Permit, issued by EPD on May 9, 2022, authorizes BCDP to operate a landfill on land owned by BCDP in Brantley County.  The location of the proposed landfill is on 122 acres on the south side of Hwy. 82, approximately one mile west of Waynesville, Georgia.  The 122-acre landfill is part of an over 2,300-acre parcel formerly owned by Magnolia Land Holdings, LLC and purchased by BCDP in December 2014.  (Tr. 216, 404-405; Exs. J-1, J-8.)

---

[2]     To the extent that certain findings of fact are more appropriately classified as conclusions of law, they should be so construed.  To the extent that certain conclusions of law are more appropriately classified as findings of fact, they should be so construed.

3.

The County has appealed EPD's issuance of the Permit based on a number of alleged procedural deficiencies in BCDP's application relating to public notice requirements and its submission of a "consistency letter," in which the County must verify that the proposed landfill is consistent with the County's local solid waste management plan.   In many instances, the deficiencies alleged by the County arose because of the County's own failure to comply with the provisions of the Act or otherwise to take effective action to oppose the siting of a landfill within its borders.   Nevertheless, as set forth below, the County met its burden to prove that the County's consistency letter was limited to a landfill located on the north side of Hwy. 82 in Brantley County, and BCDP's application and the approved Permit were for a landfill on the south side of Hwy. 82. Therefore, because a valid consistency letter was not submitted for the proposed site, the Permit was wrongfully issued.

### B.     Brantley County SWMP

4.

In March 2006, as mandated by state law, Brantley County and its two municipalities adopted a ten-year Solid Waste Management Plan (the "Brantley County SWMP").   See O.C.G.A. § 12-8-31.1(a).  In the Brantley County SWMP, the County stated that it did not anticipate opening a new solid waste management facility in the next ten years, and that any future facilities should be restricted to disposal of waste generated within the County.   In addition, the County identified environmental limitations for future landfills and reserved the right to determine whether a proposed landfill satisfied those limitations.[3]   The Brantley County SWMP also established

---

[3]      At the time the Brantley County SWMP was adopted, the County disposed of waste by transporting it to landfills outside of the County, and the County expected those landfills to be able to meet its future disposal needs. However, "Brantley County and its municipalities will carefully analyze and choose the disposal option most

various prerequisites to developing a new landfill in Brantley County, including compliance with the public meeting provisions relating to site selection under the Act.  Noting the County's "overall goal" of ensuring that any new landfills "are in areas which are suitable for such developments, are compatible with surrounding uses, and are not considered for locations in areas which have been identified by the community or region as having environmental or other development or land use limitations," the Brantley County SWMP provides that "no proposed facility or facility expansion will be sited in the planning area without a letter from the Governing entities (County and City) stating that the facility is consistent with the [SWMP]."  (Tr. 53; Ex. P-1, at 49, 70.)

5.

The Brantley County SWMP identified a number of specific requirements for obtaining the required letter, often referred to as a "consistency letter," including payment of a $500 application fee to the County and submission of a written statement at least sixty days before the applicant files for a permit with EPD.  The submission is required to include, among other things, documentation that the public has been given notice of the consistency review process and that a public meeting has been held, as well as a written statement describing the impact of the proposed facility.  The Brantley County SWMP contemplates that the County will first review any written statements on proposed new landfills and then notify the applicant of its determination on the proposed facility's consistency with the plan.  The Brantley County SWMP explains that these requirements are intended to "mandate that any future landfills will be held to the highest federal, state and local standards and done in the public eye, so that we may participate in the permitting process and exercise our constitutional rights of stewardship."  The County further noted that its

---

advantageous to the County considering economics, environmental concerns, land uses, and other issues."  (Ex. P-1, at pp. 44-45.)

citizens "have overwhelmingly stated that the Satilla River must be protected," and "are concerned that any landfill has the potential to harm the river and its environs.  In the past, the county has banned all landfills."  (Ex. P-1, at 70-71.)

**C.      Plans for a New Greenfield Landfill in Brantley County**

*Greenfield Sites*

6.

EPD and the solid waste industry refer to brand new solid waste sites as "greenfield" sites. Greenfield permit applications are fairly rare in Georgia.  In fact, the last time EPD processed an application for a new municipal solid waste landfill was in or around 2008.  Steve Harbin, a licensed professional engineer, consulted with the County on solid waste issues from 2013 to 2017 and also worked for BCDP on the Permit during that same period.[4]  Mr. Harbin explained that in 1972, there were 600 burning dumps in the State of Georgia.  Sometime in the 1990s, the federal government began regulating landfills and the state began permitting them.[5]  Mr. Harbin estimated that there were only about 60 permitted municipal solid waste landfills in the state in 2020.  (Tr. at 194-95; 333; 447, 450; Ex. P-26, Harbin Depo. Tr., at pp. 8-11, 24, 26.)

---

[4]      On November 12, 2020, Mr. Harbin was deposed by the County in a federal lawsuit filed by BCDP against the County relating to the proposed landfill.  See Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty., Civil Action No. 5:19-cv-109 (S.D. Ga., filed 11/2019).  At the start of the administrative hearing, EPD and the County stipulated to the admission of the transcript and exhibits from Mr. Harbin's deposition, which were admitted without objection as Exhibit P-26.  (Tr. at 15.)  Mr. Harbin was scheduled to testify in this matter on January 19, 2023, but Petitioner decided not to call him following the first two days of hearing.  Instead, both EPD and the County, as well as both intervenors, cited to Exhibit P-26 in their post-hearing briefs.  The Court therefore has reviewed Exhibit P-26 and has considered it as probative evidence in making these Findings of Fact.

[5]      Georgia laws governing solid waste are discussed in detail in Section III.A, *infra*.  For a broader history of federal and state regulation of municipal solid waste landfills, see generally Ex parte LeFleur, 329 So. 3d 613, 617 (Ala. 2020); Kim Diana Connolly, Small Town Trash:  A Model Comprehensive Solid Waste Ordinance for Rural Areas of the United States, 53 Cath. U.L. Rev. 1, 9 (2003).

*Early plans for a new landfill in Brantley County*

7.

The Court has reviewed the evidence in the record relating to the germination of the plan to build a new greenfield landfill in Brantley County.  Although the exact origination of the idea is not clear, the preponderance of the evidence proved that in early 2014, officials from Brantley County, including then County Manager Carl Rowland, began discussing possible revenue-generating opportunities with members of Harbin Engineering, P.C.  At that time, Harbin Engineering was working with the Brantley County Development Authority ("Development Authority") to assist in its efforts to expand the natural gas system into the County.  According to Mr. Harbin, Mr. Rowland talked to one of his engineers about "how poor the county was and said, do you know anything we could do to possibly bring revenue?  And I think Curtis the engineer from my office, says why don't y'all think about a landfill."  Mr. Harbin testified that they were trying to be helpful in suggesting a private landfill, which could bring financial compensation to the County through "host fees that are required by law to be paid when you have a . . . private landfill, in your county."  (Ex. P-26, Harbin Depo. Tr., at pp. 28-29, 33.)

8.

In or around February 2014, Mr. Harbin contacted Matt Roper of Roper Holdings LLC[6] to discuss a potential landfill project in Brantley County, and "that's how we got started with the process."  On March 10, 2014, Mr. Harbin sent Mr. Roper a letter summarizing his opinion of the "cost to develop a 300-400 acre municipal solid waste landfill to be located in Brantley County,

---

[6]    Mr. Harbin testified that he had known Mr. Roper for many years and knew that Mr. Roper had connections in the solid waste industry.  He and Mr. Roper had discussed possible solid waste projects on and off for years before the Brantley County landfill project was brought up.  (Ex. P-26, Harbin Depo. Tr., at pp. 32-34.)

Georgia."  The total estimated development costs were $1,500,000.00, and included multiple tasks,

including the following sequential tasks, early in the process:

- Prepare Documentation of Consistency with the SWMP
- Review of Documentation by County
- Hold Public Hearing on SWMP Consistency
- Determination by County of Consistency with SWMP
- Obtain SWMP Consistency Letter
- Public Notice for Siting Decision Meeting
- Schedule Siting Decision Meeting with County
- Advertise Siting Decision Meeting
- Siting Decision Meeting
- Obtain Documentation of Siting Decision Meeting and Submit to EPD

Mr. Harbin testified that Mr. Roper sought investors for the project, "and then those investors

brought other investors that became the investors of [BCDP]."[7]  (Ex. P-26, Harbin Depo. Tr., at

pp. 27, 29, 37, Harbin Depo. Exs. 1, 8.)

*Original site of the landfill was Magnolia Holdings property north of Hwy. 82*

9.

At his deposition, Mr. Harbin agreed that the concept of a new landfill in Brantley County

was first considered, "everyone was focusing on the north side of 82 . . .  where the Magnolia

Holdings planned development had been."  In 2006, Magnolia Land Holdings LLC ("Magnolia

Holdings") purchased a 2,389-acre parcel of land from Southern Pine Plantations of Georgia, and

for several years, explored a variety of development projects.[8]  The 2,389-acre Magnolia Holdings

property consisted mainly of forested flatwood land between the unincorporated rural communities

---

[7]     BCDP was not formed until around December 2014.  Mr. Roper testified that "in the very beginning it was me" talking with the commissioners about the project.  Although Mr. Roper was interested in a variety of technological and industrial development in Brantley County, the commissioners, according to Mr. Roper, were only interested in the proposed landfill.  After talking to multiple people who were not interested in investing in the property, Mr. Roper found a small group of interested investors, who eventually became the partners, through individual limited liability corporations, of BCDP.  (Ex. P-22, 30(b)(6) Depo. Tr. at pp. 16, 24-27, 93-94.)

[8]     In 2013, PrimeSouth Bank foreclosed on Magnolia Holdings' property.  (Tr. 98; Ex. R-5.)

of Atkinson to the west and Waynesville to the east.  The parcel is bisected by Hwy. 82, creating

two large and distinct tracts – an approximate 1,187-acre tract on the north side of Hwy. 82 and a

1,123-acre tract on the south side.[9]  In January 2015, Mr. Harbin wrote that when he first broached

the subject of a landfill with officials from Brantley County, sometime in or around February 2014,

"Brantley County was interested and they suggested the **± 1,187 acre** Magnolia tract, set aside for

a future industrial park, was available.  A biomass power plant had been planned for the site but

was unsuccessful and was never constructed."[10]  (Tr. 51, 81; Ex. J-8, Ex. J-9, at p. 1, Ex. R-5, Ex.

P-26, Harbin Depo. Tr., at pp. 39, 59-60, 122-123, Depo. Exs. 5, 8) (emphasis added).

10.

A Preliminary Engineering Report prepared by Harbin Engineering for the Development

Authority in June 2014 describes the location of Magnolia Holdings' planned development in more

detail.  First, the Preliminary Engineering Report discussed Brantley County's two industrial parks,

including one "known as Magnolia Holdings, LLC," located approximately 9.5 miles east of

Nahunta.  According to the Preliminary Engineering Report, the Development Authority was

exploring funding to expand the natural gas system into the County because, among other reasons,

"prospective industries who have considered the Magnolia Holdings site have been deterred in

whole or in part due to the lack of natural gas supply."  The Preliminary Engineering Report

---

[9]    The remaining acreage are two smaller tracts on the north side of Hwy. 82, including a narrow 71-acre-tract running between Hwy. 82 and the rail line, and a small 7-acre tract located between Hwy. 82 and the railroad right of way on the western side of the property.  The large 1,187-acre tract on the north side of Hwy. 82 lies north of the rail line.  (Ex. P-22, 30(b)(6) Depo. Tr., at 93-95, Depo. Ex. 6.)

[10]    Over five years later, on August 14, 2020, Mr. Harbin wrote a letter using similar language to explain the landfill project's origins, but this time he stated that in February 2014 "Brantley County was interested and they suggested the **± 2,389 acre** Magnolia Landholdings, LLC tract, set aside for a future industrial park, was available." The Court does not consider this revision to Mr. Harbin's original account to be credible or consistent with the preponderance of evidence admitted in this case.  (Ex. P-26, Harbin Depo. Ex. 53)(emphasis added.)

described the Magnolia Holdings property as "approximately 1,275 acres along U.S. Hwy 82 with rail access provided by CSX, and a rail spur in the southwestern corner of the site."[11]   The Preliminary Engineering Report also states that the Magnolia Holdings "park has been identified as a prime industrial park for Brantley County in all comprehensive plans in recent years; however, the park is awaiting appropriate utilities, including natural gas.  There was previously a wood pellet industry considering this site; however the facility was not developed due to the absence of natural gas."  Finally, Figure E of the Preliminary Engineering Report is a map of the area, and identifies only the area north of Hwy. 82 as Magnolia Holdings.  To the south of Hwy. 82, the map indicates only two elementary schools, one southwest of the Magnolia Holdings property and one southeast. (Ex. P-26, Harbin Depo., Tr., at pp. 29-31, Depo. Ex. 7, at pp. 2, 4, 7, 10 (Fig. E), 12.)

11.

The evidence in the record also proved that the Brantley County community considered the location of the Magnolia Holdings property to be on the north side of Hwy. 82.  Peggy Bowers, a member of the Development Authority, met with representatives of Magnolia Holdings in 2010, when she was the Chair of the Development Authority, to discuss a possible biomass facility on the property.  The meeting was held in an office trailer located on the north side of Hwy. 82, which Ms. Bowers considered to be the site of the Magnolia Holdings Business Park.  She did not even know that Magnolia Holdings owned the property on the south side of Hwy. 82 and was unaware of any discussions regarding development of the south side.  Similarly, Mittie Vaughn, the editor of the Brantley County Express, a local newspaper, testified that she first heard of the Magnolia Holdings Business Park in 2010, when Magnolia Holdings representatives came before the

---

[11]       The Court notes that the rail spur is only on the **southwestern corner** of the Magnolia Holdings site if the tract on the south side of Hwy. 82 is excluded.

Development Authority to discuss building a bioenergy facility on the north side of Hwy. 82.  Ms. Vaughn frequently drives along Hwy. 82, and she recalls seeing a sign relating to Magnolia Bioenergy on the north side of Hwy. 82 for about five years.  In a January 2010 newspaper article, Ms. Vaughn included a map of the area north of Hwy. 82, which included a new rail spur and the future "Magnolia BioPower Development."  In addition, a former Brantley County Commissioner, Jessie Mobley, testified that he, like Ms. Vaughn, recalls a sign on the north side of the highway announcing the planned Magnolia biopower or bioenergy facility and a sign on the south side advertising residential lots for sale.  (Tr. 49, 76-77, 121, 149-152, 157, 163-164, 167, 176; Ex. P-2.)

12.

The evidence in the record also proved that in 2014 BCDP contemplated that the proposed landfill would be located on the north side of Hwy. 82.  In November 2014, when the BCDP investors were considering the next steps in pursuing the landfill project in Brantley County, one of the investors described the investment opportunity as follows:

- Investment in 2341 Acres in southeast GA (Waynesville in Brantley County) at $1125 per acre
- **Sell the southern track (south side of Hwy 82), which is 1,122.79 acres for at least $1250 per acre**
- **Permit a 30 million yard regional solid waste land fill on 400 acres of the north track**
- **Develop a technology/business park on 100 acres of the north track**
- Maintain the remaining land for timber
- Generate up to $30 million on the permitted land fill not counting revenue on the business part and timber

(P-22, 30(b)(6) Depo., Exs. 5, 12)(emphasis added.)[12]

---

[12]     The parties, without objection from the intervenors, stipulated to the admission of Exhibit P-22, a transcript and related exhibits from a Rule 30(b)(6) deposition of BCDP in the federal lawsuit, conducted on November 11, 2020.  (Tr., at p. 15).  BCDP's Rule 30(b)(6) representatives were Matt Roper and John Kelly, neither of whom testified in the administrative hearing, although Mr. Kelly was present as a representative of BCDP.  The parties and

*County's involvement in early planning for the landfill*

13.

County Manager Carl Rowland and at least one Brantley County Commissioner, Mike Edgy, were actively involved in early discussions with BCDP about the proposed landfill in 2014. During BCDP's 30(b)(6) deposition, Matt Roper testified that he and Mr. Rowland met individually with almost every commissioner in February or March 2014, and that he told the commissioners that BCDP was considering the Magnolia Holdings property for a mixed-use heavy industrial development, including a facility that used solid waste recovery technologies, which would require BCDP to get a permit for a small landfill. John Kelly, a partner in BCDP, testified at the 30(b)(6) deposition that BCDP was considering a variety of environmentally-friendly waste conversion technologies for the Magnolia Holdings tract, but that any such technologies would entail having a permitted landfill to serve as a repository for waste material. According to Mr. Kelly, "because the county was broke and they wanted the host fees" from the traditional landfill operations, Mr. Rowland, Commissioner Edgy, and others from the County were only interested in discussing the landfill part of BCDP's plans. (Ex. P-22, 30(b)(6) Depo. Tr., at pp. 24-28, 37-38, 50.)

14.

Mr. Edgy, who owned property on the north side of Hwy. 82 close to the Magnolia Holdings tract, was very interested in BCDP's plans for a "waste-to-energy" type facility, and he and County Manager Rowland from the County accompanied Mr. Harbin and Mr. Roper on trips to tour waste-to-energy facilities in Florida and Tennessee. By December 2014 or January 2015,

_____

intervenors cited to Exhibit P-22 in their post-hearing briefs, and the Court has therefore reviewed this exhibit and considered in probative evidence.

Mr. Harbin and Mr. Roper from BCDP were having weekly conference calls with Mr. Rowland and Mr. Edgy from the County about the landfill project.  Mr. Harbin testified that he understood at that time, "that the County and the partners were looking at a public/private partnership and moving ahead together on this project."  (Ex. P-26, Harbin Depo. Tr., at pp. 43-44, 54, 64; Ex. P-22, 30(b)(6) Depo. Tr., at pp. 17, 19-20, 26, 40-41, 76-77, 82, 99, Depo. Ex. 11; Ex. J-7, at 22.)

<div align="center">15.</div>

In November 2014, Mr. Harbin sent a draft consistency letter to Mr. Rowland, based on examples of consistency letters contained in a 1993 Guidance Document from EPD.  On or about November 21, 2014, Carl Rowland, in his capacity as County Manager, signed a letter addressed to the Solid Waste Program Manager at EPD, which stated that he had reviewed the Brantley County SWMP and had "determined that the proposed Solid Waste Handling Facility to be located at the Magnolia Holdings Business Park is consistent with that plan."  There is no evidence in the record that the Board authorized the issuance of this letter by Mr. Rowland in November 2014. (Ex. J-3 (hereinafter "November 2014 Consistency Letter"); Ex. P-26, Harbin Depo. Tr., at p. 50-51, Depo. Ex. 24.)

<div align="center">16.</div>

On or about December 22, 2014, BCDP purchased the entire 2,389-acre former Magnolia Holdings property from PrimeSouth Bank.  Shortly before the sale was finalized, PrimeSouth Bank obtained an appraisal of the property, dated December 16, 2014.  For purpose of the appraisal, the property was divided into four tracts:  one tract consisted of 1,122 acres located on the south side of Hwy. 82, and the remaining three tracts were located on the north side, including the large 1,187-acre tract where Magnolia Holdings had focused its unsuccessful development efforts.  (Ex. R-5; Ex. P-22, 30(b)(6) Depo. Tr., at pp. 54, 93-94, Depo. Ex. 6.)

17.

On February 3, 2015, a little over two months after Mr. Rowland issued the November

2014 Consistency Letter, the County's Board of Commissioners held a work session.  The Board's

five members were present, along with Mr. Rowland and the County Attorney, Deen Strickland.

The minutes from the work session contain an item entitled, "Update of Industrial Park Property."

> Matt Roper and Donald Marks, partners of Brantley Development Partners, LLC, announced that their investment group has purchased approximately 2,500 acres of property located on the North and South boundaries of [Hwy. 82] between Waynesville and Atkinson, formerly known as the site for Magnolia Holdings.  The partners stated they were currently pursuing development projects to include warehousing, technology related businesses such as call centers and software development and waste to energy operations.  They stated the purchase occurred in December, 2014, and at this time no firm commitments have been made, but expected that efforts should result into specific development potentials in the near future.

(Tr. 43, 82-83; Ex. P-6.)

18.

Two days after the work session, on February 5, 2015, the County's Board of

Commissioners held its regular meeting at 6:00 p.m.  That morning, at around 10:00 a.m., Mr.

Rowland sent an email to then Commissioner Mike Edgy and copied BCDP's Mr. Roper.  He

notified them that he planned to ask that an item be placed on the Board's agenda as a "Request

by Brantley Development Partners LLC," and he described the statement he would make to the

Board about BCDP's request and the motion that Mr. Edgy should make authorizing the Board

Chairman to execute a SWMP consistency letter.  The minutes from the meeting reflect that Mr.

Rowland advised the Board that he and Mr. Harbin, BCDP's engineer, had "reviewed the proposed

activities in connection with waste handling, waste to energy and waste management and

determined that those facilities and activities are consistent with our local land use plan and our

[SWMP]."  Mr. Rowland further advised the Board that BCDP requested that the Board now

13

"ratify and approve our findings.  Ultimately, this letter is necessary to obtain the necessary permits

from the State of Georgia in operating an activity that deals with the use of waste material, be [it]

wood chips or any form of solid waste material."  (Ex. P-22, 30(b)(6) Depo. Tr., at pp. 115-116,

Depo. Exs. 15, 16; Ex. P-7; Ex. P-22, Harbin Depo. Tr., at p. 55, Depo. Ex. 10.)

19.

There is no evidence in the record that BCDP, Mr. Harbin, or Mr. Rowland provided the

Board with any written statements regarding BCDP's request, the proposed facility, or the exact

location of the proposed solid waste facility.  Mr. Mobley testified that he did not receive anything

in writing from BCDP.  Moreover, there was no evidence that there was any advance notice to the

public that Mr. Rowland would place this topic on the Board's agenda, and Ms. Vaughn testified

that she did not publish a notice of the February 5, 2015 meeting in the Brantley County Express.

Nevertheless, Mr. Edgy made a motion that the Board authorize the Chair to execute the SWMP

consistency letter, and the motion carried.  (Tr. 48, 71-72, 172; BCDP-Ex. 2; Ex. P-7.)

20.

On February 6, 2015, Board Chairman Charles Summerlin signed a letter regarding

BCDP's proposed facility.  In the letter, Mr. Summerlin states that the Board and its staff have

reviewed the SWMP and "have determined that the solid waste handling facilities being proposed

by Brantley Development Partners LLC to be located on a site formerly known as Magnolia

Holdings Business Park is consistent with the [SWMP].  We further certify that Brantley County

has a strategy and is actively engaged in meeting the statewide goal of reducing waste."[13]  (Ex. J-

4, hereinafter "February 2015 Consistency Letter.")

---

[13]     The letter did not specifically mention the "ten-year capacity needs" identified by the County in the SWMP
or verify that the proposed facilities would meet those needs.  See O.C.G.A. §12-8-31.1(e)(2).

21.

On March 5, 2015, the next regular meeting of the County's Board of Commissioners, Betty Jean Smith, an attorney and County resident, informed the Board that she intended to appear at all their meetings until her concerns about the proposed waste handling facilities were addressed. The minutes of the meeting reflect that Ms. Smith insisted that the Board call an emergency meeting to rescind the February 2015 Consistency Letter, place a moratorium on new landfills, and amend the Brantley County SWMP.  At the administrative hearing, Mr. Mobley testified that he, regrettably, did not take Ms. Smith's suggestions seriously, and he acknowledged that the Board did not vote to formally rescind the February 2015 Consistency Letter until many years later in July 2020.  In fact, the Board did not take any further formal action on the proposed landfill until after BCDP filed its application in December 2016.  (Tr. 73, 104-108, 119; BCDP Ex. 2.)

22.

Despite the lack of official County involvement with the proposed landfill after the February 2015 Consistency Letter, County Manager Carl Rowland and then Commissioner Mike Edgy continued to work closely with BCDP.  For example, just a month after the issuance of the letter, on March 11, 2015, Don Marks, a BCDP partner, emailed Mr. Rowland, Mr. Edgy, Mr. Roper, and Mr. Harbin.  Mr. Marks notified them that they "won't be having a 3pm this week since Matt and I will be in Brantley County on Friday.  By the way, everyone please start using Carl's personal email. . . ."  Mr. Roper explained at the 30(b)(6) deposition that BCDP believed that there was a "leak" of sensitive BCDP plans during this time, and that they were suspicious that the leak was a result of someone in the County going through Mr. Rowland's county emails, discovering BCDP's plans, and disclosing such plans to members of the public.  (Ex. P-22, 30(b)(6) Depo., Tr. at 156-158; Depo. Ex. 25; Ex. P-26, Harbin Depo. Tr., 97-100, Depo. Exs. 13, 14.)

23.

About five months after this email, on August 19, 2015, Mr. Rowland wrote a letter to BCDP. The letter stated that the County "considers the property of Brantley Development Partners, LLC, situated on the North and South boundaries of State Highway 520 [Hwy. 82] as one and the same tract of land." The impetus for this letter is unclear from the probative evidence in the record, and there is no evidence in the record that the Board of Commissioners authorized the letter, agreed with the statement, or even knew about its existence. In fact, Mr. Mobley, who was on the Board in August 2015, testified that he had no knowledge of the Board ever authorizing Mr. Rowland to issue this letter.[14]  (Tr. 54-55; Ex. J-15.)

*BCDP switches location of landfill to the south side of Hwy. 82*

24.

Sometime in early 2016, when BCDP and Harbin Engineering began working on the Site Suitability Assessment Report ("SAR") to be included with the permit application, BCDP began considering whether the tract on the north side of Hwy. 82 was really the best location for the landfill. In February 2016, BCDP partner Don Marks wrote to Mr. Roper, Mr. Harbin, and others, requesting a meeting to discuss, among other things, "Look at best location – North vs South." He indicated that factors in the decision included train traffic and the location of wetlands. Finally, he indicated that once BCDP decided on the best location between the north and south sides of Hwy. 82, they would send out a "final map" and begin the design layout for the landfill. Mr. Harbin testified that it was during March or April of 2016, when his firm began work in earnest

---

[14]     William Cook, the program manager for EPD's solid waste management program, testified at the administrative hearing that EPD received this letter with BCDP's application in December 2016 and interpreted it to mean that for purposes of the proposed landfill project, it did not matter to the County whether it was on the north or the south side since the County considered to be the same property.  (Tr. 548-550.)

on the SAR, that BCDP switched from the north to the south side of Hwy. 82 because of "weather impacts on the south side."  (P-22, 30(b)(6) Depo. Tr., at p. 172, Depo. Ex. 18; Ex. P-26, Harbin Depo. Tr., at pp. 96-97.)

25.

There is no evidence in the record that BCDP, Mr. Harbin, or anyone else notified the County that they had switched the site of the landfill from the north side to the south side of Hwy. 82, even in late 2016 when BCDP and the County were discussing the role of the County in a public-private partnership with BCDP.  Specifically, in October and November 2016, BCDP met with the members of the Board, briefly in executive session, then later in groups of two to avoid running afoul of open meeting requirements, to discuss the County becoming "a more significant partner through a public-private partnership" between BCDP and the County.[15]  Mr. Kelly agreed at his deposition that "[e]ach one of the commissioners said in late November that they wanted to do a public/private partnership . . . for a solid waste handling facility."  (Ex. P-22, 30(b)(6) Depo. Tr., at pp. 52-56, 59, 190, 194-197.)

*December 22, 2016 Hearing at the Brantley County Courthouse*

26.

On December 14, 2016 and December 21, 2016, the <u>Brantley County Express</u> published a Legal Notice of a "public hearing on December 22, 2016, at 3:00 p.m. in the Brantley County Courthouse."  According to the notice, the hearing was in accordance with Code Section 12-8-26

---

[15]     According to Mr. Kelly, the County, independent of BCDP, was considering a disaster recovery plan around this time, which opened the possibility of federal funds to help the County develop disaster relief infrastructure, including a landfill to hold disaster debris away from the storm surge areas.  Although Mr. Kelly could not recall if they met with every commissioner, BCDP met with most, including Mr. Mobley, who was "fine" with the landfill, but only wanted to see one in operation.  There is no evidence, however, that BCDP disclosed to the Board that it had switched the location of the landfill to the south side of Hwy. 82.

of the Act,[16] and was being held by the Board of Commissioners "to receive public comment on the proposed siting of a municipal solid waste facility (landfill) by [BCDP] to be located on Highway 82 East, Waynesville, Georgia on property formerly owned by Magnolia Holdings, LLC, now owned by Brantley County Development Partners, LLC in the unincorporated area of Brantley County."  The preponderance of the evidence in the record proved that BCDP, not the County, caused the notice to be published in the newspaper.  (Tr. 170-171; Ex. J-6.)

27.

Even though the public "hearing"[17] was hastily scheduled for the Friday afternoon before Christmas, almost 200 people attended.  The County Attorney, Deen Strickland, spoke first and explained that the hearing was being held pursuant to the Act, which required a local governing authority to hold a public meeting before making a siting decision.  The evidence proved that the hearing had some of the imprimatur of an official meeting of the Board of Commissioners in that the County Clerk (Rene Herrin), the County Manager (Carl Rowland), a current commissioner (Mike Edgy), and an incoming commissioner (Jesse Mobley), were all present.  In addition, Mr. Strickland kept order and generally ran the hearing using Board protocols, such as imposing a five-minute limit on public comments.  Although Mr. Strickland introduced BCDP's attorney, Robert Lovett, Esq., and initially stated that Mr. Lovett was present if the public had questions, Mr. Lovett stated that he was there just there to take comments as to the suitability of the siting of a landfill "on the southern parcel of this property," and not to answer specific questions because the permit application had yet to be filed.  Mr. Lovett assured the crowd that this was the "first part of a long

---

[16]    As discussed *infra*, Code Section 12-8-26 requires local governing authorities to provide notice and conduct public meetings on site selection for municipal solid waste disposal facilities.

[17]    The Court will refer to this gathering as a "public hearing," as opposed to a "meeting," because the preponderance of the evidence proved that this was not a meeting of the Board of Commissioners.

process," and there would be "plenty of opportunities" in the future for the public to ask questions.[18]  (Tr. 84, 103-104, 182-184; Ex. J-7.)

28.

The preponderance of the probative evidence in the record proved that BCDP did not disclose to the Board of Commissioners or the public that it had decided to locate the landfill on the south side of Hwy. 82 until the time of the public hearing.  Mr. Mobley testified that he first learned that the landfill would be located on the south side, closer to residential areas and schools, at the December 22, 2016 public hearing.[19]  In addition, the transcript of the December 22, 2016 public hearing confirmed that the public was not aware of the location of the proposed landfill before the meeting.  Mr. Lovett, in attempting to explain to the public the location of the proposed site, referred to it as the "Old Magnolia Plantation," but the "south parcel of that on the other side of the road. . . ."  One Brantley County resident called the project a "mystery" and lamented "secret meetings," while others commented on the close proximity to the two schools and noted that the proposed landfill was "a whole lot closer than I was under the impression it was."  Nevertheless, the public comments generally expressed a blanket opposition to building a landfill anywhere in

---

[18]     The Court finds Mr. Lovett's and Mr. Strickland's contradictory statements at the public hearing to be confusing.  For example, as stated above, Mr. Strickland first said that Mr. Lovett would answer questions, but then Mr. Lovett stated that the hearing was just an opportunity for the public to make comments about "where this site is going to be situated in the county."  Just a few moments later, Mr. Lovett told the audience, which was clearly opposed to the landfill being close to schools and their backyards, that "[t]his is not an opportunity for you to comment on this particular site."  In response to a question about the parcel number or other identification of the location of the landfill, Mr. Lovett refused to provide an exact location, but responded that the meeting was not a questions and answer session, but for the public to make "any comments about this particular site . . . ."  Mr. Strickland then told the crowd that because this was a private landfill, the County was only the "facilitator" of the meeting, and the applicant would be responsible for answering any questions about the landfill.  However, Mr. Lovett then stated that he would not be answering any questions "at this time."  (Tr., at pp. 4, 12, 21, 29-30, 45; Ex. J-7.)

[19]     In weighing Mr. Mobley's testimony, the Court considers that he was only sworn into office as a commissioner in January 2015.  Accordingly, there is insufficient probative evidence that Mr. Mobley was privy to information about the County's involvement in site selection or its relationship with the landfill project before that time.  (Tr. 42, 101-102.)

the County, and were not focused on the south side of Hwy. 82 versus the north side.  (Tr. 50-52, 101, 521; Ex. J-7.)

### D.    BCDP's Permit Application

*2017 – Application deemed incomplete*

29.

On December 29, 2016, just one week after the public hearing, BCDP filed its permit application with EPD.  In the application, BCDP clearly defined the location of the proposed landfill, including latitude and longitude coordinates and a map.  The proposed location of the landfill was on the south side of Hwy. 82, on approximately 463 acres, of which 122 acres were to be actually used for waste disposal.  BCDP included with the application a copy of the November 2014 Consistency Letter signed by Mr. Rowland, as well as Mr. Rowland's August 2015 letter addressed to BCDP stating that the County considered the north and south sides of BCDP's property to be the same parcel.  BCDP did not include a copy of the February 2015 Consistency Letter with the application.  (Tr. 193, 213-214, 405-406, 421; Exs. J-8, J-9.)

30.

As discussed above, a greenfield application like BCDP's is a rare occurrence at EPD.  In fact, neither William Cook, the manager for EPD's solid waste program, nor Chad Hall, the EPD unit manager in 2016, had previously worked on a greenfield permit application.  According to Mr. Hall, he did an initial review of the application and went through a checklist to determine if the application was complete and ready to be reviewed.  He identified some deficiencies, which he discussed with Mr. Cook and Jeff Cown, the head of EPD's Land Protection Branch.  The first deficiency was the date of the November 2014 Consistency Letter; he considered it to be too old. In addition, the November 2014 Consistency Letter did not provide an address or any other unique

identifier or lot number for the proposed landfill.  Finally, the application stated that a siting decision meeting had been held, but there was no documentation that public notice was given or that the meeting had been properly conducted.  Mr. Cown concurred with Mr. Hall's assessment and authorized him to issue a deficiency letter to BCDP.  (Tr. 194-195; 218-220, 240, 332-333, 377, 450; Ex. P-33.)

31.

On January 6, 2017, Mr. Hall sent a letter to Mr. Kelly, notifying BCDP that EPD would not proceed with the review of the application until BCDP addressed the identified deficiencies by providing, among other things, current documentation that the proposed landfill was consistent with the Brantley County SWMP and proof that the siting decision meeting was advertised and conducted in compliance with the Act.  On the same day he sent the deficiency letter, Mr. Hall received a letter from Mr. Strickland, the Brantley County Attorney, relaying the County's unanimous opposition to BCDP's application.  Mr. Strickland notified EPD that the County did not consider the December 22, 2016 public hearing to have been a valid siting decision meeting because it was not properly noticed and there was not a quorum.  Mr. Strickland also stated that the Board had adopted a Moratorium on solid waste facilities, which contained "the Board's opposition to the proposed siting."  (Tr. 221-223; Exs. J-11, J-12.)

32.

On April 27, 2017, more than three months later, BCDP replied to Mr. Hall's deficiency letter.  Mr. Lovett, on behalf of BCDP, provided a copy of the transcript from the December 22, 2016 public hearing, as well as proof of publication of the legal notice.  Mr. Lovett explained that the delay in providing this documentation was due to issues with obtaining the affidavits of publication.  He did not address the untimeliness of the November 2014 Consistency Letter or

mention the February 2015 Consistency Letter.  Mr. Hall quickly conferred with other EPD staff about BCDP's response, which he still considered deficient.  Specifically, Mr. Hall noted that the November 2014 Consistency Letter only described the location of the proposed site as "Magnolia Holdings Business Park," and did not provide a unique parcel identification.  Mr. Hall reasoned that without an attached description of the facility proposed in 2014, EPD could not determine that the facility described to the County in 2014 was the same as what was applied for in 2016.  (Tr. 224, 226, 228; Ex. J-13; Ex. P-40.)

<div align="center">33.</div>

About a week after receiving Mr. Lovett's response, Mr. Hall wrote a second deficiency letter to BCDP, on May 5, 2017.  EPD was still unwilling to process the application because the deficiencies had not been satisfactorily addressed.  Mr. Hall pointed out that BCDP had not provided current documentation that the proposed landfill was consistent with the Brantley County SWMP.  In addition, the November 2014 Consistency Letter referred to a proposed landfill "at the Magnolia Holdings Business Park," but did "not relate Magnolia Holdings or their plan to the current permit application from [BCDP].  EPD has received incomplete information demonstrating how the unspecified proposal in 2014, submitted by an unstated party, relates to a landfill proposed in 2016 by [BCDP]."[20]  EPD also remained unsatisfied with the timing of the notice of the December 22, 2016 public meeting.  (Tr. 226, 231, 234; Ex. J-14.)

---

[20]      At the administrative hearing, Mr. Hall testified that it was not uncommon for permit applicants to submit consistency letters from local jurisdictions that included only a general statement that the application was consistent with the local SWMP, without proof that the project described in the application was the same as that which was presented to the local jurisdiction for their approval.  Rather, "[i]t was almost always taken almost as an article of faith. . . .  We were left to assume that what the county was saying is consistent with the SWMP is the same proposal as in the application."  (Tr. 229-231.)  The Court notes, however, that all the applications handled by Mr. Hall and Mr. Cook during their tenure in the solid waste permitting unit were applications that sought to modify an existing permitted solid waste facility, not build a brand new facility.

*2018 – Application deemed complete*

34.

The two-year period after BCDP filed its application was "pretty slow moving," and EPD did not receive a formal written response to its second deficiency letter for over a year.  BCDP and EPD staff did communicate informally during that period, however, and in September 2018, BCDP representatives met with Chuck Mueller, the new chief of the Land Protection Branch, and the Director of EPD, about the application.  On October 3, 2018, BCDP's attorney, Mr. Lovett, wrote a letter to Mr. Hall, requesting that EPD proceed with the review of BCDP's application.  Mr. Lovett included the February 2015 Consistency Letter, which he said should have been included with the original application.  As to the deficiency regarding the December 22, 2016 public hearing, Mr. Lovett argued that it was no longer relevant because BCDP no longer intended to enter into a public-private partnership agreement with the County to operate the landfill.  (Tr. 305-307, 309-310, 320, 323-326; Ex. J-16; Ex. R-4.)

35.

On October 12, 2018, EPD accepted the February 2015 Consistency Letter, and Mr. Hall notified BCDP that "[t]he items noted as deficient in EPD's January 6, 2017 letter have been adequately addressed."  Specifically, Mr. Hall found the February 2015 Consistency Letter to be "sufficient to complete your application.  The October 3 response also demonstrated that a siting decision meeting is no longer pertinent as the proposed facility no longer involves a public partner."[21]  According to Mr. Hall, once EPD reached consensus that the application was complete, the agency processed the application on a standard track.  (Tr. 316-317; Ex. P-17.)

---

[21]     Although EPD appeared to have accepted BCDP's argument that a siting decision meeting under Code Section 12-8-26(b) was not required because the County and BCDP were no longer pursuing a public-private partnership, Mr. Cook's testimony on that issue was inconsistent.  For example, at the end of his testimony, Mr. Cook said that the County was not required to make a siting decision during the December 2016 meeting because the facility

36.

Mr. Hall acknowledged that EPD's decision to accept the February 2015 Consistency Letter was a change from EPD's original position that any SWMP consistency letter needed to be "current" and must specifically identify the proposed project, including its applicant and proposed location.  He agreed that replacing the November 2014 Consistency Letter with the February 2015 Consistency Letter did not resolve EPD's original timeliness concerns.  However, he testified that EPD reviewed the Act and the rules and did not find any basis for imposing a timeliness requirement on such letters.[22]  As to the description of the location of the proposed landfill, Mr. Hall testified, "I don't know that it really got any better."  Upon reflection, Mr. Hall testified that EPD relied on the specific location information in the Site Assessment Report and may have deferred to BCDP and overlooked the discrepancy between that specific description in the SAR and the reference in the February 2015 Consistency Letter to the "Magnolia Holdings Business Park," which seemed vague and like a "colloquialism."  Mr. Hall opined that it would be preferable for the rules to require proof that the project that a local government deems consistent with its SWMP is the same project that is proposed in the permit application.  However, in the absence of such a requirement, Mr. Hall believes that the Legislature must have intended for EPD to make an

---

was privately-owned, and the County did not play a role in deciding where the facility would be sited.  Yet Mr. Cook testified earlier that Code Section 12-8-26(b) did apply to this application, and that EPD considered that the requirements for such meeting were met on December 22, 2016.  Specifically, because BCDP published notice and there was a transcript indicating that a meeting was held and some county personnel were present, the siting decision meeting requirement was met.  According to Mr. Cook, EPD does not look into the details of these public meetings, such as whether there was a quorum.  EPD just looks to see if a meeting occurred, and "then we just checked the box that it did" because the local government is in the best position to ensure that the meeting is properly conducted.  (Tr. 500-504, 529, 532-534, 542, 555.)

[22]    Mr. Hall testified that there should be timeliness requirements imposed on consistency letters, and he found the letters submitted by BCDP to be old and unusual.  Mr. Cook also considered the letters to be old compared to what they were used to receiving.  Still, because the Act does not specifically impose such a requirement, EPD eventually decided that the age of BCDP's consistency letters would not be a bar to completeness.  He questioned whether the Director could rely on such letters to make a determination under Code Section 12-8-31(e) that the proposed landfill complied with the Brantley County SWMP, but EPD did not consider this Code Section when making the decision to accept the February 2015 Consistency Letter.  (Tr. 261-63, 403-404, 422-424.)

assumption, as an "article of faith," that the local government was looking at the same thing that is submitted to EPD in the application; "[o]therwise, it's just sort of a house of cards."  (Tr. 235, 243-49, 274-275, 277, 281, 403, 406-408.).

<div style="text-align:center">37.</div>

At the administrative hearing, William Cook, the manager of EPD's Solid Waste Unit, testified that consistency letters are relatively simple.  EPD looks only to see whether the local government confirms that the proposed facility would be consistent with the local SWMP.  If a local government issues a letter that identifies a permit applicant and states that the facility proposed by the applicant is consistent, that is the end of the inquiry from EPD's standpoint.  In fact, as long as the name of the applicant matches, or is very close, to the name on the consistency letter, EPD "essentially trusts the local government has reviewed . . . the project that's being proposed."  Consequently, with respect to BCDP's application, Mr. Cook testified that EPD did not need to know where the "Magnolia Holdings Business Park" was, even though that term was in the February 2015 Consistency Letter and did not appear anywhere in the application.  Rather, according to Mr. Cook, EPD only needed to see some reference in the consistency letter that would "tie" the letter to the pending application, which they found in the February 2015 Consistency Letter once it was finally submitted to EPD in October 2018.  That is, the February 2015 Consistency Letter identified BCDP as the entity proposing the project.  The reference to the Magnolia Holdings Business Park "didn't really matter."[23]  (Tr. 390-391, 407-408, 419-420, 431-432, 499, 525, 543.)

---

[23]     Mr. Cook agreed, however, that if an applicant owned multiple different pieces of property in a county that EPD would want to make sure that the County is talking about the same piece of property in the consistency letter as is in the application. (Tr. 523.)  In addition, Mr. Cook testified that local governments could draft their consistency letters narrowly, such as adding an expiration date or restricting the letter to a specific address or parcel number.  (Tr. 543, 544.)

*Permit approval*

38.

Once the application was deemed complete, EPD began to review the Site Assessment Report and provided multiple opportunities for the public to offer comments on the draft siting notification and limitations, as well as the design and operation plan.  In the case of BCDP's application, EPD had an extended public comment period and issued responses to the public comments, including the County's.  In total, EPD received over 9,000 comments in opposition to BCDP's application.[24]  In addition, the County continued to express its opposition to the application through both informal and formal communications.  In July 2020, the Board formally rescinded the consistency letters, and on December 13, 2021, the County's outside counsel sent a letter to EPD, setting forth in detail the County's arguments that the 2014 and 2015 consistency letters were invalid.  For the first time in writing, the County specifically argued that the consistency letters were limited to the "Magnolia Holdings Business Park," which referred only to the north side of Hwy. 82, not the south side where BCDP now proposed to site the landfill.  "[B]oth the 2014 letters and the February 2015 letters were intended for a different parcel of land entirely . . . on the north parcel of the site."  (Tr. 384-87, 434-437, 481, 485-486, 494-495; Exs. P-18, P-19.)

39.

EPD did not respond to the County's December 2021 letter.  Rather, five months later, on May 9, 2022, EPD issued Solid Waste Permit No. 013-994D (MSWL) to BCDP to operate the

---

[24]     Mr. Cook acknowledged that the opportunities provided under the Act for public participation after the application is filed merely allow for the public to make comments to EPD.  Comments during the post-application period regarding site suitability will not stop the permitting process from moving forward.  Rather, the Act protects the public's rights to provide input on the location of landfills at a local level under Code Section 12-8-26, and such public notice and meeting requirements must occur before the application is filed.  (Tr. 511-512, 515-517.)

Coastal Terrace Municipal Solid Waste Landfill on the south side of Hwy. 82 in Brantley County. (Tr. 495; Ex. J-1.)

### E.    The County's Appeal and Procedural History

<div align="center">40.</div>

On June 8, 2022, the County filed a petition for hearing challenging EPD's issuance of the Permit.  On July 6, 2022, the Court granted BCDP's Motion to Intervene, filed on June 23, 2022. On July 27, 2022, EPD filed a Motion to Dismiss in Part, Motion for Summary Determination in Part, and Brief in Support ("EPD Motion").   On October 21, 2022, the Court granted the Riverkeeper's Motion to Intervene, over the objection of EPD and BCDP.  After the parties and intervenors submitted briefs and presented oral arguments on EPD's Motion, the Court issued a Memorandum Opinion and Order on EPD's Motion on November 4, 2022, dismissing Counts VI and VII of the Petition and granting summary determination in favor of EPD on Counts III and IV and a portion of Count II.[25]  The Court denied EPD's Motion as to Counts I and V, and a portion of Count II, and scheduled an evidentiary hearing for January 5 and 6, 2023 in Nahunta, Georgia on the following remaining claims:

- Count I:  The consistency letters were untimely.

- Count II:  The consistency letters failed to sufficiently describe the location of the facility.

- Count V:   The County did not comply with the public notice and meeting requirements regarding site selection in violation of O.C.G.A. § 12-8-26.

---

[25]     The Memorandum Opinion and Order, as amended to correct a pagination problem on November 10, 2022, is incorporated into this Final Decision by reference.

<center>41.</center>

On December 21, 2022, the Court held a pre-hearing conference to consider pending motions and objections.  On December 27, 2022, the Court issued an Amended Pre-Hearing Order, which, among other things, added a third hearing day on January 19, 2023, in Atlanta, Georgia to hear testimony from Mr. Harbin, who was scheduled for surgery in early January.  On January 4, 2023, the day before the evidentiary hearing, BCDP filed a Motion to Dismiss Count V for Lack of Subject Matter Jurisdiction ("BCDP's Motion").  The Court took BCDP's Motion under advisement, and the evidentiary hearing commenced on January 5 and 6, 2023 in the Brantley County Courthouse.  Petitioner opted not to call Mr. Harbin on January 19, 2023, and the parties and intervenors chose to present closing arguments on that date and file post-hearing briefs on February 3, 2023.  The Court extended the deadline for issuing this Final Decision to February 27, 2023.

## III.   CONCLUSIONS OF LAW

### A.   Introduction

<center>1.</center>

Georgia law provides that "[a]ny person who is aggrieved or adversely affected by any order or action of the director [of EPD] shall . . .  have a right to a hearing before an administrative law judge of the Office of State Administrative Hearings . . . acting in place of the Board of Natural Resources."  O.C.G.A. § 12-2-2(c)(2).  The evidentiary hearing is de novo, and the administrative law judge, who has "all the powers of the ultimate decision maker in the agency," must make "an independent determination on the basis of the competent evidence presented at the hearing."  O.C.G.A. § 50-13-41(b); Ga. Comp. R. & Regs. 616-1-2-.21(1), (3).  Moreover, "the evidence on

<center>28</center>

the issues in a hearing shall not be limited to the evidence presented to or considered by the agency prior to its decision."  Ga. Comp. R. & Regs. 616-1-2-.21(3).

<div align="center">2.</div>

In this case, as the party challenging the issuance of a permit, the County bears the burden of proving, by a preponderance of the evidence, that the decision of the Director of EPD to issue the Permit to BCDP was unlawful.  Ga. Comp. R. & Regs. 616-1-2-.07(1)(a), .21(4); see also Longleaf Energy Assocs. v. Friends of the Chattahoochee, Inc., 298 Ga. App. 753, 768 (2009) (administrative law judge required "to consider the applicable facts and law anew, without according deference or presumption of correctness to the EPD's decision, and to render an independent decision on whether the Challengers carried their burden to prove by the preponderance of the evidence that the permit should not have been issued"); Coastal Marshlands Prot. Comm. v. Altamaha Riverkeeper, Inc., 315 Ga. App. 510, 514 (2012) (challenger must show that the permit was wrongfully issued) (citing Hughey v. Gwinnett County, 278 Ga. 740, 741 (2004)).  In the context of a de novo administrative hearing, the Georgia Court of Appeals has held that this Court is not "to determine whether a permit applicant met its burden of proof before [EPD]," but whether the permit was "wrongfully issued" based on all the available evidence, including additional evidence that may be introduced during the administrative hearing.  Id.

**B.**     **Georgia Comprehensive Solid Waste Management Act**

<div align="center">3.</div>

The Georgia General Assembly adopted the Act in 1990.  O.C.G.A. § 12-8-20.  The Act requires the State of Georgia to "institute and maintain a comprehensive state-wide program for solid waste management . . . so as to assure that solid waste does not adversely affect the health, safety, and well-being of the public and that solid waste facilities, whether publicly or privately

owned, do not degrade the quality of the environment by reason of their location, design, method of operation, or other means . . . ." O.C.G.A. § 12-8-21(a).  The General Assembly charged EPD with primary responsibility for the state's Solid Waste Management Program.  O.C.G.A. § 12-8-21(d).  Among other powers and duties under the Act, the director of EPD is responsible for issuing solid waste permits and for making "investigations, analyses, and inspections to determine and ensure compliance with [the Act]."  O.C.G.A. §§ 12-8-23.1(3) & (4), 12-8-24(a).

4.

Under the Act, local governments have a role to play in the issuance of permits to operate landfills within their jurisdictions.  As the Georgia Supreme Court recognized in 2014, "regulation by a local government of the collection and disposal of solid waste serves an important and legitimate purpose."  Advanced Disposal Servs. Middle Ga., LLC v Deep S. Sanitation, LLC, 296 Ga. 103, 106 (2014) (citing O.C.G.A. § 12-8-21(a) (purpose of the Act is "to protect the public health, safety, and well-being of [Georgia] citizens and to protect and enhance the quality of [Georgia's] environment"); O.C.G.A. § 12-8-31.1(a) and (b) (requiring counties to develop or be included in a comprehensive solid waste management plan which provides, at a minimum, "for the assurance of adequate solid waste handling capability and capacity within the planning area")).[26]  The Supreme Court has also held that "[a]n important part of the statutory scheme is the requirement that each city and county develop or participate in a SWMP."  Murray County v. R&J Murray, LLC, 280 Ga. 314, 316 (2006), citing O.C.G.A. § 12-8-31.1.[27]  Under the Act, a local

---

[26]    Prior to 2011, the Act called for oversight of local development of SWMPs by the Department of Community Affairs ("DCA").  See O.C.G.A. § 12-8-31.1(c) (2010).  In 2011, the General Assembly amended Code Section 12-8-31.1(c) by removing language requiring such review and providing that DCA shall promulgate solid waste planning guidance that a city or county may use to update or amend their SWMPs.  See 2011 Ga. Laws 76.

[27]    "Then, when a new solid waste facility is proposed, the applicant must request written verification from the local government that the proposed facility is consistent with the SWMP.  After receiving written verification from the local government, the applicant may then request a permit from the director of EPD."  Murray Cnty., 280 Ga. At 316 (citing O.C.G.A. § 12-8-24(a) & (g)).

SWMP must identify, among other things, "those sites which are not suitable for solid waste handling facilities based on environmental and land use factors."  O.C.G.A. § 12.-8-31.1(b). Further, the Act provides that applicants for solid waste permits must provide written verification to EPD "that the proposed facility is consistent with the local . . . solid waste management plan." O.C.G.A. § 12-8-24(g).  Similarly, Code Section 12-8-31.1(e) prohibits EPD from issuing a permit for a facility that is not consistent with the local SWMP and provides that each application for a permit must include a verification that the facility meets the ten-year capacity needs identified in the local SWMP.[28]

<div align="center">5.</div>

The Act also provides for public participation when local governments take action regarding the location of a municipal solid waste disposal facility.[29]  See O.C.G.A. § 12-8-26. First, when a county or other governing authority begins the process of selecting a site for such a facility, the Act requires that the county "first call at least one public meeting to discuss waste management needs of the local government" and "to describe the process of siting facilities to the public."  O.C.G.A. § 12-8-26(a).  EPD refers to this as the "needs meeting," and the Act requires notice of this public meeting to be published in a local newspaper "at least once a week for two weeks immediately preceding the date of such meeting."  Id.  Subsection 26(b) of the Act also requires the governing authority of a county to publish advance notice of a meeting when the County takes action resulting in a "siting decision."

The governing authority of any county or municipality taking action resulting in a

---

[28]    The County did not raise the apparent absence of a specific verification regarding the ten-year capacity needs in its Petition.

[29]    A "municipal solid waste disposal facility" is defined as "any facility or location where the final deposition of any amount of municipal solid waste occurs, whether or not mixed with or including commercial or industrial solid waste, and includes, but is not limited to, municipal solid waste landfills and municipal solid waste thermal treatment technology facilities."  O.C.G.A. § 12-8-22(19).  See also Ga. Comp. R. & Regs. 391-3-4-.01(48).  BCDP's proposed landfill falls within the definition of a municipal solid waste disposal facility under the Act.

<div align="center">31</div>

publicly or privately owned municipal solid waste disposal facility siting decision shall cause to be published within a newspaper of general circulation serving such county or municipality a notice of the meeting at which such siting decision is to be made at least once a week for two weeks immediately preceding the date of such meeting.  Such notice shall state the time, place, and purpose of the meeting and the meeting shall be conducted by the governing authority taking the action.  A siting decision shall include, but is not limited to, such activities as the final selection of property for landfilling and the execution of contracts or agreements pertaining to the location of municipal solid waste disposal facilities within the jurisdiction, but shall not include zoning decisions.

O.C.G.A. 12-8-26(b).

<div align="center">6.</div>

Under the Act, the Board of Natural Resources ("BNR") has the authority to adopt, modify, and repeal rules and regulations to implement the Act and facilitate its purposes and policies, including establishing procedures for applying for permits and submitting verifications and other information deemed relevant to the issuance of the permit.  O.C.G.A. § 12-8-23(1)(B).  BNR has adopted rules regarding solid waste handling permits.  See Ga. Comp. R. & Regs. 391-3-4-.02 (hereinafter, "EPD Rule .02").  For example, EPD may only issue permits for solid waste handling if it receives an application that is judged complete and that meets the requirements of the Act and EPD's rules.  EPD Rule .02(1)(b).  To be judged complete, an application for a permit must include, among other things, verification that the facility is consistent with the local SWMP.  EPD Rule .02(9).  "The verification shall consist of letters from the host jurisdiction and generating jurisdictions verifying consistency with the approved local solid waste plans."  Id.

<div align="center">7.</div>

BNR has also adopted rules on public participation, which mirror the provisions in Code Section 12-8-26 of the Act.  See Ga. Comp. R. & Regs. 391-3-4-.03 (hereinafter, "EPD Rule .03").  Specifically, consistent with Code Section 12-8-26(a), EPD Rule .03(1) requires a county "beginning a process to select a site for a municipal solid waste disposal facility" to "first call a

<div align="center">32</div>

public meeting," the purpose of which "shall be to discuss the waste management needs of the local government or region and to describe the siting process to be followed."  EPD Rule .03(2), similar to Code Section 12-8-26(b), requires the governing authority of any county "taking action resulting in a municipal solid waste disposal facility siting decision" to notify the public by causing to be "published in a newspaper . . . at least once per week for two weeks immediately preceding the date of such meeting, notice of the meeting at which the siting decision is to be made."  EPD Rule .03(2)(a).  The notice must state the time, place, and purpose of the meeting, and the meeting must be conducted by the governing authority taking the action.  EPD Rule .03(2)(b) & (c).  Finally, EPD Rule 391-3-4-.05(1)(b) requires that a permit applicant submit documentation that the provisions relating to siting decisions in Code Section 12-8-26 have been met.

### C.   The County proved that EPD erred in accepting the consistency letters, not because they were too old, but because they did not relate to the landfill's proposed location.

8.

*1. Consistency letters are an important part of the permitting process.*

States were required to develop solid waste management plans in 1976 through the federal Resource Conservation and Recovery Act ("RCRA"), and such plans were intended to "foster cooperation among Federal, State, and local governments and private industry."  42 U.S.C. § 6941.[30]  The purpose of Georgia's "comprehensive state-wide program is to assure the goals of the Act – protection of public health and the environment."  R&J Murray, LLC v. Murray County, 282 Ga. 740, 744 (2007) (Melton, J., concurring).  One of the specific goals of the Georgia's comprehensive state-wide plan is to assure that "solid waste facilities, whether publicly or

---

[30]    "Despite the perceived need for federal action, however, Congress affirmed in RCRA that 'the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies."  AES Puerto Rico, L.P. v. Trujillo-Panisse, 857  F.3d 101, 103 (1st Cir. 2017)(citing 42 U.S.C. § 6901(a)(4)).

privately owned, do not degrade the quality of the environment by reason of their location, design, method of operation, or other means." Id., citing O.C.G.A. § 12-8-21(a) (emphasis added). In addition to the state plan, the Act requires local jurisdictions to develop their own SWMPs in order to further these same goals on the local level. Id.

9.

The General Assembly intended the director of EPD to exercise authority over the state's solid waste management program in collaboration with local governments, mandating that the director "shall at all times coordinate his activities with those of other state agencies and local political jurisdictions so as to achieve a unified and effective solid waste management program in the state." O.C.G.A. § 12-8-21(d). Justice Melton observed that "local plans are inextricably tied to the Act as the mechanism by which the Act is essentially set into motion." R&J Murray, 282 Ga. at 745. Accordingly, when it comes to reviewing applications for new solid waste facilities, EPD does not consider the application to be complete and ready for review until the applicant provides satisfactory written verification of consistency from the local government. O.C.G.A. § 12-8-24(g); EPD Rule .02(9).

*2. The Consistency Letters were not invalid because they were untimely.*

10.

Count I of the Petition for Hearing claimed that the letters submitted by BCDP to verify SWMP consistency were untimely. However, notwithstanding EPD's initial determination that the November 2014 consistency letter was too old and Mr. Hall's request for a "current" letter, the Court concludes that EPD's later decision to accept the February 2015 Consistency Letter did not violate the Act or EPD's rules for reasons of untimeliness. Mr. Cook and Mr. Hall provided a reasonable explanation for EPD's change in its position as to the timeliness of the consistency

letters.  That is, although EPD would have preferred a more recent letter from the governing authority, when EPD staff reviewed the current statutes and rules, they correctly determined that neither the Act nor EPD's rules and regulations contained any specific time requirement for such letters.[31]  The Court credits Mr. Cook's testimony that EPD reasonably expected some lag between the issuance of the consistency letters and the submission of the application given the time-consuming task of developing a site assessment plan.  Furthermore, the fact that EPD currently is considering amending its informal guidance document to require applicants to submit consistency letters that are no more than eighteen months old does not change the rules and regulations in place at the time BCDP filed its  application in December 2016.  See generally Fulton County v. Action Outdoor Advert., JV, LLC, 289 Ga. 347, 349 (2011) (applicant has vested right in consideration of application under law then in existence) (citations omitted).           .

<center>11.</center>

Of course, BNR has the clear authority under the Act to amend its rules, and, as Mr. Hall testified, imposing a time requirement for consistency letters may better effectuate the policies and purposes of the Act.  However, in the absence of such a rule, it was not unreasonable for EPD to reconsider its demand for a "current letter."  Moreover, although EPD would not have accepted the February 2015 Consistency Letter if it had been rescinded prior to BCDP filing its application, the Court concludes, based on the evidence in the record, that EPD correctly determined that the County did not effectively rescind the February 2015 Consistency Letter until July 2020, more

---

[31]     Mr. Cook testified that EPD's rules only set time requirements on certain elements of the application relating to site assessment, which are discussed in Circular 14 and incorporated by reference in Ga. Comp. R. & Regs. 391-3-4-.05(4) (SAR must be prepared in accordance with Circular 14, 1991, (amended 1997) and published by the Georgia Geologic Survey).  Mr. Cook testified that Circular 14 requires some parts of the SAR to be current within five years, and certain requirements, like buffers, must be in place as of the date of the application. (Tr. 537-39.)  Circular 14 was not included in the record, but the Court considers Mr. Cook's testimony to be relevant in showing that EPD has the authority to impose, and has imposed in the past, time requirements on parts of the application if it deems it appropriate.

than five years after the County issued the letter and over three years after BCDP filed its application.[32] Although the evidence in the record proved that the County notified EPD that it was opposed to BCDP's application just one week after the application was filed, the County did not notify EPD that it was rescinding the consistency letters.  In addition, although the County argues that it was lulled into inaction by EPD's 2017 deficiency letters, which rejected the November 2014 Consistency Letter as too old and demanded a current letter, any reliance on the deficiency letters was no longer justified once EPD withdrew its demand for a current letter and accepted the February 2015 Consistency Letter in October 2018.

<div align="center">12.</div>

Based on the evidence in the record and the statute and rules in effect at the time BCDP filed its application, the Court concludes that the February 2015 Consistency Letter was not untimely, and that EPD did not err in abandoning its demand for a current letter.  Accordingly, the County did not prove that the Permit was wrongfully issued on the basis of its claim in Count I that the consistency letters were untimely.

> *3. The consistency letters applied to a facility located on the north side of Hwy. 82.*

<div align="center">13.</div>

In response to Count II regarding the consistency letters' description of the location  of the landfill, EPD contends that the written verification of SWMP consistency that is required by the Act is simple.  It must only be signed by a governing authority, mention the permit applicant by name, and contain a statement that the applicant's proposed facility is consistent with the SWMP. In fact, if those elements are in the letter, EPD typically will "check the box" and move on with its

---

[32]      Although Mr. Mobley testified that the Board was uncertain about its legal options in the early days when the application was first filed, the Court notes that the County had, but did not heed the advice of Betty Jean Smith, an attorney and outspoken Brantley County resident, who urged the Board to rescind the letter as early as March 2015.

<div align="center"></div>

review of the application.  In many instances, that practice would be reasonable, especially with respect to all the previous permit applications processed by the Solid Waste Unit in the eight years proceeding BCDP's 2016 application.  In those applications, the applicant was proposing only a modification or expansion of an existing permitted landfill whose location was obviously known by everyone – the applicant, the local government, and EPD.  In the case of BCDP's greenfield application, however, the proposed site was only identifiable by the description in the application and in the consistency letters, which did not match.

<div align="center">14.</div>

That is why Mr. Hall, on his first review of BCDP's application, noted the absence of "an address or any other unique identifier" on the November 2014 Consistency Letter.  He repeated his concern about the lack of a "unique parcel identification" four months later to his supervisors, noting that the consistency letter described the location of the proposed facility as the "Magnolia Holdings Business Park," and there was no way for EPD to know that the facility that was described to the County when it issued the letter was the same as the one described in the application two years later.  Mr. Hall also conceded at the hearing that the description of the location of the property did not become any clearer once BCDP submitted the February 2015 Consistency Letter in October 2018.  That letter still referred to the facility "to be located on a site formerly known as Magnolia Holdings Business Park," and it was a facility at that location that the County verified was consistent with its SWMP.  The preponderance of the evidence proved that at the time EPD accepted the February 2015 Consistency Letter and deemed the application complete, EPD had no information about what the former Magnolia Holdings Business Park was or where it was located.

15.

The location of future proposed solid waste facilities is a critically important part of a local SWMP.  In fact, as Justice Melton observed in his concurrence in R&J Murray, one of the required components of a local SWMP is the identification of "suitable areas for future solid waste facilities."  282 Ga. at 744 (citing O.C.G.A. § 12-8-31.1(a)).  Admittedly, if the County had not included a specific location in its consistency letters, EPD might reasonably have assumed that the County's consistency verification was unbounded by location, or at the very least, included any property in Brantley County that BCDP owned.  But that was not the case here.  The County did specify a location for BCDP's proposed facility, and the Court concludes that EPD was not authorized to take it "as an article of faith" that the former Magnolia Holdings Business Park was the same location as the site proposed in BCDP's application, which did not mention the Magnolia Holdings Business Park, nor was it reasonable for EPD to "essentially trust" that the County reviewed and approved the same project on the same site as in the application when the two location descriptions did not match.  Rather, the Act required EPD to "at all times coordinate [EPD]'s activities with" local governments, and, when necessary, conduct investigations and analyses to ensure compliance with the Act.  O.C.G.A. §§ 12-8-21(d); 12-8-23.1(4).  Simply put, in order to ensure that the permit was consistent with the local SWMP, as EPD is required to do before issuing a permit under Code Section 12-8-31.1(e), EPD was obligated to verify that the "facility to be located on a site formerly known as Magnolia Holdings Business Park" was the same as the facility proposed in BCDP's application.

16.

This was not done.  Nevertheless, the County cannot meet its burden to prove that the Permit was wrongfully issued solely by proving that EPD did not have sufficient evidence to make

the necessary findings to approve the Permit at the time of issuance.  Coastal Marshlands Prot. Comm., 315 Ga. App. At 514 (finding no merit in the argument that an ALJ should deny a permit if there was insufficient evidence before the agency).  Rather, as the Court of Appeals held, this Court is "required to make an 'independent determination' based upon the evidence presented," including any additional probative evidence admitted at the administrative hearing.  Id. at 513-14. Having weighed that evidence in the record of this case, the Court concludes that the County proved that the facility it approved in the February 2015 Consistency Letter was not the same facility proposed in BCDP's application.  That is, the preponderance of the admitted evidence proved that the facility located on "the site formerly known as Magnolia Holdings Business Park" was on the north side of Hwy. 82, not the south side, where BCDP's proposed facility is.

<div align="center">17.</div>

As an initial matter, in reaching this conclusion, the Court has considered BCDP's argument that this Court may not consider testimony of a commissioner to determine what the County's "subjective intent" was when it made its consistency findings with respect to  a "facility located at the former Magnolia Holding's Business Park."  See Fulton Cnty. v. Dangerfield, 260 Ga. 665 (1990); City of Smyrna v. Ruff, 240 Ga. 250 (1977).  Rather, BCDP argues that the intent of the Board must be derived from the official minutes from the February 3, 2015 work session and the February 5, 2015 Board meeting.  The Court has considered those minutes, without regard to Commissioner Mobley's testimony about his or the Board's subjective intent, and concludes that the minutes prove only that BCDP told the Board that it was considering a variety of development projects on an almost 2,500 acres tract that it had purchased from Magnolia Holdings and that was located on both the north and south side of the highway.  However, the minutes reflect that the motion passed by the Board did not authorize a SWMP consistency letter for the whole

2,500 acre parcel owned by BCDP.  Instead, the Board approved the issuance of a consistency letter for "a site formerly known as Magnolia Holdings Business Park."  Considering only the County's official records of the vote, as BCDP suggests, the Court concludes that such records do not prove that the County considered the former Magnolia Holdings Business Park to encompass the entire 2,389-acre parcel formerly owned by Magnolia Holdings.

18.

Rather, the Court considers the phrase "former Magnolia Holdings Business Park" contained in the February 2015 Consistency Letter to be ambiguous, or as Mr. Hall testified, akin to a "colloquialism."  Although EPD could reasonably have found, as it did initially, that the ambiguity was fatal to BCDP's application, BCDP offered, and EPD ultimately considered, extrinsic evidence to identify the ambiguous phrase.  Specifically, BCDP submitted Mr. Rowland's August 19, 2015 letter with its application, which stated that the County considers the property of BCDP situated on the north and south side of the highway as one and the same tract of land.[33]  Mr. Cook testified that EPD accepted Mr. Rowland's letter and considered it in determining that the County intended for the February 2015 Consistency Letter to apply to both the north and south

---

[33]     Mr. Rowland's letter, in addition to being an out-of-court statement from a witness who did not testify at the hearing, is no different than the parole evidence in the form of Mr. Mobley's testimony on the intent of the Board, which BCDP objected to and which the Court has not considered in reaching this Final Decision.  Yet, the Court has taken into account Mr. Rowland's letter at BCDP and EPD's suggestion, and has weighed its reliability and probative value.  See O.C.G.A. § 24-8-802 (hearsay may be admitted as legal evidence under Georgia's civil evidence rules if the opposing party does not object); Parker v. State, 296 Ga. 586, 597 (2015) (trier of fact retains prerogative to determine weight and credibility of evidence submitted).  In determining the appropriate weight to give to Mr. Rowland's letter, the Court has considered that his letter was not an official act of the Board, and Mr. Rowland, as the County Manager, did not have authority to bind the Board or interpret their official actions any more than an individual commissioner could.  See O.C.G.A. § 36-5-22 (county manager's powers are administrative in nature); City of Atlanta v. Black, 265 Ga. 425, 427 (1995) (citing O.C.G.A. § 45-6-5 ("Powers of all public officers are defined by law and all person must take notice thereof.  The public may not be estopped by the acts of any officer done in the exercise of an unconferred power.").  The Court also notes that Mr. Rowland's letter does not mention the phrase "former Magnolia Holdings Business Park," and therefore is not probative as to how that phrase should be defined.  Finally, the Court has considered the evidence in the record of Mr. Rowland's divided loyalties, including his weekly telephone conference with BCDP, the use of his personal email as opposed to his county email to avoid "leaks," and the lack of evidence that Mr. Rowland ever notified the Board that he had written this letter to BCDP.

side of Hwy. 82.   Similarly, BCDP argued in its post-hearing brief that Mr. Rowland's letter verified "that the entire tract is compliant with local zoning and SWMP."   In addition, both EPD and BCDP argued that EPD was entitled to extrapolate from another piece of extrinsic evidence – the County's own tax records – that the entire parcel that was previously owned by Magnolia Holdings was purchased by BCDP and, therefore, the entire parcel must be where the business park was intended to be.

<div align="center">19.</div>

The Court concludes that it was not improper for BCDP and EPD to look to Mr. Rowland's letter and the tax map as extrinsic evidence to prove the meaning of an ambiguous phrase in the February 2015 Consistency Letter.   See, e.g., Faulkner v. McKelvey, 207 Ga. 354, 355 (1950) (where contract for purchase contained the heading "Georgia, Bartow County" and a description of the property as "the brick store building, known as the old Post Office Building," the description "contained a key which, when aided by proper extrinsic evidence, would be sufficient to identify the land in question").[34]   That is, the phrase "former Magnolia Holdings Business Park" is a "key" to the description of the location of the facility approved by the County.   However, it is also appropriate in a de novo hearing for the Court to consider additional reliable extrinsic evidence to

---

[34]     See also McCumbers v. Trans-Columbia, Inc., 172 Ga. App. 275, 277 (1984) ("We recognize that where a description refers to a particular name as 'the Oakley-Pirkle' property (the situation in this case), parole evidence is admissible to show that such a place does exist. In such instances, a descriptive name is said to provide the 'key' which may be explained by parole evidence. However, there is a marked distinction between explaining an ambiguous description by parole evidence, and admitting parole evidence to supply a non-existent description.") (citation omitted);  CDM Custom Homes v. Windham, 280 Ga. App. 728, 730 (2006) ("To be valid, a description in a deed, contract for the sale of land, or a claim of lien on real estate must identify the land with reasonable definiteness or contain a key by the use of which the description may be applied by extrinsic evidence."); Nahn v. Wellington Square, LLC, 263 Ga. App. 717, 721-22 (2003) (contract's description of shopping center to be conveyed as "Wellington Square at Indian Trail Lilburn and Dickens Road" was a sufficient "key" to allow the court to consider extrinsic evidence).

identify the meaning of the "key" used by the Board.  Having weighed the extrinsic evidence set forth in the Findings of Fact above, including the deposition transcripts and exhibits of BCDP's own representatives and BCDP's engineer,[35] as well as Mr. Rowland's August 19, 2015 letter and the tax map, the Court finds that the preponderance of the probative evidence proved that the phrase "former Magnolia Holdings Business Park" referred to the tract on the north side of Hwy. 82, not on the south side.

<center>20.</center>

Based on this finding, the Court concludes that the February 2015 Consistency Letter does not constitute written verification of SWMP consistency of BCDP's proposed facility on the south side of Hwy. 82.  Accordingly, because EPD may not issue a permit without a valid SWMP consistency letter, the issuance of the Permit to BCDP was improper as alleged in Count II of the Petition.  EPD Rule .02(1)(b); EPD Rule .02(9); O.C.G.A. § 12-8-24(g); 12-8-31.1(e).

### D.     OSAH does not have jurisdiction over Count V.

<center>21.</center>

Count V of the Petition alleged that the Permit is unlawful because the public notice and meeting requirements in Code Section 12-8-26 were not met.  As an initial matter, the Court must address BCDP's motion to dismiss Count V for lack of subject matter jurisdiction.[36]  After much consideration, the Court concludes that the Georgia Supreme Court's decision in Emmons v. City

---

[35]     As noted *supra*, these depositions were admitted by stipulation of the parties and without objection from the intervenors, and all the post-hearing briefs cited to them.  The Court therefore reviewed these exhibits and weighed them against the other admitted evidence.

[36]     Pretermitting whether an intervenor was entitled to file such a motion under the Court's October 21, 2022 Order Granting Motion to Intervene by Satilla Riverkeeper, the Court concludes that under Georgia case law and the Civil Practice Act, "[w]henever it appears, by suggestion of the parties or otherwise, that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'"  State of Ga. v. Fed. Defender Program, Inc., 315 Ga. 319, 343 (2022), quoting O.C.G.A. § 9-11-12(h)(3) (emphasis added).  See also Ga. Comp. R. & Regs. 616-1-2-.02(3), 616-1-2-.22(1)(i).

<center>42</center>

of Arcade controls, and that BCDP's Motion should be granted. 270 Ga. 196 (1998).  The Court does not reach this conclusion lightly, particularly as the evidence in the record proved that the County violated O.C.G.A. § 12-8-26(a) by not holding a "needs meeting."  Nevertheless, the Supreme Court's ruling is clear, and as discussed below, EPD's interpretation of its limited role in enforcing these public participation provisions of the Act is consistent with that ruling.

<div align="center">22.</div>

Emmons involved a lawsuit filed by citizens of the City of Arcade seeking a declaratory judgment and injunction against the city based on the city's failure to comply with the public notice provisions of O.C.G.A. § 12-8-26. Id.  In 1992, the City of Arcade learned that a private developer, Bartram Environmental, Inc. ("Bartram"), was considering land adjacent to the city for a landfill, and in May 1993, the city council annexed the property in hopes of reaping financial benefits from hosting the landfill within city limits. Id. at 196-197.  In December 1993, the city entered into an agreement with Bartram to develop the landfill on the annexed land. Id. See also Emmons v. City of Arcade, 228 Ga. App. 879, 882 (1997).[37]  The city annexed the land and entered into the agreement without complying with the notice and meeting requirements under O.C.G.A. § 12-8-26. Emmons, 270 Ga. at 197-198.  In December 1994, Bartram applied for a permit to operate the landfill from EPD and received a letter of site suitability for the proposed landfill from EPD in February 1996. See Bartram Env't v. Reheis, 235 Ga. App. 204 (1998); see also Bartram Env't v. Reheis (Docket No. OSAH-DNR-SW-97-028), 1997 Ga. ENV LEXIS 12 (July 16, 1997).[38]

---

[37]    The Supreme Court relied on the facts detailed in the opinion of the Court of Appeals, which included the date the city entered into the agreement. Id.

[38]    The Bartram Environmental v. Reheis litigation is related to the Emmons case, and is an appeal by Bartram of EPD's denial of its application for a permit to operate a landfill in the City of Arcade. Id. (The citizens who opposed the permit were intervenors in the administrative hearing before OSAH and on appeal.)  OSAH's Final Decision, which was upheld by the Court of Appeals, found that Bartram filed an application for a permit in December 1994, and that EPD issued a letter of site suitability in February 1996. 1997 Ga. ENV LEXIS 12, at *2.   In or around September 1996, the city scheduled a public hearing on the permit under O.C.G.A. § 12-8-24(d), which must occur

23.

After Bartram's permit application had been pending before EPD for almost two years, citizens of the City of Arcade filed suit against the city for violation of the public notice and meeting provisions in Code Section 12-8-26.  Emmons, 270 Ga. at 196; Bartram Env't v. Reheis, 235 Ga. App. at 205.  The trial court found that the city had violated these provisions, voided the agreement, and enjoined the city from taking further action on the landfill.  Id.  On appeal, both the Court of Appeals and the Supreme Court upheld the trial court's finding that Code Section 12-8-26 had been violated and that the agreement was properly voided.  However, the Supreme Court reversed the Court of Appeals' ruling that the trial court was barred from issuing the injunction. Id., at 198.  The Court of Appeals had ruled that the trial court did not have jurisdiction to exercise control over EPD's administrative process regarding whether the permit should be granted under the Act.  Id.  In reversing the Court of Appeals on this issue, the Supreme Court held that "the administrative jurisdiction of EPD does not include a determination of whether the city has comported with meeting and notice requirements, and does not provide for remedies for the city's violation of O.C.G.A. § 12-8-26."  Id.

---

"not less than two weeks prior to the issuance of any permit."  Id.  The Superior Court of Jackson County temporarily enjoined the city from holding the public hearing, which was scheduled for September 9, 1996, so the city rescheduled the hearing and caused a notice to be published for a public hearing on November 6, 1996 at City Hall.  Id.  See also 235 Ga. App. at 205.  On November 4, 1996, the Superior Court enjoined the city from taking any further action relating to the landfill, including holding the public hearing on November 6.  Id.  Bartram quickly leased the Arcade City Hall for November 6 and held a meeting, telling the assembled public that this was the public hearing advertised by the city.  Id.  Bartram forwarded the transcript of the November 6 hearing to EPD, describing the hearing as being authorized and advertised by the City and held pursuant to O.C.G.A. § 12-8-24(d).  Id.  In upholding the ALJ's finding that Bartram had attempted to mislead EPD about the public hearing, the Court of Appeals held that "the required public hearing must be conducted by a 'governing authority' not a private entity," and the applicant's statements to EPD that the public hearing had occurred and been properly advertised were "clear and convincing evidence of misrepresentation."  Id., at 207.

24.

In this matter, the County and the Riverkeeper argue that this clear pronouncement of the Supreme Court does not mean what it says.  They argue that, in fact, the Act does give EPD the authority to provide remedies for the violation of Code Section 12-8-26, and they cite to the Director's general authority to enforce the Act and to deny permits to applicants when the provisions of the Act have not been met.  O.C.G.A. §§ 12-8-23.1(a)(1); 12-8-24(d); Ga. Comp. R. & Regs. 391-3-4-.02(1)(b) (permits may only be issued if the application meets the requirement of the Act and rules).[39]  EPD, on the other hand, has interpreted its role with respect to the public notice requirements in Code Section 12-8-26 in keeping with Emmons, disclaiming any authority or responsibility to determine whether local governments have complied with the Act in noticing and holding their meeting and requiring only that applicants provide documentation if such public meetings have occurred.[40]

25.

The particular facts of this case illustrate why EPD's jurisdiction does not include enforcing compliance with Code Section 12-8-26.  In Emmons the Supreme Court held that the issue of whether Code Section 12-8-26(a) requires a "needs meeting" depends on answering a factual question regarding whether the local jurisdiction has begun the process to select a site, a question that applies even when the site is for a private facility.  270 Ga. at 198.  In this case, the preponderance of the evidence in the record proved that County officials began an informal process

---

[39]  EPD's rules requires that whenever a county begins a process to select a site for a landfill or takes an action resulting in a siting decision for a publicly- or privately-owned landfill, "documentation shall be submitted which demonstrates compliance with O.C.G.A. 12-8-26[(a) and (b)]."  Ga. Comp. R. & Reg. 391-3-4-.05(b), 391-3-4-.03(1) and (2).

[40]  As Mr. Cook explained, EPD just looked to see if a meeting occurred, and "then we just checked the box that it did."

of selecting a site for a landfill before BCDP was even involved with the project, and certainly well before the February 2015 meeting when the consistency letters were formally approved.[41] However, by the time the application was filed with EPD in December 2016, the possibility of a public-private partnership between the County and BCDP had evaporated, and BCDP presented its application to EPD for a permit for a purely private landfill.  None of the evidence of the failed public-private partnership or the County's involvement in identifying a site for the landfill in February 2014 was presented to EPD in the application, and there is no record that EPD was ever put on notice that such evidence existed.[42]  Consistent with the Supreme Court's ruling in Emmons, this Court concludes that the Act did not require the Director to investigate whether the process of selecting the site for BCDP's private landfill was actually begun by local government officials, nor was EPD required to fashion a remedy for a violation of public meeting requirements under Code Section 12-8-26.

<div align="center">26.</div>

This is not to say that the public participation provisions in in the Act are not important components of the state's comprehensive solid waste plan or that the citizens of the County, including the Riverkeeper, were not denied a right to public notice guaranteed under Code Section

---

[41]    Among the evidence in the record cited by the Riverkeeper in their post-hearing brief on this issue, the January 2015 letter from Mr. Harbin to BCDP stands out as probative evidence that the selection of the site for the landfill originated with the County.  According to Mr. Harbin, when he first broached the idea of a landfill with the County, before BCDP was even involved in the project, "Brantley County was interested and they suggested the ± 1,187 acre Magnolia tract, set aside for a future industrial park, was available."

[42]    The County's January 2017 letter in opposition to the application did not mention Code Section 12-8-26(a) and did not reveal that the County had been involved in the process of selecting a site for the proposed private landfill. (Ex. J-11.)  In addition, even five years later, when the County wrote to EPD in December 2021 to explain in detail its grounds for opposition to the permit, the County focused on whether a siting decision meeting was required under O.C.G.A. § 12-8-26(b), and only stated in a footnote that "[a]rguably, a . . . needs meeting under O.C.G.A. § 12-8-26(a) should also have been held," but provided none of the evidence presented in this hearing to show the County's early involvement. (Ex. P-18.)

12-8-26.[43]   Rather, the administrative court is bound by the ruling of the Supreme Court in

Emmons, which has not been overturned or limited in subsequent cases and which clearly holds

that EPD's jurisdiction over solid waste permitting does not include enforcement of these rights

as they relate to the actions of local government in the process of site selection for solid waste

facility.  Consequently, the Court hereby **GRANTS** BCDP's Motion, and Count V of the Petitioner

is hereby **DISMISSED.**

## IV.   ORDER

As alleged in Count II of the Petition, the Permit was wrongfully issued because BCDP's

failed to submit a valid consistency letter for the proposed facility.  Accordingly, the Director's

decision to issue the Permit is hereby **REVERSED**.

**SO ORDERED**, this   27th   day of February, 2023.


**Kimberly W. Schroer**
**Administrative Law Judge**

---

[43]      "The implicit purpose of the notice requirements is to promote reasoned decisions on the location of waste facilities made after public discussion and to assure officials' accountability."  Grove v. Sugar Hill Inv. Assocs., 219 Ga. App. 781, 785 (1995), 1996 Ga. LEXIS 601 cert denied (citing O.C.G.A. § 12-8-26).  The Court of Appeals in Grove held that the General Assembly used mandatory language – the word "shall" – in fashioning the notice requirement" under the Act.  Id.  Nevertheless, the issue of non-compliance with the Act's public notice and participation requirements was addressed and remedied in Grove not through the EPD permitting process, but through a suit by citizens against the landfill operator and the city to void an agreement to expand the landfill that was adopted by the city without first complying with the notice requirements in Code Section 12-8-26.



## NOTICE OF FINAL DECISION

Attached is the Final Decision of the administrative law judge.  The Final Decision is not subject to review by the referring agency.  O.C.G.A. § 50-13-41.  A party who disagrees with the Final Decision may file a motion with the administrative law judge and/or a petition for judicial review in the appropriate court.

### Filing a Motion with the Administrative Law Judge

A party who wishes to file a motion to vacate a default, a motion for reconsideration, or a motion for rehearing must do so within 10 days of the entry of the Final Decision.  Ga. Comp. R. & Regs. 616-1-2-.28, -.30(4).  All motions must be made in writing and filed with the judge's assistant, with copies served simultaneously upon all parties of record.  Ga. Comp. R. & Regs. 616-1-2-.04, -.11, -.16.   The judge's assistant is Devin Hamilton - 404-657-3337; Email: devinh@osah.ga.gov; Fax: 404-657-3337; 225 Peachtree Street NE, Suite 400, South Tower, Atlanta, Georgia 30303.

### Filing a Petition for Judicial Review

A party who seeks judicial review must file a petition in the appropriate court within 30 days after service of the Final Decision.  O.C.G.A. §§ 50-13-19(b), -20.1.  Copies of the petition for judicial review must be served simultaneously upon the referring agency and all parties of record.  O.C.G.A. § 50-13-19(b).  A copy of the petition must also be filed with the OSAH Clerk at 225 Peachtree Street NE, Suite 400, South Tower, Atlanta, Georgia 30303.  Ga. Comp. R. & Regs. 616-1-2-.39.

Docket No.: 2228917-OSAH-BNR-SW-13-Schroer